N/S

1

Ejeme Joyce Aire

2

19528 Ventura Blvd, #697
Tarzana, CA 91356

3

|818 277 3102

4

Jayecyber@gmail.com

Pro Per

5

FEE
PAID

No CV 30

FILED
CLERK, U.S. DISTRICT COURT
04/29/2025
CENTRAL DISTRICT OF CALIFORNIA
BY _____ GSA _____ DEPUTY
DOCUMENT SUBMITTED THROUGH THE
ELECTRONIC DOCUMENT SUBMISSION SYSTEM

UNITED STATES DISTRICT COURT

6

7

CENTRAL DISTRICT OF CALIFORNIA

8

9

EJEME JOYCE AIRE,

Plaintiff,

10

vs.

11

12

ANTHONY O. EGBASE;

13

A.O.E LAW AND ASSOCIATES, APC;

14

DAVID INGRAM;

15

DAVID INGRAM LAW, APC;

16

17

ALICIA BLANCO, in her individual and official
capacities as judge of Los Angeles Superior Court;

18

TATYANA BETS, in her individual and official
capacities as clerk of Los Angeles Superior Court;

19

20

LINDA COMSTOCK, in her individual and official
capacities as clerk of Los Angeles Superior Court;

21

22

GEORGE CORONA, in his individual and official
capacities as Chief trial Counsel of State Bar of
California;

23

24

SUPERIOR COURT OF STATE OF CALIFORNIA,
LOS ANGELES COUNTY;

25

DOE DEFENDANTS 1 through 10, inclusive,

26

Defendant

27

28

COMPLAINT FOR DAMAGES,
INJUNCTIVE AND DECLARATORY
RELIEF    2:25-cv-03980-SVW-KS

Case No.:    ( To be assigned )

1. Domestic Violence (California
   Civil Code Section 1708.6)
   A. Fraud
   B. Forgery
   C. Lawfare (including perjury and
      Abuse of Legal Process)
   D. Coerced Debt
   E. Identity theft
   F. Falsified Court Records and
      Docket Tampering
2. Infliction of Emotional Distress
3. Breach of Fiduciary Duty
4. Fraud
5. Violations of 42 U.S.C. § 1983
   Fourteenth Amendment: Due
   Process

   A. Deprivation of Property based
      on Race/Age/Gender/Marital
      status/Financial status Equal
   B. Conspiracy to Deprive Plaintiff
      of Property without Due
      Process

1

C. Denial of Equal Access to

Court

6. Title VI of the Civil Rights Act
7. Violence Against Women
   Reauthorization Act, 42 U.S.C. ¬
   §12395(b): Gender-Based
   Violence and Discrimination

DEMAND FOR TRIAL BY JURY

## COVER SUMMARY OF CLAIMS

This action arises from a wide-ranging conspiracy to deprive Plaintiff of constitutional and statutory rights under color of law. Plaintiff asserts:

• Fraud Upon the Court through forged judicial documents, including a fraudulent bifurcation judgment, perjury, and falsified transcripts, carried out in collusion with court officers and attorneys.

• Concealment of Community Property, including the hidden proceeds of international legal contracts exceeding $100 million in value, fraudulently obtained during the marriage and unlawfully withheld from Plaintiff.

• 42 U.S.C. § 1983 violations for deprivation of due process, equal protection, access to courts, and property rights.

• 42 U.S.C. § 1985(2) and (3) claims for conspiracy to obstruct justice and interfere with civil rights.

• Fraudulent Conveyance of community assets through false instruments, nominee ownership structures, and strategic post-judgment real estate acquisitions.

• Disability Discrimination and Retaliation under the Americans with Disabilities Act (ADA) for denial of reasonable accommodations and advocate access.

• Gender-Based Discrimination under the Equal Protection Clause and Title VI of the Civil Rights Act of 1964, based on systemic family court bias favoring male litigants.

• Violation of the Violence Against Women Act (VAWA) through litigation abuse constituting ongoing domestic violence, coercive control, and financial strangulation.

• Legal Malpractice and Breach of Fiduciary Duty by former counsel, who abandoned Plaintiff mid-trial and suppressed evidence critical to Plaintiff's claims.

• Identity Theft and Financial Abuse, including fraudulent filings in Plaintiff's name, concealment of marital assets, and manipulation of financial records.

• Negligence and Deliberate Indifference by court clerks, court reporters, and the State Bar in facilitating and covering up fraudulent activity.

Plaintiff seeks compensatory damages, punitive damages, disgorgement of

concealed assets, imposition of constructive trusts over fraudulently acquired
properties, vacatur of fraudulent judgments, declaratory relief, injunctive relief,
and all other relief deemed just and proper.

Table of Contents

**I.**...........................................................................................................................**11**

**INTRODUCTION** ...............................................................................................**11**

PATTERN OF POLITICAL INFLUENCE AND ABUSE OF .............................................POWER

15

INITIATING THE LITIGATION WITH HIS CONSPIRACY WITH .........J. BLANCO TO FILE A FORGED DIVORCE DECREE WAS EGBASE'S SHOT ACROSS THE BOW SIGNALLING TO AIRE WHAT SHE WOULD BE FACING TO OBTAIN HER FAIR SHARE OF PROPERTY AND SUPPORT.                                       19

EGBASE'S HIDDEN $100 MILLION+ CONTRACT PROCEEDS, CONCEALMENT ........... OF COMMUNITY ASSETS, AND PLAINTIFF'S DEMAND FOR HER 50%  INTEREST            27

FRAUDULENT TRIAL MISREPRESENTATIONS AND POST-TRIAL ......... CONDUCT THROUGHOUT THE TRIAL:                                       36

FOREIGN ASSET DIVERSION AND UNDISCLOSED ............ INTERNATIONAL HOLDINGS

39

**II.** .........................................................................................................................**40**

**JURISDICTION AND VENUE** ...........................................................................**40**

**III.**........................................................................................................................**41**

**PARTIES** ............................................................................................................**41**

**IV.**.........................................................................................................................**43**

**ADDITIONAL FACTS** .................................................................................................**43**

**CALIFORNIA FAMILY COURT IS A DANGER TO MOTHERS** ................... **AND CHILDREN**

**43**

EGBASE SUBJECTED AIRE TO A PROLONGED PATTERN OF DOMESTIC VIOLENCE ..... THAT EXTENDED

BEYOND FINANCIAL ABUSE INTO PHYSICAL AND PSYCHOLOGICAL   CONTROL. EGBASE REGULARLY

EXERCISED PHYSICAL VIOLENCE AGAINST AIRE AND  THEIR  CHILDREN, PARTICULARLY TARGETING

THEIR OLDER SON, WHICH WAS   SUBSTANTIATED BY A  POLICE REPORT THAT WAS LATER

SUPPRESSED BY AIRE'S   ATTORNEY.                                        46

**THE BLOOM FIRM'S NEGLIGENCE AND COMPLICITY IN** ........ **ALLOWING DEFENDANT**

**EGBASE TO RECLAIM LITIGATION  CONTROL        50**

GROSS NEGLIGENCE BY LASC IN ALLOWING ......................................... ABANDONED CASE

53

SYSTEMIC FAMILY COURT MISCONDUCT ...........................................................................53

**TAX BENEFITS ABUSE, AND POST-BIFURCATION** ......................................... **MISREPRESENTATION**

**57**

**BARIIERS CREATED BY DEFENDANT SUPERIOR COURT OF** .... **STATE OF CALIFORNIA,**

**LOS ANGELES COUNTY ("LASC") IN  FAMILY CASES      64**

PROFILE OF ANTHONY EGBASE: ...................................................................................69

EGBASE'S MOTHER TREATED AS A SERVANT/BREEDER ..............................................69

EGBASE'S RISE TO PROMINENCE ...................................................... EGBASE'S IMPRESSIVE RESUME

70

PHOTO OF DEFENDANT ANTHONY EGBASE, APPEARING ON JUNE 13, 2017, AT THE  ... UNITED STATES

CONGRESS  AS PART OF A DIPLOMATIC DELEGATION REGARDING THE  RECOVERY OF $480 MILLION

IN LOOTED NIGERIAN FUNDS                                                    94

**NIGERIAN HOME.** ................................................................................................ 130

**LAW PRACTICE** ................................................................................................... 133

NIGERIAN LAW PRACTICE - NO MENTION OF IT IN EGBASE LAW ..................... 133

EGBASE'S CALIFORNIA BANKRUPTCY PRACTICE ........................................... 135

POST-JUDGMENT PROPERTY ACQUISITIONS ................................................... 135

USING HIDDEN FUNDS ....................................................................................... 135

**THEFT OF COMMUNITY FUNDS FOR "LOVE NEST". 880 WEST 1ST STR. UNIT** ............... **306, LA 90012**

138

**THE ILLEGAL EVICTION OF AIRE AND HER SONS.** .......................................... 147

**MOTION TO DISQUALIFY J. BYRD AND TWO MOTIONS FOR NEW TRIAL** ........ 149

**JUDICIAL HANDOFF CHAOS ENABLING FRAUD** ............................................. 149

**FAILURE TO PROTECT PLAINTIFF'S VULNERABLE ADULT CHILD** ................. 150

TAMPERING WITH EVIDENCE DURING APPEAL .............................................. 150

**MISUSE OF DATE OF SEPARATION CONTRARY TO FAMILY CODE §70** .......... 152

**TERMINATION OF SPOUSAL SUPPORT WITHOUT JURISDICTION** ................. 153

**LINDA COMSTOCK, COURT REPORTER** ....................................................... **155**

REFUSAL TO PRODUCE STENOGRAPHIC NOTES AND ASCII FILES ................ 157

**MALPRACTICE LAWSUIT AGAINST INGRAM** ................................................ **160**

**THESE FACTS JUSTIFY RELIEF UNDER 42 U.S.C. §1983. LEGAL** ................................. **CLARIFICATION**

168

**DISABILITY FRAUD, MEDICAL RETALIATION, AND CIVIL RIGHTS VIOLATIONS** ................ 173

**DISCRIMINATORY DENIAL OF ADA ADVOCATE ASSISTANCE** .................... **179**

**DENIAL OF ADA ADVOCATE** ....................................................................... **179**

**DUE PROCESS, EQUAL PROTECTION, AND ACCESS TO** .......................................... **COURT**

179

STATE BAR'S DELIBERATE SUPPRESSION OF CONFLICT- ...... OF-INTEREST EVIDENCE

AND INVESTIGATORY    OBSTRUCTION               203

DOMESTIC VIOLENCE,  CA CIV. C. SECTION 1708.6 - APPLIES TO EGBASE ...... AND A.O.E.  LAW AND

ASSOCIATES, APC                                          206

INTENTIONAL AND/OR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS .........APPLIES TO EGBASE,

A.O.E.  LAW AND ASSOCIATES, APC AND TO INGRAM AND  DAVID INGRAM LAW, APC ("INGRAM

LAW")                                              208

THIRD CAUSE OF ACTION ........................................................................................210

BREACH OF FIDUCIARY DUTY - COMMON LAW AND FAM. C. SECS. 721, 1100, ......... 1101, APPLIES TO

EGBASE; AND TO INGRAM AND INGRAM AND INGRAM LAW -  VIOLATION OF  CA ETHICAL RULES

1,1(A), 1.4, 1.7,  COMMON LAW - DUTY OF  LOYALTY                 210

EGBASE..........................................................................................................211

FOURTH CAUSE OF ACTION..................................................................................215

FRAUD BY CONCEALMENT AND MISREPRESENTATION - APPLIES TO EGBASE,  ........... A.O.E. LAW, J.

BLANCO, INGRAM, INGRAM LAW, BETS, COMSTOCK, AND   UNSUED J. BYRD...................................215

FIFTH CAUSE OF ACTION ....................................................................................220

42 U.S.C. SEC.1983 - FOURTEENTH AMENDMENT - CONSPIRACY TO DEPRIVE ............. PLAINTIFF OF

PROPERTY WITHOUT DUE PROCESS; DEPRIVATION OF PROPERTY     BASED ON

RACE/AGE/GENDER/MARITAL STATUS/FINANCIAL STATUS; DENIAL OF   EQUAL ACCESS TO COURT

- APPLIES TO EGBASE, A,O.E.  LAW AND    ASSOCIATES, APC;  INGRAM, DAVID INGRAM LAW J.

BLANCO, BETS,    COMSTOCK, AND UNSUED J. BYRD                 220

SIXTH CAUSE OF ACTION ......................................................................................225

TITLE VI, 1964 CIVIL RIGHTS ACT AS...........................................................................225

AMENDED APPLIES TO LASC............................................................................................225

**EIGHTH CAUSE OF ACTION** ............................................................................**228**

**VIOLENCE AGAINST WOMEN REAUTHORIZATION ACT , ("VAWA") 34 U.S. ... CODE SEC.12395(B): GENDER/RACE discrimination - APPLIES TO LASC                228**

**NINTH CAUSE OF ACTION**..............................................................................**230**

**TENTH CAUSE OF ACTION** ............................................................................**232**

**EQUITABLE RECLASSIFICATION AND PROTECTIVE RELIEF .. FOR PRIMARY MARITAL RESIDENCE                232**

**ELEVENTH CAUSE OF ACTION** .....................................................................**235**

FRAUDULENT CONVEYANCE, NOMINEE OWNERSHIP, AND CONCEALMENT OF ... COMMUNITY PROPERTY INTEREST                                              235

(AGAINST ANTHONY EGBASE AND VICTORIA EGBASE) ..............................................235

**TWELFTH CAUSE OF ACTION** ......................................................................**238**

**FRAUDULENT CONCEALMENT OF COMMUNITY PROPERTY .... INTEREST: 121 S. HOPE STREET                238**

**THIRTEEN CAUSE OF ACTION** ....................................................................**241**

**FOURTEENTH CAUSE OF ACTION**...............................................................**244**

FRAUDULENT POST-JUDGMENT ACQUISITION OF 10909 .. BALANTRE LANE USING HIDDEN COMMUNITY FUNDS (AGAINST DEFENDANT ANTHONY EGBASE) ....................................244

**FIFTEENTH CAUSE OF ACTION** ..................................................................**246**

FRAUDULENT CONCEALMENT OF COMMUNITY PROPERTY INTEREST - NIGERIAN ............. GOVERNMENT CONTRACTS AND ASSET RECOVERY PROCEEDS (AGAINST    DEFENDANT ANTHONY O. EGBASE) ........246

**PRAYER FOR RELIEF** ...................................................................................**249**

**JURY DEMAND**................................................................................................**254**

**EXHIBITS IN SUPPORT OF COMPLAINT** ........................................**256**

Fraudulent "Original" FL-180 Judgment (Filed August 3, 2017)..................258

Fraudulent Conformed Copy Submitted as Trial Exhibit (2019) ...............260

# I.
## INTRODUCTION

1. This action arises out of systemic judicial misconduct, **fraud upon the court,** docket tampering, unlawful denial of due process, collusion between officers of the court and private attorneys, and retaliatory actions to suppress Plaintiff's access to justice following a prolonged and abusive family law proceeding. It further arises from fraud upon the court in a family law proceeding filed in DEFENDANT LOS ANGELES SUPERIOR COURT ("LASC") and the forgery of judicial signatures and court records, including the fraudulent creation of a fictional procedure, a fictional hearing of a fictional bifurcated divorce proceeding, and submission of a forged divorce decree and a falsified Notice of Entry of Judgment by DEFENDANT ALICIA BLANCO ("J. Blanco") and DEFENDANT ANTHONY EGBASE, ("Egbase"), an attorney and the former husband of PLAINTIFF EJEME JOYCE AIRE ("Aire"). The fraudulent family law action was filed in a moribund dissolution case that Egbase had originally opened in 2007 in *Egbase v. Aire*, Case No. LD051587, and then abandoned after the couple reconciled.

2. In October 2016, the Bloom firm agreed to represent Aire. Rather than move to dismiss Egbase's earlier proceeding because it had lain dormant for over eight years, or alternatively, immediately start enforcing the

orders of child and spousal support, the firm did nothing except *to stipulate to dismiss Aire's case* BD645011 *without Aire's knowledge making her extraordinarily vulnerable in court.*

3. In April 2016, following a troubling discovery that Defendant Egbase had been secretly renting a condominium outside the marital home, Aire sought preliminary legal advice from her friend, Attorney Manny Ibay, regarding a potential petition for legal separation. After seeking guidance from her father and reflecting on the situation, Aire instructed Mr. Ibay not to take any further legal action at that time, choosing instead to attempt to preserve and reconcile the marital relationship.

4. Unbeknownst to Aire, Mr. Ibay filed the petition for legal separation sometime in May 2016 without her express authorization. At the time of this filing, Aire and Defendant Egbase were actively reconciling and had traveled together to Atlanta, Georgia, where they spent time as a family.

5. On July 31, 2016, Defendant Egbase returned from a trip to Nigeria. The following day, on August 1, 2016, Plaintiff Aire confronted Egbase regarding his refusal to submit her citizenship application and uncovered Egbase's financial misconduct, including unauthorized transfers, which exceeded over $2 million in community funds to offshore accounts through third-party intermediaries. In response, Plaintiff formally

informed Egbase of her decision to end the marriage. Egbase vacated the marital residence that same day, establishing August 1, 2016, as the legal date of separation in *accordance with In re Marriage of Davis (2015)*. Aire immediately instructed attorney, Manny Ibay, to proceed with serving Egbase with the pending petition.

6.  In light of these events, Plaintiff retained The Bloom Firm in October 2016, intending to file for dissolution of marriage. However, The Bloom Firm proceeded with using the prior legal separation petition originally filed by Mr. Ibay under **BD 640511. Defendant Egbase was formally served on October 29, 2016**, as confirmed by the Proof of Service. Plaintiff, due to her dyslexia, was unaware of the legal distinction between legal separation and dissolution of marriage, a fact that Defendant Egbase, an experienced attorney, exploited throughout the proceedings.

7.  Immediately after being formally served with the legal separation petition on October 29, 2016, Defendant Egbase took swift legal action to regain control over the narrative of the proceedings. On November 4, 2016, Egbase executed a Substitution of Attorney form (filed November 7, 2016), formally removing himself as his own attorney of record and retaining Maya Shulman of the Shulman Family Law Group as his

counsel. The substitution was filed in case LD051587 despite the fact that Plaintiff's pending matter, BD640511, had not yet been dismissed. This timing is significant because it reflects Defendant Egbase's premeditated strategy to revive the previously dormant LD051587 case, in which he was the petitioner, rather than proceed under the BD640511 matter that Plaintiff had initiated.

8.  Egbase's swift retention of counsel immediately upon service also supports Plaintiff's broader contention that he had always **intended to avoid a fair litigation under Plaintiff's terms**. His use of procedural mechanisms, including exhuming an inactive case where he maintained petitioner status, demonstrates **calculated manipulation of the judicial process**. Further, his reactivation of the LD051587 docket just days after Plaintiff's counsel served the separation petition reveals a coordinated effort to derail Plaintiff's pursuit of marital justice and spousal support. This maneuver set the stage for a series of procedural abuses, improper filings, and judicial bias that ultimately denied Plaintiff access to a fair and impartial tribunal.

9.   Plaintiff's dyslexia, which impairs her ability to differentiate complex legal terminology, contributed to her misunderstanding of critical procedural developments. Exploiting the lapse caused by The Bloom

14

Firm's withdrawal, Egbase, an experienced attorney well-versed in court

procedures, improperly diverted litigation into the previously dormant

LD 051587 case. As a result, Aire was compelled to represent herself pro

se, leaving her at a distinct disadvantage. Egbase then manipulated the

proceedings by asserting inconsistent and contradictory dates of

separation—claiming separation occurred in 2007, later shifting to 2015,

and ultimately testifying at trial that the move-out date was April 2016.

However, during prior hearings before Commissioner Alicia Blanco,

Egbase had identified August 2016 as the date he vacated the marital

home. These conflicting assertions were used by Egbase to obscure the

true facts and undermine Aire's position during trial.

PATTERN OF POLITICAL INFLUENCE AND ABUSE OF
POWER

10.Egbase exploited his financial standing, professional status, and extensive

political connections to corrupt the judicial process and engineer a

litigation environment fundamentally hostile to Plaintiff Aire. While Aire

was left financially devastated and legally unsupported, Egbase leveraged

his economic resources and entrenched political ties to insulate himself

from judicial accountability and directly manipulate the outcome of the

proceedings.

15

11. Egbase misappropriated marital assets, channeling funds to high-profile political fundraisers and making personal political donations— approximately $10,000 toward a fundraiser for Karen Bass and over $20,000 during the 2016 election cycle—while falsely claiming indigence in Los Angeles Superior Court to minimize his spousal and child support obligations.



12. Invitation to a 2021 political fundraiser hosted at Plaintiff's former residence by Defendant, Anthony Egbase in support of mayoral candidate Karen Bass. The event took place less than one year after Plaintiff and her son were unlawfully evicted during the pandemic. Plaintiff alleges the event was funded through undisclosed community assets concealed during divorce litigation

16

Photo of Defendant Anthony Egbase with Mayor Karen Bass at a political
fundraiser held at 4852 Queen   Florence Lane.

13. This was not merely the failure of a single judicial officer or legal

representative—it was the orchestration of a systemic scheme where

Egbase's wealth and political entrenchment enabled him to skew the

administration of justice, stripping Plaintiff Aire of due process and

perpetuating fraud upon the court.

14. In late 2016, when Aire sought records from the Van Nuys Courthouse,

she was informed that LD 051587 had been archived, as it had been

dormant for years. Despite this, Egbase, with the cooperation of court

personnel, unlawfully reactivated the case, bypassing mandatory

dismissal procedures under California Code of Civil Procedure §

583.310. The case was then assigned to Judge Shirley Watkins, with no

report how it was reassigned to Commissioner Alicia Blanco, who

collaborated with Egbase to falsify and produce a forged divorce decree judgment, resulting in grave violations of Aire's constitutional and procedural rights.

The Egbase-Blanco Collusion: Fabrication of Court Proceedings and Judicial Fraud in 2017

15. This conspiracy revived an abandoned dissolution action Egbase had filed in 2007 in *Egbase v. Aire*, Case No. LD 051587, which had lain dormant due to the couple's reconciliation.

16. What Egbase and J. Blanco (at the time, a commissioner) pulled off in LASC in 2017 is frightening and disturbing. If they can get away with their crime, which not only included forging court documents but actually creating an alt universe in which a hearing took place which never did, and a judgment of divorce was granted which never happened, a fictional hearing conducted by a judge which never heard it, then any kind of fraud and white-collar crime can be pulled off in LASC, causing enormous and untold harm to innocent litigants.

17. Egbase's motive for enlisting the services of J. Blanco to pull off this fraud was greed, pure greed. He did not want Aire to know about his earnings in 2015 and 2016 and that in 2016 he had received an attorney fee of over a million dollars from the Nigerian government.

18

18. He convinced J. Blanco to join with him in perpetrating the fraud and

creating the false alt universe of a proceeding, a hearing, and a judgment

so that he could file his income taxes for 2015 and 2016, which were

already overdue, as a single unmarried person—an act that constitutes tax

fraud, as he was still married for those tax years. Aire did not learn of the

million-dollar payment until after she had lost her property and support in

court. **This conduct not only defrauded Plaintiff but also constituted**

**federal tax fraud in violation of 26 U.S.C. § 7206(1) and 18 U.S.C. §**

**371 (conspiracy to defraud the United States).**

19. The astounding fraud of J. Blanco and Egbase set the tone and infected

the dissolution proceeding of Egbase and Aire. Because it did, the details

of the fraudulent divorce are alleged here in the Introduction because it

was so shocking and because it was the first act of litigation in the family

law proceeding.

INITIATING THE LITIGATION WITH HIS CONSPIRACY WITH
J. BLANCO TO FILE A FORGED DIVORCE DECREE WAS EGBASE'S
SHOT ACROSS THE BOW SIGNALLING TO AIRE WHAT SHE
WOULD BE FACING TO OBTAIN HER FAIR SHARE OF PROPERTY
AND SUPPORT.

20. Egbase immediately introduced the fraud and forgery he had been

engaging in during the marriage into the court proceeding. J. Blanco

entered into a conspiracy with him to file a forged "judgment of

19

bifurcation [of dissolution, or termination of marriage status]" (Rule 5.390), which is so ridiculous that the only reason the Blanco/Egbase conspiracy succeeded is because there is zero regulation and accountability of commissioners and judges at LASC.

21. The proof of forgery is found in the judgment documents J. Blanco and Egbase concocted, with critical disparities appear between the "original" document filed with the court and the "conformed" copy, see **Exhibit A and B (attachment)**, introduced at trial—both purporting to represent the same judgment. These documents display distinct handwriting, clerical markings, and judicial signatures that are inconsistent, the case summary, the declaration of Ms. Kulik, Egbase's former attorney who was representing him at the time Egbase and J. Blanco concocted the fraudulent judgment, time records of both attorneys for the parties, and the daily courtroom calendars for Judge Shirley Watkins between the dates of November 2016 and October 2017 (if they still exist), besides Aire's oath that she never attended a contested hearing on Egbase's motion ("Request for Hearing", or "RFO") for bifurcation for termination of marriage status in Judge Shirley Watkins' courtroom or in any other judge's courtroom.

22. Aire contacted Anthony Egbase's former attorney Annette Kulik and her former attorney (limited scope), Shannon Payne. Both attorneys confirmed that they had no knowledge of the bifurcation regarding termination of marriage status, and Kulik confirmed she had never represented Egbase in any hearing related to it. Kulik also signed a Declaration on August 8, 2017, stating she had never attended a hearing on behalf of Egbase seeking a bifurcation of dissolution (termination of marriage).

   A. The judgment itself does not indicate the date of the hearing (because the hearing never occurred.)

   B. On p.1 of the judgment at No. 4(a)(1), it states that the judgment of bifurcation (i.e., divorce) was entered on May 24, 2017, but on p.2 of the judgment next to Blanco's stamped signature or written signature (depending on which version of the judgment one is reviewing) it states the judgment was entered on August 3, 2017. **Because of their fraud, J. Blanco and Egbase confused the (concocted) date of the entry of (non-existent) judgment (in their imaginary universe, May 24, 2017) with the date of notice of entry of (concocted) judgment which occurred on August 3, 2017.**

21

C. The "judgment" states that it was received by LASC on June 2—,
2017 (second number not legible) for notice of entry of judgment.

D. According to Annette Kuilk's billing statement, on May 23, 2017,
Egbase requested for his attorney to prepare "Draft/revise dates on
Bifurcation request".

E. The notice of entry of judgment was not filed until August 3, 2017,
**75 days after the fictional hearing** pronouncing entry of
judgment of bifurcation on May 24, if May 24 was the date of the
hearing. This was done purposely to throw off the sleuths. As
shown, infra, Egbase did file a noticed motion for bifurcation
judgment on June 28. By ensuring the notice of entry of judgment
was not filed until August 3, 2017, it masks the false date of the
judgment of bifurcation of May 24 and that the bifurcation had
occurred after Egbase had filed his (real) RFO for bifurcation.

F. The "conformed" notice of entry of judgment copy does not
"conform" to the original notice because it is different from the
"original" notice of entry. The signatures of the clerk are distinctly
different, possibly because one clerk signed one forged notice of
entry, and another clerk signed yet another forged notice of entry.

22

The document, submitted for trial, marked Ex. 000001, by Egbase, has Egbase's handwriting on it, signing for the clerk P. Morejoin.

G. The "judgment" states a contested hearing was held on some unknown date. Egbase and his attorney Annette Kulik were present. Besides Kulik's declaration stating she never attended any hearing on termination of status on behalf of Egbase, her time/billing records also do not show she was in court on some unknown date in a contested hearing on the bifurcation of marital status motion between November 2016 and October 4, 2017 (if even then), in which May 24, 2017, was selected as the date the marriage was dissolved (i.e., divorce was granted).

H. To facilitate this fraudulent operation, Egbase orchestrated the substitution of his attorney, Annette Kulik, on August 10, 2017, after instructing her on May 23, 2017, to prepare documents for the bifurcation dissolution of marriage to review, as evidenced by her billing statement. By substituting Kulik, Egbase ensured all forwarded documents would be mailed directly to him, bypassing his prior counsel. This maneuver allowed Egbase to maintain control over communications and court filings, including the use of Kulik's letterhead to commit fraud.

23

I.   The "judgment" states that Aire was present without an attorney, She was never present at a contested hearing on bifurcation at any time, ever, with or without an attorney.

J.   There are two different second pages of the judgment. J. Blanco's name appears as signing this "judgment," but according to p.1 of judgment, Judge Shirley Watkins was the hearing officer, not Commissioner Blanco, at the contested hearing. On one second page, J. Blanco's name is stamped, and J. Watkins' typed name is whited out. On the other second page, J. Blanco's signature appears, maybe twice, and so does J. Watkins' name typed in. Later, in a hearing, in October 2017, J. Blanco and Egbase gaslighted Aire as J. Blanco argued that there had never been a hearing on the bifurcation where she was present (true), while both of them insisted the hearing had taken place. Aire did not confront J. Blanco with the fact she had signed the forged bifurcation judgment. J. Blanco did admit she was not present at the contested hearing (and yet signed the judgment). J. Blanco stated she was certain Aire was present at the hearing, and it was contested because the forged document stated Aire was present and the hearing was contested. This is question begging since Egbase/J.

24

Blanco forged the document, thus relying on their own forgery to gaslight Aire.

K. Even if this fictional hearing occurred before J. Watkins – which it did not because it never happened – Commissioner Blanco was not involved in the Egbase case, and there is no stipulation of the parties allowing her to serve as a judicial officer in the case until August 24, 2017. Without a signed stipulation of the parties, **J. Blanco was without jurisdiction even to sign a forged judgment on August 3, 2017,** let alone an authentic one. Neither Egbase nor J. Blanco nor LASC has explained why, if the hearing was conducted by J. Watkins, the judgment was not signed by J. Watkins.

L. The case summary conclusively establishes that Egbase or his attorneys never filed a noticed motion or ex parte application seeking a bifurcation of termination of marriage status between November 2016 when Egbase illegally revived his expired dissolution case and May 24, 2017, the date Egbase and J. Blanco chose as the date the divorce or bifurcation was granted in a fictional contested hearing before J. Watkins.

M. The case summary does not indicate that Judge Shirley Watkins conducted a contested hearing on Egbase's RFO or ex parte application for a bifurcation between November 2016 and May 24, 2017.

N. Egbase filed a noticed motion for bifurcation of marital status on June 28, 2017, with a hearing date of October 4, 2017. This is, in a word, crazy making. He was supposedly present at a contested hearing on a date when J. Watkins granted his motion for a divorce judgment effective May 24, 2017. The judgment of termination of status was entered on May 28, 2017, according to the judgment J. Blanco signed. As stated above, before June 28, 2017, there is no entry in the case summary for Egbase's noticed motion or ex parte application for bifurcation nor is there an entry in the case summary showing that a contested hearing on Egbase's nonexistent RFO or motion for bifurcation occurred on May 24, 2024, or at any other time between November 2016 and August 3, 2017.

O.  Aire was very puzzled when she received Notice of Entry on Judgment and the "[deficient] Judgment of marital status" sometime in August 2017 when just prior to the receipt of the

26

judgment she had received Egbase's June 2017 Motion to

Bifurcate. It took her some time to realize that the judgment was a

fraud.

23. This fraud occurred early on in the litigation, about six months after

Egbase reopened his expired dissolution case. It set the stage and was an

omen of what was to come for Aire, fraud and litigation abuse resulting

in destitution for Aire. LASC endorsed this fraud and J. Blanco/Egbase's

forgery of court documents.


**Egbase's Hidden $100 Million+ Contract Proceeds, Concealment
of Community Assets, and Plaintiff's Demand for Her 50%
Interest**

24. During the marriage between Plaintiff Ejeme Joyce Aire ("Plaintiff") and

Defendant Anthony O. Egbase ("Egbase"), both parties jointly supported

Egbase's legal career, with Plaintiff actively promoting and participating

in Egbase's public relations efforts to attract high-profile international

contracts.

25. Egbase established two separate law practices during the intact marriage

— A.O.E. Law & Associates, Inc. (California) and Anthony Egbase &

Associates (Nigeria) — both of which operated to capture the substantial

opportunities developed through marital labor and marital sacrifices, thus

rendering their revenues community property under California law.



26.

27. At no point during the dissolution proceedings did Egbase disclose,

violated his fiduciary duties under California Family Code §721 and

§1100.

•    The Nigerian law firm (Anthony Egbase & Associates).
•    The revenues and receivables earned abroad.
•    His increasing financial interests' post-contracts.
•    The international luxury purchases funded by hidden proceeds.

   **Nigerian Government Contracts and Cases Secured During the Marriage**

28. **On or about March/April 2016,** Defendant Egbase, individually and

through **A.O.E. Law and Anthony Egbase & Associates**, was engaged

by the **Federal Government of Nigeria** and secured at least seven (7) major cases/contracts, including but not limited to:

29. **The Abacha Loot Recovery** ($550 Million) - United States v. All Assets in Account No. 80020796 (Case No. 1:13-cv-01832).

30. **The Alamieyeseigha Asset Recovery** (Boston assets) - United States v. Solomon & Peters, Ltd. (Case No. 8:11-cv-00662-RWT and 1:11-cv-10606-RWZ).

31. **The James Ibori Asset Recovery** - Queen's Bench Division & U.S. District Court enforcement actions.

32. **Federal Republic of Nigeria v. M/Y Galactica Star Yacht** - U.S. District Court (Texas) civil forfeiture of luxury yacht valued at $144 Million (Case No. 4:17-cv-02166).

33. **The IPOB Lawsuit Defense** - Doe v. Tukur Yusuf Buratai et al. (Case No. 1:17-cv-01033, U.S. District Court, D.C.) where Egbase represented 27 Nigerian top officials against allegations of human rights violations.

*(Case No. 1:17-cv-01033-DLF) - IPOB case dismissed based on jurisdiction and foreign-official immunity grounds)*

34. **Abuja v. Alison-Madueke Assets Recovery** - Action to recover $144 Million in luxury assets, including apartments and a yacht seized in the United States.

35. Additional Unlisted Cases - initiated and anticipated based on letters from **the Attorney General of Nigeria** confirming future enforcement and asset recovery actions.

36. Each engagement carried potential legal fees of approximately **40%** of recovered assets, per standard contingency agreements used for international recovery actions, confirmed by comparable cases such as the **Godson Nnaka claim** ( Nigerian attorney based in America) in the U.S. District Court (seeking 40% of recovered funds).

37. Both corporations (**A.O.E Law & Associates, Inc and Anthony Egbase & Associates)** were involved in representing sovereign clients like the Federal Republic of Nigeria and engaged in highly lucrative asset recovery operations.

38. **Despite this, Egbase falsely represented himself during trial proceedings as lacking any substantial income,** further defrauding the court and the community property estate.

**Marital Contributions and Ongoing Relationship**

39. Plaintiff made substantial, uncompensated contributions of labor, emotional support, and public relations work which directly enhanced Defendant's professional standing and ability to secure lucrative

international contracts, including but not limited to the contracts awarded

by the Federal Republic of Nigeria. :

> Organizing and participating in events (e.g., Special Olympics at USC
> to showcase Nigerian community).
> Promoting Defendant's reputation in Nigerian diaspora communities.
> Attending government-related events and public relations
> engagements.
> Maintaining the family home and raising the children, freeing
> Defendant to travel extensively.

40. On or about August 2, 2015, Plaintiff and Egbase jointly attended and co-

hosted the "**Team Nigeria Wins Big**" **Posted on Anthony Egbase**

**Facebook page, on August 5, 2015**. event at the Special Olympics held

at the University of Southern California (USC), alongside Nigerian

representatives and California dignitaries. This public relations event was

strategically orchestrated to raise Egbase's profile among Nigerian

government officials. Importantly, this event occurred after the **false date**

**of separation claimed by Egbase (February 22, 2015**), clearly

demonstrating the intact marital partnership during the critical time of

contract acquisition.

41. Plaintiff's active and visible participation in these activities was

instrumental in boosting Egbase's candidacy for multimillion-dollar

Nigerian government asset recovery contracts.



42. Egbase's Thanksgiving text messages sent -2015 also support the fact that he was predominantly residing and working in Nigeria during that critical time, **pursuing contracts** that bore fruit in early 2016. His consistent absence, as confirmed by:

    Travel schedules
    Communications
    Work product from Nigeria
    Numerous letters and contracts dated **March 2016**

43. All affirm that the contracts, profits, and future entitlements were fruits of labor during the marriage, and thus **presumptively community property** under **California Family Code §760.**

44. The strong meaning of the text messages is that **while Egbase was sending affectionate messages remotely**, his physical location and professional focus were geared toward business efforts in Nigeria. He

32

made calculated moves to secure massive contracts **for personal gain,** intending to exclude the spouse from the resulting wealth.

45. Egbase spent over **90% of his time between 2014 and 2016** in Nigeria, working actively to secure high-value, government-related contracts. His efforts paid off when, in **March 2016**, during the marriage, he was **retained by the Federal Government of Nigeria** to represent the country in major corruption and asset recovery cases.

46. By fraudulently misrepresenting the date of separation and failing to disclose material assets, Defendant Egbase:

- Breached his **fiduciary duty** under California Family Code §§ 721 and 1100,
- Engaged in **constructive fraud** and **intentional concealment**,
- Deprived Plaintiff of her lawful **50% community property interest** in proceeds conservatively estimated at **over $100 million**.

47. In March 2016, Egbase and A.O.E. Law were officially retained by the Federal Government of Nigeria to represent Nigeria's interests in multiple high-value asset recovery matters, including but not limited to:



48. Additionally, Egbase, through A.O.E, Law, represented **the Federal Republic of Nigeria** and over 27 top Nigerian officials in defense of claims brought by the **Indigenous People of Biafra (IPOB***)* in the United States District Court for the District of Columbia. This case, involving hundreds of millions of dollars, was successfully dismissed in favor of Nigeria and its officials in July 2018.

(See, "Federal Government wins case filed by IPOB in U.S. District Court.", Linda Ikeji's Blog, July 24, 2018.)

34

49. Plaintiff alleges based on documentation and public reports that **Egbase received payments exceeding $200 million+ for these representations**.

50. Egbase's own contemporaneous messages reinforce the marital partnership's **sacrifices** toward this achievement. **In a Thanksgiving 2015 Facebook Messenger exchange, Egbase wrote**:

51. *"My darling and my wonderful boys. I wish you all happy Thanksgiving. I want you to know it hurts not to celebrate this Thanksgiving holiday with you. However, sometimes we have to make sacrifices so that we have better and more prosperous Thanksgivings in years to come. I love you and I hope you join me in this **sacrifice.**"*

52. Plaintiff responded affirmatively, evidencing continued marital unity and disproving Egbase's fabricated claims of early separation.

53. Following the success of these contracts, Egbase engaged in substantial financial transactions that directly reflect the concealment of community assets, including:

    - Paying down over $820,000 in mortgage obligations on 4852 Queen Florence Lane between November 2015 and April 2016. Immediately after trial.
    - Purchasing 10909 Balantrae Lane, Potomac, Maryland, for $1,499,000 (July 16, 2021).
    - Purchasing 3199 Bel Air Drive, Las Vegas, Nevada, for $1,438,800 (December 23, 2021).

54. In addition to luxury real estate, Egbase acquired multiple high-value

35

vehicle shortly after the trial concluded :
- **A Brand-New Chevrolet Suburban SUV**
- A Brand-New Ford Mustang sports car
- A Mercedes-Benz G-Wagon (G63 AMG) luxury SUV
- Two (2) Brand New Tesla vehicles
  Including a Model 3 and a Model S.

55. Egbase intentionally failed to disclose the existence of these Nigerian

contracts, the contingency payments, or the resulting assets during

marital dissolution proceedings, breaching his fiduciary duties under

California Family Code §§ 721 and 1100.

56. Egbase's concealment constitutes extrinsic fraud warranting equitable

remedies, including the setting aside of prior judgments under California

Code of Civil Procedure § 473(d).

*In re Marriage of Rossi (2001) 90 Cal.App.4th 34: Concealment of post-separation lottery winnings was held fraud*


### Fraudulent Trial Misrepresentations and Post-Trial Conduct Throughout the trial:

57. Egbase presented himself as destitute, driving a Toyota, unable to pay his

son's school fees, and burdened with three folders of unpaid debts.

58. He testified falsely that he was financially struggling, and his properties

were under foreclosure.

59. He never disclosed his substantial earnings from the Nigerian

government cases or his newly established firm in Nigeria.

36

60. However, immediately after the trial concluded in November 2019 - and even before the final judgment was signed - Egbase began making large payments on the family property located at 4852 Queen Florence Lane, which he had previously defaulted on since February 2017.

**During litigation (2017-2019):**

61. Egbase deliberately withheld mortgage payments on the family home to create the impression of financial hardship while using legal tactics (as a bankruptcy attorney) to stall foreclosure proceedings.

**After trial (Nov-Dec 2019):**

62. Egbase resumed payments on substantial arrears, quickly paying off loans and liens once it became clear the property would be awarded solely to him under Judge Christine Byrd's judgment.

63. Egbase stopped paying the mortgage in February 2017 but strategically resumed payments only after he secured ownership through the trial verdict. This behavior further supports Plaintiff's contention that Egbase had undisclosed sources of funds and manipulated the judicial process.

**Community Property Interest in Contracts Awarded During Marriage**

64. Regardless of the nominal designation under which the Nigerian government contracts were awarded, Plaintiff alleges that the contracts, earnings, and resulting assets are properly characterized as community property under California Family Code § 760. Under California law, community property includes all earnings, efforts, skills, labor, and opportunities acquired during marriage, irrespective of title or registration.

65. Here, the contracts awarded to Defendant Anthony O. Egbase and/or his associated law firms (A.O.E. Law & Associates, Inc. and Anthony Egbase & Associates) were obtained through sustained efforts, goodwill, business development, and labor undertaken during the marriage, with substantial contributions from Plaintiff, including public relations support, family sacrifices, promotional activities, and maintenance of the marital household while Defendant traveled extensively to secure these contracts.

66. As such, the contracts themselves, the contingency fees, recovered funds, law firm receivables, and all resulting real and personal property

acquisitions constitute community property in which Plaintiff holds a

vested 50% interest.

67. Any attempt by Defendant to characterize the contracts or proceeds as

"separate property" constitutes fraudulent concealment and breach of

fiduciary duty under California Family Code §§ 721 and 1100.

68. Plaintiff further alleges that the concealment of these lucrative

engagements, and the proceeds flowing from them, materially deprived

her of her rightful share of the community estate, warranting appropriate

remedies including constructive trusts, disgorgement, punitive damages,

and vacatur of fraudulently obtained judgments.

1. community property,
2. 50% minimum interest,
3. gross recoveries,
4. equitable relief like constructive trust and disgorgement.

FOREIGN ASSET DIVERSION AND UNDISCLOSED INTERNATIONAL HOLDINGS

69. Plaintiff alleges that during the course of the marriage, Defendant Anthony Egbase used community funds to conduct business ventures and purchase real estate in Nigeria. Egbase maintained political and legal relationships with the Nigerian government and its entities, which he leveraged using community assets. These actions were concealed from Plaintiff, and Egbase never disclosed the existence, location, or financial benefits derived from these foreign holdings. Plaintiff seeks a full accounting of all assets acquired through government contracts, trusts, partnerships, or transfers involving the Nigerian government or affiliated entities, and requests the imposition of a constructive trust over any resulting property or proceeds.

## II.
## JURISDICTION AND VENUE

70. This Court has jurisdiction under 28 U.S.C. § 1331 (federal question), as this case arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983 (civil rights violations), forgery of court seals and judicial signatures, and Title VI of the Civil Rights Act. Plaintiff asserts violations of her rights to due process, equal protection, and access to the courts.

71. Supplemental jurisdiction is proper under 28 U.S.C. § 1367(a), as Plaintiff's state law claims arise from the same core of operative facts as the federal claims, forming part of the same case or controversy.

72. Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred within this District, and the primary defendants, including judicial actors, attorneys, and court staff, reside or conduct business here.

73. Plaintiff also seeks declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, to prevent further harm arising from continuing judicial fraud and constitutional violations under color of state law.

74. Defendants acted under the color of state law in their official capacities, abusing the judicial process to falsify records, fabricate a bifurcation

judgment, and strip Plaintiff of property and legal standing without a lawful hearing, in violation of Plaintiff's civil and constitutional rights.

75. Plaintiff respectfully asserts that federal jurisdiction is proper and necessary to prevent ongoing harm, ensure impartial review, and preserve access to justice where state remedies have proven structurally inadequate or unavailable due to conflicts of interest and systemic failures.

76. Plaintiff, a pro se litigant, respectfully reserves the right to amend and supplement this complaint to include additional factual allegations and legal claims as may become apparent during discovery or further review.

## III.
## PARTIES

77. Aire is a resident of Los Angeles County and the respondent in a family law case filed in LASC, *Egbase v. Aire*, Case No. LD 051587. She is the former wife of Egbase.

78. Egbase is a resident of Los Angeles County and the petitioner in a family law case filed in LASC, *Egbase v. Aire*, Case No. LD 051587. He is the former husband of Aire. Egbase caused the harm Aire has suffered as alleged in this complaint.

79. AOE LAW AND ASSOCIATES, APC also known as Anthony O.

Egbase & Associates Attorneys At Law is the law firm owned by Egbase.

Its office is located in Los Angeles. He also owns another law practice in

Nigeria, Anthony Egbase and Associates. Egbase has over 18 employees

in the L.A. office. The firm is the alter ego of Egbase and is liable for the

harm Aire has suffered as alleged in this complaint. Currently the law

practice is valued at over five million dollars.

80. DAVID INGRAM ("Ingram") is an attorney licensed to practice in

California. He caused the harm alleged in this lawsuit while representing

Aire in the trial regarding support and division of property.

81. DAVID INGRAM LAW, APC is the name under which Ingram conducts

his law practice. Ingram caused the harm Aire has suffered as alleged in

this complaint.

82. SUPERIOR COURT OF STATE OF CALIFORNIA, LOS ANGELES

COUNTY, LASC is a court vested with judicial power of the State of

California pursuant to Article VI, Sec. 1, CA Constitution. Aire is suing

LASC for a declaratory judgment and for damages based on the status of

LASC as a recipient of federal funding. It caused the harm Aire has

suffered as alleged in this complaint.

83. ALICIA BLANCO ("J. Blanco") is a former commissioner who was appointed as a judge of LASC. She conspired with Egbase to file a forged court document, the "Bifurcation of Marital Status Judgment" by signing it in 2017. She caused the harm Aire has suffered as alleged in this complaint. She is sued in her individual and official capacity as former commissioner of LASC for a declaratory judgment.

84. TATYANA BETS ("Bets") is a clerk employed by LASC. She is sued for a declaratory judgment in her individual and official capacities as clerk of LASC. She caused the harm Aire has suffered as alleged in this complaint.

85. LINDA COMSTOCK ("Comstock") is a court reporter who falsified a transcript in the Egbase family case, causing harm to Aire. She caused the harm Aire has suffered as alleged in this complaint. She is sued for damages and for an injunction.

86. GEORGE CORONA, is the chief Counsel of the State Bar of California, is sued in his Official Capacities.

IV.
ADDITIONAL FACTS

CALIFORNIA FAMILY COURT IS A DANGER TO MOTHERS AND CHILDREN

Systemic Family Court Misconduct

43

87. Contrary to the assertion that Aire's case fell outside the systemic anti-woman practices of California family courts, Aire and her children were subjected to the very same institutionalized bias and misconduct. Throughout the proceedings, multiple judges and attorneys colluded to marginalize Aire's parental rights and obscure the dangers posed by Egbase.

88. In November 2017, during a custody hearing before Judge Slawson, Egbase, despite being largely absent while residing in Nigeria, aggressively pursued 50/50 custody to minimize his child support obligations. Judge Slawson, aware of the broader pattern, warned: "Throughout the years, I've had - I can't recall if it was two or three cases of children who attempted to kill themselves because their parents cannot stop fighting. You guys have been at this now for almost nine years of the divorce, just hanging there. So I just hope you focus not on yourselves, not on the money. Normally when people come in and say 50/50, so, what that really means is child support, to get that number up. The Court's done this, folks, for 17 years."

89. Following this, Judge Slawson privately interviewed the parties' minor son, who explicitly requested to only visit his father three days a year,

citing fear and apprehension. The judge assured the child that his wishes would be respected.

90. However, in a conspiracy involving Judge Christine Byrd, Egbase, Aire's attorney David Ingram, court reporter Linda Comstock, and others, the minor's testimony was disregarded. Ingram failed to produce both the transcript of this critical testimony and Egbase's passport—evidence showing Egbase's near-permanent absence from the United States.

91. Instead, Judge Byrd used a DARVO tactic, casting doubt on Aire's fitness as a parent and ruling in favor of 50/50 custody, primarily to shield Egbase from financial responsibility. Post-trial, Egbase continued to alienate the children, refusing them access to the family home and avoiding meaningful parental contact.

92. Additionally, during trial proceedings, the court willfully ignored and suppressed crucial evidence regarding Aire's older son's severe mental health condition—an issue protected under Family Code § 3910. Aire's reports were erased from the transcript, and no adult child support order was entered. This negligence contributed directly to her son's psychiatric hospitalization under Section 2 of the UK Mental Health Act, causing lasting and irreparable harm.

93. Aire's case is emblematic of the broader failures of California's family court system, where anti-woman practices, judicial misconduct, and the erasure of critical evidence continue to harm mothers and children alike.

> Egbase subjected Aire to a prolonged pattern of domestic violence that extended beyond financial abuse into physical and psychological control. Egbase regularly exercised physical violence against Aire and their   children, particularly targeting their older son, which was substantiated by a  police report that was later suppressed by Aire's attorney.

94. Despite Aire's lack of knowledge, Egbase concealed large sums of community funds, diverting them to accounts in Nigeria under the names of third parties, including his sister, Victoria Egbase. Egbase also concealed the existence of a joint account that he managed without Aire's awareness, allowing him to transfer community funds abroad throughout the marriage.

   A. In furtherance of his fraud upon the court and financial concealment, Defendant Egbase intentionally failed to disclose his international banking relationships, including an active **Barclays Bank account in London** and a domiciliary account through which he received undisclosed payments from the Nigerian government for legal contracts. Plaintiff had direct knowledge of these accounts and provided the account number and formal

requests to her trial attorney, Defendant David Ingram, asking that

the accounts be subpoenaed during discovery. However, Ingram

willfully failed to act, ignoring Plaintiff's emails and formal

discovery instructions. Instead of formally pursuing the matter,

Ingram mocked Plaintiff's request in open court by casually asking

Egbase if he had a London bank account, to which Egbase falsely

replied "no." Egbase's refusal to produce documentation or submit

to formal financial disclosure regarding these accounts constituted

not only fraud but also a material omission that prevented the court

from assessing the full extent of community property. Egbase's

reluctance to reveal the account may be attributable to strict anti-

money laundering and disclosure regulations in the United

Kingdom, which would have triggered scrutiny had he attempted

to depict substantial deposits without lawful justification. At the

time of the first ex parte application initiated by Ingram, Egbase

was actively appealing an adverse judgment in London in

connection with his Nigerian government contracts, further

evidence of the financial scope concealed from the court and

Plaintiff.

95. LASC did not insure that J. Blanco immediately rule on Aire's request for needs-based attorney fees. It did not insure Aire had sufficient fees for the duration of the case. It failed to insure she had continuing spousal support until she became self sufficient to support herself. It failed to provide adequate supervision of its jurists so that J. Blanco could not engage in the outlandish. Egbase conspired with judicial actors in the creation of a proceeding which never occurred and a judgment which was never granted by any judge. It allowed J. Byrd, whose record of misconduct is so blatant that it is clear she was working hand in glove with Egbase and Ingram while pretending to simulate due process. It encouraged fraud so that a clerk signed a false writ of execution and issued it to Egbase while making sure its issuance was not reflected in the case summary of the unlawful detainer and a reporter felt empowered to falsify her transcript she provided to Aire.

96. The Court of Appeal exacerbated the injustice by refusing to grant Plaintiff an extension to file her opening brief, dismissing her appeal at Defendant Egbase's request despite clear evidence of transcript tampering by Court Reporter Comstock. The appellate court's refusal to compel correction of the record denied Plaintiff meaningful appellate review, further entrenching the due process violations described herein.

48

97. Aire is also a victim of a pattern of misconduct on the part of

DEFENDANT LOS ANGELES SUPERIOR COURT ("LASC") against

mostly mothers and children, and some fathers whereby LASC allows

judges to routinely nullify the family code statutes opening the door for

them to routinely violate the due process and equal protection rights of

parents, mostly mothers (and their children). The appellate courts,

including the Supreme Court of California, back up these renegade

family court judges.

98. Plaintiff is the sole caregiver for her adult son, who has been medically

diagnosed with a chronic mental illness. As a direct consequence of the

defendants' actions—including judicial sabotage, housing instability, and

financial deprivation—Plaintiff and her son have been subjected to

repeated cycles of homelessness, interruptions in medical care, and

profound emotional trauma. Plaintiff's caregiving duties have become

even more demanding due to the lack of stable housing and financial

support. The family court's refusal to recognize and enforce protections

under California Family Code § 3910 has directly contributed to this

crisis. Plaintiff urgently seeks judicial acknowledgment of the special

circumstances surrounding her son's condition and requests that the

Court order the creation of a structured Special Needs Trust to ensure

49

continuity of care, housing stability, and long-term security for her son.

Such a trust is essential to preserve his dignity, meet his medical and

daily living needs, and enable Plaintiff to fulfill her caregiving

responsibilities without the constant threat of destitution or displacement.

### THE BLOOM FIRM'S NEGLIGENCE AND COMPLICITY IN ALLOWING DEFENDANT EGBASE TO RECLAIM LITIGATION CONTROL

99. In October 2016, Plaintiff retained The Bloom Firm, a high-profile law

firm, to represent her in her dissolution of marriage proceeding against

Defendant Anthony Egbase. The engagement was formalized through a

retainer agreement executed on or about October 18, 2016. Plaintiff,

unfamiliar with the legal distinctions between legal separation and

dissolution of marriage, reasonably relied on The Bloom Firm to

safeguard her legal interests and to prosecute her claims for spousal

support, property division, and relief from domestic violence.

100.   On October 29, 2016, Defendant Egbase was formally served by The

Bloom Firm in case BD640511, the proceeding Plaintiff initiated through

her former counsel, Attorney Manny Ibay. Rather than moving swiftly to

consolidate or dismiss Egbase's dormant and expired 2007 case

(LD051587)—a case which had remained inactive for nearly nine

years—The Bloom Firm took no action. Instead, and without Plaintiff's

informed consent or understanding, The Bloom Firm voluntarily stipulated to dismiss Plaintiff's active case (BD640511), thereby stripping her of her procedural advantage and leaving her exposed to Egbase's legal machinations.

101.   Within days of being served, Defendant Egbase filed a Substitution of Attorney on November 4, 2016, formally substituting in Attorney Maya Shulman into LD051587. The filing was deliberately timed and designed to reassert his role as Petitioner, despite the procedural abandonment of LD051587 for nearly a decade. Egbase's substitution was a calculated attempt to seize control of the litigation and to prevent Plaintiff from prosecuting her case on her own terms.

102.   The Bloom Firm failed to challenge Egbase's improper procedural tactics. They did not file a motion to dismiss LD051587 for failure to prosecute under California Code of Civil Procedure § 583.310, nor did they petition for judicial intervention to consolidate the actions in a way that preserved Plaintiff's interests. The firm also failed to advise Plaintiff of her right to continue litigating in BD640511 and failed to protect her from being forced into Egbase's forum of choice.

103.   After the dismissal of Plaintiff's case, The Bloom Firm abruptly ceased representation and withdrew without adequate notice or transition,

leaving Plaintiff—who is dyslexic and was untrained in the law—to

proceed pro se against an experienced litigator. This withdrawal placed

Plaintiff at a grave disadvantage and directly enabled Egbase to

perpetuate fraud upon the court, including the submission of falsified

documents and the orchestration of a bifurcation judgment forged in

collusion with Commissioner Alicia Blanco.

104.   As a result of The Bloom Firm's inaction, neglect, and premature

withdrawal, Plaintiff was denied due process, lost access to equitable

remedies, and was forced to litigate under procedurally compromised

circumstances. The firm's conduct constitutes legal malpractice, breach

of fiduciary duty, and a violation of Plaintiff's constitutional rights to fair

access to court and meaningful representation.

105.   The abrupt abandonment by The Bloom Firm left Plaintiff, a dyslexic

stay-at-home mother, financially vulnerable and exposed to Egbase's

manipulations, causing immense distress.

**Bloom Firm's Breach of Fiduciary Duty**

106.   The Bloom Firm not only failed to protect Plaintiff's interests but

financially coerced her by demanding unaffordable retainer increases and

abandoning representation when she could not pay. This withdrawal left

Plaintiff pro se against a wealthy attorney adversary, compounding her

deprivation of due process and resulting in the loss of discovery

opportunities, property rights, and protective orders.

## GROSS NEGLIGENCE BY LASC IN ALLOWING
## ABANDONED CASE
### Systemic Family Court Misconduct

107.   Defendant Los Angeles Superior Court negligently allowed Case No.

LD051587 to remain dormant for over eight years, despite mandatory

dismissal requirements under California Code of Civil Procedure §§

583.310 and 583.360. This gross negligence directly enabled Defendant

Egbase to fraudulently revive the case, weaponize it against Plaintiff, and

deny her access to a fair litigation forum. The failure to monitor and

dismiss the stale action constitutes deliberate indifference to Plaintiff's

rights and proximately caused the constitutional harms alleged herein.

108.   Egbase is not only guilty of marital fraud against Aire, he is also

guilty of bankruptcy, L.A. City, lender, insurance, IRS, business, Identity

fraud and client fraud. Here are some of the cases Aire discovered which

were filed against Egbase and/or his law firm:

A. *GF Health Products Inc. vs. Palmer Medical Supply*. Egbase

fraudulently opened Palmer Medical Supply using his sister,

Victoria Egbase's, identity as the registered owner, without her

53

knowledge or consent. By exploiting Victoria's identity, Egbase

successfully shifted legal and financial liability away from himself.

Despite multiple cases being filed against Victoria Egbase with the

Los Angeles Superior Court (LASC), she has never physically

appeared in any courthouse in the United States. This strategic

maneuver allowed Egbase to avoid scrutiny, deflect investigations,

and ultimately facilitated the quiet closure of the case after its 2007

filing, resulting in a non-jury judgment that left the true

orchestrator of the fraud unaccountable.

Some of these fraudulent acts were just discovered during trial

proceedings, revealing a broader pattern of deceit and financial

control spanning years of their marriage.

Egbase's misuse of corporate structures, falsified ownership, and

hidden financial accounts is emblematic of his ongoing efforts to

defraud Aire and the community estate.

B. *Mu Chin Deitke vs. AOE Law & Associates, APLC* – Filed in 2017

   for fraud (no contract), commercial breach of contract, dismissed

   before trial. Probably legal malpractice case.

C.  *Willie Mae McKay vs. AOE Law & Associates, Inc.* – Filed in2020, fraud/breach of contract, dismissed. Probably legal malpractice case.

D.  *Benjamin Elmo vs. AOE Law & Associates* – Small claims case from 2016, judgment entered. Probably legal malpractice case.

E.  *Abdorreza Movassaghi vs. Anthony O. Egbase & AOE Law & Associates* – Legal malpractice or negligence claim.

F.  F. California Depositions Reporters vs. Anthony Egbase (DBA Law Office of Anthony Egbase) – Filed in 2013, dismissed

G.  *Beachwood Escrow Inc. vs. Anthony Egbase* – Filed in 2008, small claims judgment entered.

H.  *Benjamin Elmo v. A.O.E. Law & Associates, Inc.* Probably legal malpractice case - Filed on April 12, 2016 - Judgment Entered

109.    In *Willie Mae McKay v. A.O.E. Law & Associates, Inc., McKay* alleged that Egbase loaned $53,717 to Gabriel Medina to purchase McKay's house through a bankruptcy sale, despite previously representing the Plaintiff in legal matters related to the property. Egbase was an insider, learning that the bankruptcy trustee was selling his client's home, and armed with that knowledge, he had a straw person purchase the property for him.

A. At the same time, in September 2019, Egbase was engaged in trial

proceedings with Aire, claiming severe financial hardship. While

pleading poverty to the court, stating he could not pay the

mortgage on community properties or their son's school fees,

Egbase was simultaneously lending tens of thousands of dollars to

Medina to acquire foreclosed property.

B. Egbase further manipulated the court by filing a series of ex parte

applications, including:

04/09/2019 Ex Parte - Application (Petitioner Egbase's FL

Section 6324 Ex Parte Application for an RFO for Possession,

Use, or Control Over Real Property, or in the Alternative an

Order for Respondent to Pay Liens Thereon, or Rental Value)

Filed by Petitioner.

110.    These filings resulted in the suspension of Aire's spousal support and

reinforced the false narrative of Egbase's alleged financial hardship. In

reality, Egbase was siphoning community funds to exploit distressed

properties while depriving Aire and their children of basic financial

support.

111.    Egbase illegally re-opened the earlier dissolution so he could use the

date of separation in that case which was in 2007, to cut off Aire from her

alimony, attorney fees, spousal support, and her share of property. He did so, until he learned Child Support Services would sue him for hundreds of thousands of dollars of unpaid child support. If the case was still open, as Egbase claimed, then the orders of child and spousal support were still valid and enforceable. He almost hung himself on his own petard.

112.    Egbase immediately changed his legal position and started using a later date of separation ("DOS") in 2015. Why would the judges allow him to do so? If the case was filed in 2007 but the couple did not separate until 2015, what happened to the eight years in between the filing of the case and the DOS? Isn't this insanity that LASC should be able to control? Shouldn't a judge have filed an OSC re dismissal? And dismissed the case?

**Tax Benefits Abuse, and Post-Bifurcation Misrepresentation**

113.    Egbase obtained a fraudulent bifurcation judgment on August 3, 2017, which purported to dissolve the marriage status only, while reserving all other financial and custodial issues for later adjudication. The judgment was signed by Commissioner Alicia Blanco. Plaintiff did not fully understand the implications of the document at the time and specifically asked her attorney, David Ingram, to investigate its legitimacy. Despite

being put on notice, Ingram failed to act, and instead assisted in suppressing the fraud and ensuring the judgment was submitted as Exhibit E during trial before Judge Byrd on February 26, 2020.

114.    The bifurcation judgment was procured without full disclosure to Plaintiff, without any bifurcation motion being filed or served in accordance with California Family Code §2337, and with Plaintiff being unrepresented or uninformed at the time. It was used deceptively to treat Plaintiff as no longer a spouse for the purpose of extinguishing her entitlement to spousal rights while still litigating all remaining issues as though she were legally divorced.

115.    Following the fraudulent bifurcation decree, Egbase continued to represent himself to the public, institutions, and government authorities as a legally unmarried man. Leveraging this misrepresentation, **Egbase filed tax returns for the 2015 and 2016** tax years in 2017 as **a single man** — despite the fact that the parties were still legally married and the decree he relied upon was obtained fraudulently. He filed these taxes on or about June 2017, shortly after securing the bifurcation order in May 2017, and received the Notice of Entry of Judgment dated August 3, 2017. Egbase retroactively submitted filings for prior tax years (2015 and

2016), **depriving Plaintiff of any tax refund or dependent benefits for those years.**

116.    This fraudulent tax filing occurred during a period when the couple had been two years behind on their taxes, and Egbase excluded Plaintiff from the process entirely, although Plaintiff was unemployed and dependent on the household financial returns.

117.    The bifurcation judgment was then used by Egbase and his legal counsel to unfairly block Plaintiff's right to financial benefits, delay trial dates, suppress evidence, and falsely represent to the court and the IRS that Plaintiff was no longer a spouse, creating long-lasting financial injury and a denial of legal due process.

118.    Egbase is an unrepentant sociopath. After Egbase succeeded in stealing from Aire all her property and support, he is now trying to get her deported by criminal fraud. In December 2024, Aire, who is the sole caregiver for her son with mental illness, traveled to London to assist her son in transitioning back to university life after his hospitalization. Despite Egbase's pattern of neglect, when Aire's son requested his father to purchase a ticket for Aire (his mom) to accompany him, Egbase swiftly complied—marking the only act of assistance he provided post-separation, motivated by his desire to have Aire leave the country. While

in London, where Aire had to stay with her son in a hostel to support his

recovery and reintegration into academic life, Aire received a call

regarding a Notice of Appearance in Court connected to her Social

Security Number for an American Express account that was fraudulently

used and maxed out by Egbase without her consent and knowledge. Aire

was informed that Egbase's criminal fraud and identity theft might bar

her from re-entering the U.S.

119.    This is just one example of Egbase's secret imposition of coerced

debt on Aire. Coerced debt is domestic violence, and Egbase has engaged

in it against Aire for years.

120.    Coerced debt has become a national concern. The Consumer Finance

Protection Bureau is planning to establish a new rule specifically

addressing coerced debt as domestic violence. See

consumerfinance.gov/about-us/newsroom/cfpb-kicks-off-rulemaking-to-

help-mitigate-the-financial-consequences-of-domestic-violence-and-

elder-abuse/

121.    Egbase imposed coerced debt on Aire by repeatedly taking out loans

on community real property, which loans he used for himself but for

which Aire was responsible because she was married to him. To make

matters even worse, the banks who provided the equity loans to Egbase

60

had to know he was married and yet allowed him to state he was

unmarried when obtaining the loans.

122.    Egbase created even more coerced debt for Aire by refusing to pay

the entire amount for the mortgages for four years, which reduced the

equity affecting Aire's rights.

123.    Egbase filed ex parte to remove Aire from the family home on April

9, 2019, claiming he could not afford to pay spousal support and the

mortgages on the property at the same time. Judge Dordi denied the ex

parte but suspended spousal support to Aire in exchange for payments on

the home mortgage.

124.    Instead of paying the full mortgage after eliminating spousal support,

Egbase continued his fraudulent practice of paying only part of the

mortgage to keep the bank from foreclosing on the properties. The

coerced debt of which Aire had no knowledge enabled Egbase to argue

the properties were worthless at trial, making the fraud even worse.

**Concealment of Community Assets, Undisclosed Business Interests, and Fiduciary Breaches**

125.    Plaintiff alleges that Defendant Anthony Egbase engaged in a

systematic and deliberate scheme to conceal substantial community

assets acquired during the marriage. Despite Plaintiff's repeated efforts to

bring these matters to the attention of her legal counsel, Defendant's

business dealings, personal property, and financial holdings were never

introduced at trial, in violation of California Family Code §§ 1101 and

2100 et seq. These omissions materially prejudiced Plaintiff's right to a

fair division of the marital estate.

**Concealed Corporate Entity – Palmer Properties & Development:**

126.    In 2004, Defendant Egbase incorporated Palmer Properties &

Development under California law. Without Plaintiff's knowledge,

consent, or authorization, Egbase listed Plaintiff as a corporate officer

and opened a business bank account linked to the corporation. Plaintiff

was never made aware that she was named as Secretary or Director, nor

did she participate in the formation, operations, or banking activities of

the company. Bank of America business records and corporate filings

substantiate this unauthorized use of Plaintiff's name and identity.

127.    Defendant operated Palmer Properties & Development as a vehicle

for business transactions and potentially diverted community income and

assets through this undisclosed channel. Despite its relevance to the

marital estate, no mention of the corporation or its financial records was

introduced during trial. Plaintiff provided her attorney with

documentation and insisted the matter be raised, but her attorney failed to

take any investigative or legal steps. This concealment constitutes a

willful breach of fiduciary duty.

**Undisclosed Insurance Policy – Guardian Whole Life Policy No. 5370546**:

128.    Defendant falsely testified at trial that he held no retirement, pension,

or insurance assets. However, in 2017, Defendant submitted to his

attorney Maya Shulman a Guardian Whole Life Insurance Policy issued

in 2006, listing a $500,000 face amount, waiver of premium rider, and up

to $1,000,000 in paid-up additions (PUAs). The annual premium of

$4,788.50 was paid from community funds. The policy named the

couple's children as beneficiaries. Defendant never disclosed this asset

during the dissolution proceeding, constituting material fraud.

**Concealed Tangible Assets – Vehicles, Luxury Items, and Artwork:**

129.    During the marriage, the parties acquired multiple vehicles, luxury

household furnishings, artwork, and expensive jewelry. Several vehicles

were shipped by Defendant to Nigeria while the parties were still

together. These were community assets never disclosed in discovery,

never listed at trial, and entirely omitted from the division of property.

The furnishings disregarded, despite Plaintiff raising the issue multiple

times with her counsel.

130.    Failure to Disclose Investments and Bank Accounts:

Defendant testified at trial that he had no stocks, bonds, or investment accounts. No forensic accounting or third-party subpoenas were pursued by Plaintiff's attorney to verify these claims. Plaintiff maintains that Defendant maintained financial relationships, including with Barclays Bank in the UK and other offshore accounts, through which he diverted community funds. These accounts were not disclosed in any Schedule of Assets and Debts (FL-142), and Plaintiff was denied the opportunity to contest this financial misrepresentation.

BARIIERS CREATED BY DEFENDANT SUPERIOR COURT OF STATE OF CALIFORNIA, LOS ANGELES COUNTY ("LASC") IN FAMILY CASES

LASC Engages in a Pattern and Practice of Denying Needs-Based Attorney Fees

131.    Aire is the victim of LASC's failure to insure needs-based attorney fees to her.

132.    While Egbase was working with the judges and clerks of LASC to deprive Aire of her legal rights, he used community funds to hire attorneys when he felt he needed one. Neither Ingram nor J. Byrd determined the amount of community funds Egbase used for attorneys so that Aire could be reimbursed her one half of those funds. The attorneys she did hire, DEFENDANT DAVID INGRAM LAW, APC

("Ingram") failed to present evidence of the community funds Egbase used to hire attorneys for himself.

A. LASC Fails to Assign Dissolution Cases to One Judge for all Purposes.

133.    Egbase was also able to manipulate the outcome because family cases are passed from judge to judge which occurred in the Aire/Egbase case, although they are supposed to be assigned to one judge for all purposes. Going from judge-to-judge enabled Egbase to spin the case and facts to his benefit at each hearing since Aire was representing herself for the most part, and she knew nothing about legal procedure. Besides, judges automatically defer to the lawyer husband and rarely to the wife who is representing herself.

B. The Judicial Council Prints Family Court Forms for Mostly Pro Pers Which Are Unduly Complicated.

134.    The Judicial Council forms parties and attorneys must use in family court are confusing, in small print, difficult for pro pers to decipher, and many times ridiculous. For example, the judgment in Aire's case forces the reader to refer to three attachments to decipher the judgment than state simply on the judgement form what the judgement is.

## C. Hostility Towards Stay-at-Home Wives and Mothers.

135.   Aire was also facing obstacles built into family court, a tremendous

prejudice against stay-at-home mothers and wives. Judges routinely

nullify family statutes designed to protect the interests of stay-at-home

wives and mothers like Aire. Judges routinely deny spousal support

unless the support order has an end date as if, for example, a black

woman in her 50's who had not worked for twenty years, like Aire, can

suddenly earn enough to be middle class in L.A.

### D. California Judges Founded Association of Family Conciliation Courts ("AFCC") Which at its     Core Is Extremely anti-Woman and Has Substituted Its Dogma for the Family Code.

136.   Because of the illegal, pernicious influence of AFCC which is

notoriously anti-woman, and many judges are AFCC members, although

Aire encountered fair judges on some occasions as the case progressed it

was hit and miss, leaving her on tenterhooks and generally denied due

process because she could easily go into the courtroom of an AFCC

judge and not know it. Judges also routinely overrule one another in

family court when the father has wealth, although a violation of due

process.

137.   Egbase successfully did what he is best at – he forged, perjured, and

defrauded his way through the marriage into the dissolution proceeding

leading to a judgment depriving Aire of all property and support aided

and abetted by LASC. Egbase was able to use the court to swindle Aire

out of all her property and support by engaging in concerted action with

his forensic accountant, judges, especially J. Byrd, a commissioner,

Aire's attorney, a court clerk, and a court reporter to accomplish the

outrageous outcome that he did.

138.   Aire was born in London in December 1966 and raised in Nigeria.

She received a Degree in Computer Studies from South Bank University,

London in 1994. She then began working as an analyst in London. Aire

and Egbase had met briefly in the 80's. Egbase began contacting her by

phone in 1997.

139.   He was living in Los Angeles. He invited Aire to come visit him and

she flew to Los Angeles from London in 1997. She also went to Nigeria

to meet his family in 1997. In September 1997, Aire became pregnant

with their first child. Aire returned to her job in London.

140.   Their first-born son, Obehi Anthony Egbase was born in June 1998 in

the U.S. Rather than assume his fatherhood responsibilities, and begin

living as a family, Egbase insisted that Aire return to London with their

infant son and live there. Aire did so but later demanded that Egbase be

involved in raising their son, and she returned to the U.S.

141.    Aire and their son came back to the home in 2000 located at 4852 Queen Florence Lane which Aire and Egbase bought in 1997.

142.    Aire had wired £15,000.00 to Egbase as part of the down payment for the home purchase on October 22, 1997. Aire was too trusting. She did not demand to see a copy of the deed. Nor did she demand that her name go on the deed to protect her investment in the home. She never saw the deed on the home until after the trial on property and support was concluded and she was evicted from the home based on the forgery of the writ evicting her from the home concocted by Egbase and signed by DEFENDANT TATYANA BETS ("Bets").

143.    The couple's second son, Efeose Andrew Egbase, was born March 2002 in Los Angeles. A month later, Egbase arranged for him and Aire to marry in Nigeria on April 26, 2002, in a traditional marriage and a dowry payment was made.

144.    After marrying Aire in Nigeria, Egbase then insisted on a registry marriage in Los Angeles on April 7, 2005, although by this time they had been involved for the past eight years and were already married in 2002. Egbase was looking ahead building a record against Aire that would look "legal" to California judges, so he would be able to shave off three years of marriage should divorce litigation occur.

68

145.    Egbase began to rob Aire of her interest in the property by taking out enormous loans against the home and the bank allowed him to do it "as an unmarried man". The bank officers were complicit in Egbase's fraud robbing Aire of her property interest in the property for years.

146.    Egbase's pattern and practice of fraud goes beyond what he did to Aire which makes it extremely difficult for Aire to unravel all of his fraud, often, criminal transactions. One crime he repeatedly committed was using his sister, Victoria Egbase, identity repeatedly, by switching her date of birth on California ID. She has always resided in Nigeria, only occasionally visiting the U. S.

**Profile of Anthony Egbase:**

Egbase's Mother Treated as a Servant/Breeder.

147.    Egbase grew up in a family where his own mother was not legally married to his father and treated as a breeder and a servant. Egbase's mother had six children for his father all of whom were raised by their father's legal wife after their mother weaned them. Egbase and his brothers modeled themselves after his father and engaged in contentious legal battles with the mothers of their children.

148.    Thus, Egbase easily betrayed Aire. He lived a double life, committed

adultery, hid enormous amounts of  community income in Nigeria, and

kept her in the dark about the community finances and income.

149.    Egbase was never honest with Aire. He was absent from the home in

Woodland Hills for long periods of time, which he used to his advantage

to obfuscate the date of the marital separation. Given his achievements in

the law in the U.S. and in Nigeria, he is a wealthy man.

**Egbase's Rise to Prominence**
**Egbase's Impressive Resume.**

150.    According to his resume which appears on the website of his law

firm, A.O.E., Egbase graduated from University of Benin (UNIBEN) in

1987, served Nigeria as a youth cooper (National Youth Service Corp.)

from 1987 -1988 and moved to the United States where he clerked for the

Honorable James Luther, Superior Court Judge, Mendocino County,

California from 1990 -1992. Egbase then worked as an Independent

manager for three law firms from 1992-1995. In 1995, he passed the

California Bar and was admitted to California Bar in 1996. Egbase is also

a member of the Maryland State Bar and Washington D.C. Bar.

151.    Prior to starting A. O. E. Law & Associates, Inc., Egbase worked as a

prominent chapter 11, debtor's side, and general civil and criminal

defense practitioner in Los Angeles, California. In 2011 (during the

70

marriage) Egbase built A. O. E. Law & Associates, Inc., (a multi-
attorney/multi-jurisdictional law firm) that includes criminal defense,
civil Litigation and Individual, Corporate reorganization.

152.    Egbase describes experience in his web-based resume which gives
him insider knowledge on how to pull off financial fraud, as he did
throughout his marriage and in the dissolution against Aire.

153.    According to Egbase's resume, he  has achieved a variety of success
for borrowers including stripping secured status on a number of alleged
secured claims. In 2004, Mr. Egbase led delegates of Nigerian Bankers
Association to the American Law Institute-American Bar Association
Conference on Corporate Mergers and Acquisitions in New York. As a
litigator, he has obtained jury verdicts in favor of individual defendants
and resolved claim disputes and jury awards for civil litigants in both
state and federal courts. There were no records produced in court as to
the enormous attorney fees Egbase had received over the years between
2002 and the date of the trial and there was no tracing of where
those fees went.

154.    In 2013, Egbase served as the chairman of University of Benin
Alumni Association North America (UBAANA) Southern California
Chapter. Practice Area.

155.    His areas of law according to his website include Real Estate Law,
Business & Commerce Law, Labor & Employment Law,
Personal/Business Reorganization (Bankruptcy Law), International Asset
Forfeiture and Asset Recovery, Immigration Law, Criminal Defense,
General Civil Litigation.

156.    On March 24, 2016, the Federal Government of Nigeria retained
Egbase to assist in the recovery of corruption proceeds from international
jurisdictions. **This engagement spanned from 2014 to 2016 and
involved millions of dollars in recovered assets, for which Egbase was
entitled to 40% of the recovered funds as legal fees**. Aire was entitled
to a portion of the fees Egbase received as community property. The fees
should have served also as a basis for an award of spousal support

157.    One of the notable cases was United States of America v. All Assets
Held in Account Number 80020796 et al., Case No. 1:13-cv-01832 (The
Abacha Case), **where the recovery of stolen funds amounted to
approximately $550 million. Egbase's share was 40% of this amount
alone**. It reflects the substantial financial resources at his disposal during
the family law proceedings and proves
that Aire was entitled to substantial spousal support. Yet, Ingram failed to

prove the value of Egbase's attorney fees he obtained in the cases in which he represented Nigeria.

158.    Egbase's professional recognition further illustrates his extensive influence and the power imbalance in this case. He was featured as one of the "Top 10 Nigerian Lawyers on the Fast Track in California," showcasing his prominence in the legal community and the powerful network he had built. His accomplishments, **such as securing $350 million in recovered assets for Nigeria, and his connections with influential figures, including former U.S. President Barack Obama and former First Lady Michelle Obama,** former Senator and presidential candidate Kamala Harris, and Mayor Karen Bass have played a major role in cementing his status as a key legal figure with extensive resources at his disposal. A photo of Egbase and Aire take with Bass is attached as **Ex. 1**. These relationships, while enhancing Defendant's career, have also empowered him to exploit and manipulate legal processes for his personal gain, at the expense of Plaintiff.

**Aire's Advancement of Egbase's Career Led to Enormous Attorney Fees for Egbase while He Cheated Aire out of a Portion of the Law Practice as Community Property and Spousal Support.**

159.    Aire contributed significantly to Egbase's career. In 2014, Aire introduced Egbase to Tanya R. Young Williams, a media and crisis

management expert, whose influence helped Egbase secure significant media coverage and high-profile meetings. Williams played a key role in developing a narrative that linked Egbase's influence to global issues, particularly the Boko Haram crisis in Nigeria. Although Egbase did not have an expertise in international terrorism Williams worked on a story that highlighted Egbase's "insight into Boko Haram" and connected it to broader geopolitical issues involving ISIS. It paved the way for high-profile meetings with former U.S. First Lady Michelle Obama and President Barack Obama, as well as significant government contracts in Nigeria. He also met with Mayor Karen Bass. A photo of Egbase and Aire taken with Bass is attached.



74

160.    Williams further crafted questions to evoke media interest, enhancing

Egbase's profile in both the United States and Nigeria. Williams

connected Egbase with influential figures in the media and politics,

further elevating his profile. This led to invitations to White House events

and strengthened Egbase's perceived role as an expert on terrorism in

Nigeria, directly contributing to lucrative contracts with the Nigerian

Government.

161.    Despite Aire's central role in these developments, her contributions

have not just been ignored by Egbase, he owes his newfound influence to

acquire significant financial gains, including contracts with the Nigerian

government for asset recovery, to Aire. But he hid his enormous profits

Nigeria paid him which directly impacted on Aire's spousal support

because he earned enormous fees in 2018 from Nigeria defeating lawsuits

on Nigeria's behalf entitling Aire to an enormous increase in support had

she not been denied support.



Defendant Anthony Egbase hosting and pictured with former Los Angeles Mayor Eric Garcetti at a fundraiser in 2014, demonstrating his established political connections and financial resources prior to divorce proceedings.

### Egbase's Use of Sister's Identity for Fraudulent Business Transactions.

162.    As an international litigator, Egbase met his share of white-collar

criminals. He began to act as one. Egbase has systematically engaged in

fraudulent financial activities using his sister, Victoria Egbase and her

identity. Victoria Egbase, a Nigerian resident and government official,

has never lived or worked in the United States; yet Egbase has falsely

listed her as an employee in multiple business entities, applied for loans under her name, and opened business and bank accounts to obscure financial transactions.

163.   For example, Egbase owned a property on Le Doux Road in Los Angeles, and a buyer sued him successfully for using Victoria's name on the deed fraudulently. **Egbase admitted in the lawsuit that he had signed Victoria's name, and not Victoria,** Case BC289121*, ANTHONY O EGBASE as Trustee from VICTORIA EGBASE FAMILY TRUST  vs RE/MAX BEACH CITIES REALTY; SOUTHCOAST TITLE ESCROW, MARY CROSS, ANNIE HARRIS ....*

164.   Egbase facilitated the creation and use of a fraudulent California Department of Motor Vehicles (DMV) identification document in Victoria Egbase's name, bearing a fake date of birth, although Victoria has never resided in California.

165.   Egbase also engaged in criminal employment fraud against the state and federal governments by taking illegal business deductions claiming Victoria as an employee of his law firm without Victoria having worked even one day for the firm.

166.   Egbase also used Victoria's identity to shield himself from financial liabilities, resulting in uncollectible judgments against her for transactions in which she was not an actual party.

167.   Egbase used Victoria's fake identity to deprive Aire of her property.

168.   Egbase also used Aire's identity without her knowledge and consent. Around April 2004, while Aire remained in London, Egbase opened a business, Palmer Properties and Development, in Aire's name without her knowledge, handled all correspondence regarding the business at his office address. The first time Aire learned about Palmer Properties was in 2007, when she received a call from a loan company about a loan, she knew nothing about, linked to the company.

Constitutional Violations Following Ignored Affidavit of Truth and Judicial Notice Filings
(42 U.S.C. § 1983 – Denial of Due Process and Equal Protection)

169.   On August 7, 2023, Plaintiff EJEME JOYCE AIRE filed with the Superior Court of California a certified 300-page Affidavit of Truth detailing extensive fraud, forged court documents, judicial misconduct, and systemic denial of due process. The affidavit included exhibits and sworn declarations substantiating Plaintiff's allegations against the defendants in *Egbase v. Aire, LD051587* and related proceedings.

170.    Simultaneously, Plaintiff submitted formal Judicial Notices in both *LD051587* and *20VEUD00634*, alerting the courts to the fraudulent nature of the bifurcation decree, the misrepresentation of jurisdiction, falsified clerk signatures, and the backdating of writs and filings. These filings included a Certification of Affidavit formally attesting to the truth of her claims and requesting judicial recognition and remedy.

171.    Plaintiff made an oral announcement of the Affidavit during the August 8, 2023, hearing before Judge Firdaus Dordi. The court took no judicial notice of the affidavit nor responded to its serious allegations. Instead, Judge Dordi denied Plaintiff's motion to vacate judgment, relying solely on Family Code § 2122's statute of limitations, without considering the **fraud-on-the-court** exception.

172.    Despite filing these materials over eight months ago, no court, judge, opposing party, or agency has issued any formal response, initiated investigation, or addressed the material claims of constitutional violations, fraud, or court corruption, amounting to a blanket refusal to acknowledge sworn and publicly filed evidence.

173.    The **absolute termination of jurisdiction over spousal support**, codified in Judge Christine Byrd's December 20, 2019, judgment (highlighted in Paragraphs (c) and (d)), has acted as a **de facto bar to**

**judicial redress**, eliminating Plaintiff's access to legal remedy even in light of material changes in circumstance or newly discovered fraud. The ruling states that "**no court shall have any jurisdiction to order support thereafter, even if a change in circumstances occurs.**"

174.    This rigid jurisdictional termination directly contravenes Plaintiff's rights under the **Fourteenth Amendment**, specifically her right to **due process and equal protection**. By permanently foreclosing judicial review, the court's ruling enshrines an unconstitutional barrier that allows fraud and misconduct to go uncorrected, causing ongoing harm to Plaintiff and her disabled son, who remains dependent on her care.

175.   The **inaction by the Court**—despite formal notice via affidavit, certified judicial notices, and oral requests for intervention—has compounded the harm and placed Plaintiff in a **perpetual state of disenfranchisement,** unable to access remedies for property division, support, or legal restitution. This has contributed to **ongoing homelessness, financial devastation, and emotional trauma**.

176.    Plaintiff asserts that this **systemic disregard** constitutes a **continuing violation of her civil rights** and requests **declaratory and injunctive relief** from the federal court to restore her right to access judicial review of support and property division, and to hold accountable all defendants

who participated in, or failed to correct, this ongoing constitutional

deprivation.

    Egbase's Conduct Leading to the sons Being Removed from Home.

177.  Because Egbase traveled frequently to Nigeria, he spent little time at

home. His mother and one of his brothers lived in the home in Woodland

Hills with Egbase, Aire, and their children. On the first day of school in

September 2007, when Egbase was in town, an argument escalated to the

point where the police were involved, and the sons were temporarily

taken to Egbase's brother's house.

178.  On December 2,  2007, Aire sought intervention from family friends

to confront Egbase with his behavior. The next day, Egbase dissolved the

fraudulent business he had secretly opened in Aire's name and filed for

dissolution of marriage.

179.  In 2008, as part of his divorce strategy, Egbase let the properties all

go into foreclosure as he would later do again, in 2016 when Aire filed

for dissolution, causing Aire to incur coercive debt without her

knowledge and consent which also reduced  the value of the real

properties. He also took out loans also reducing the equity on the

properties in both 2008 and 2016. He kept the loans for himself thus

enjoying a double benefit from the coerced debt, reducing the equity in the properties AND keeping the loan money for himself only.

180.    On April 16, 2008, Judge Wendy Kohn ordered Egbase to pay spousal and child support. When Egbase realized he would be paying substantial support, he requested reconciliation in May 2008.  By October 2008, family and DCFS cases were closed, and Egbase was allowed back home. **Egbase brought the properties mortgages current as he would do years later once he learned that Aire's appeal of the family court judgment in 2019 had been dismissed**.

181.    Egbase resumed his long absences from home, concealing from Aire the family finances, and the fraudulent transfers of property he was making without her knowledge or consent. He also began an adulterous relationship in California, renting an apartment as his "love nest" using community funds to pay the rent which went on for several years.

182.    On July 31, 2016, Egbase left his cell phone at the house while he was out. The phone was unlocked. Upon examining it, Aire was utterly shocked to discover overwhelming evidence that during the marriage, Egbase had been systematically stealing community funds and transferring them to Nigeria without her knowledge or consent. The phone contained numerous emails and financial transactions that revealed

a long-standing, covert scheme of monetary transfers involving detailed

instructions for wiring both U.S. dollars and Nigerian Naira to

individuals in Nigeria. These transactions were conducted using

community funds.

183.    The messages showed Egbase orchestrating the transfers with the

assistance of his employee, Ebahi Ehichioya. The financial instructions

were precise, listing amounts, names of recipients, and destination

accounts.

**Notable documented transactions from cell phone, includes**
- **December 29, 2011**: Egbase emailed his associate Ebahi Ehichioya, directing the following:
    - ₦1,000,000 Naira to Victory Obuane (approx. $6,250 USD at 2011 rate of ₦160/$1)
    - $500,000 USD to "Christopher" (increased from an earlier instruction of $300,000)
    - $350,000 USD to Chief Richard
    **Total: $856,250 USD + ₦1,000,000 Naira (≈ $6,250 USD) = $862,500 USD**
    - **April 18, 2012**:
    Egbase emailed Marcel Imoisili instructing him to transfer ₦3,200,000 Naira to Victoria. Marcel confirmed the transfer in writing.
    **Total (at ₦157/$1): ≈ $20,382 USD**
    - **April 29, 2013**: Egbase emailed his sister in Nigeria instructing:
    - ₦2,500,000 Naira to Agenmomwen (≈ $15,625 USD)
    - ₦700,000 Naira to Chief Richard (≈ $4,375 USD)
    **Total: $20,000 USD**
    Combined total of these documented transactions:
    - $862,500 USD (Dec 29, 2011)
    - $20,382 USD (Apr 18, 2012)
    - $20,000 USD (Apr 29, 2013)

**Grand Total: $902,882 USD**

184.    These transactions represent only a small portion of the unlawful

transfers discovered on Egbase's phone. All were conducted without

Aire's knowledge or consent and violated the fiduciary duties owed to

her during marriage. These acts constitute:

- Conversion of community property
- Breach of fiduciary duty
- Potential violations of federal law under mail and wire fraud statutes

185.    These acts show a pattern of deceit, financial manipulation, and

calculated exploitation of community assets, with the assistance of

Egbase's associates. The evidence retrieved from Egbase's own phone

provides firsthand proof of his fraudulent actions and misconduct.

186.    When Aire saw these secret transfers of funds Aire decided this was

the final straw. She told Egbase she was finished with the marriage.

187.    Further email and text message records reveal that these transactions

were part of a broader scheme spanning several years, totaling

approximately $2,000,000 (dollars) in community funds transferred to

Nigeria. The majority of these transfers were executed covertly with the

assistance of his office staff, predominantly Ebahi Ehichioya.

188.    At trial, Judge Christine Byrd refused to allow evidence of Egbase's

theft and fraudulent transfers of community funds to Nigeria to be

formally admitted, based on Egbase's false claim that Aire had

unlawfully obtained the financial records from his office computer. This accusation was entirely false and easily disproven. Aire had discovered the relevant email communications and financial records directly from Egbase's personal cell phone, which he had left unlocked at their residence on July 31, 2016. These emails revealed Egbase's explicit instructions to transfer large sums of community funds to various individuals in Nigeria.

189.    Despite the evidence's authenticity and direct relevance to the case, Aire's attorney at trial failed to adequately present or defend its admissibility. Aire was forced to threaten her attorney to introduce the material herself if her attorney continued to suppress it. When the attorney finally referenced the evidence in open court, he did so inaccurately and misleadingly. Specifically, while referencing the December 29, 2011, email from Egbase to Ebahi Ehichioya—where Egbase instructed the transfer of $350,000 USD to Chief Richard— Aire's attorney falsely testified that the instruction was for ₦350,000 Naira, a gross misrepresentation that significantly minimized the fraud.

190.    Worse still, the attorney failed to submit the original email as an exhibit or attach it to the court record, ensuring that the document could not be relied upon or reviewed by the court. Whether by negligence or

intent, this omission prevented the court from considering crucial proof of Egbase's fraudulent conduct. Aire's effort to expose the theft of community funds was obstructed both by judicial discretion and ineffective assistance of counsel.

191.    Aire's retrieval and exposure of these transactions was not a violation of Egbase's privacy, but a lawful and necessary act to uncover egregious marital misconduct, conversion of community property, and potential federal crimes. These acts constitute a breach of fiduciary duty, theft of Aire's one-half interest in community assets, **and potential violations of federal mail and wire fraud statutes**. That the evidence was wrongfully excluded from trial proceedings deprived Aire of due process and allowed Egbase's financial misconduct to go unpunished.

> Privilege Pierced by Ongoing or Future Wrongful Conduct: The Crime Fraud Privilege Exception is Broader Than You Think By: W. Scott O'Connell found
> at .iadclaw.org/assets/1/17/Privilege_Pierced_by_Ongoing_or_Future_Wrongful_Conduct.pdf?7797

192.    Aire had filed a dissolution case as a pro per in May 2016 on advice of a friend.  Egbase appeared to change his behavior and Aire did not serve him. Having realized he had been hiding community funds for years from her, on August 1, 2016, Aire  met with the Bloom firm, to commence dissolution. Egbase ducked service. He was finally served  on

October 29, 2016. As already alleged, the firm jumped ship leaving Aire to fend for herself.

193.    Initially, Egbase retained attorney **Maya Shulman with _$10,000 of community funds_** *who sent Aire a letter falsely claiming an ongoing dissolution matter since 2008*. The Bloom firm then dropped Aire in violation of its collective ethical duty not to abandon a client who is in a vulnerable position.

194.    In May 2017, Regan & Associates, Aire's former attorneys sought unpaid attorney fees from 2008. *Egbase realized that his decision to claim the case had been pending for years was backfiring on him because not only he would have to pay attorney fees but also enormous unpaid child and spousal support.* **He then _retained a new attorney, Annette Kulik, using $15,000 of_ community funds, and changed the date of separation to 2007 to 2015**.

195.    Returning to the chronology, on August 1, 2016, following Aire's confrontation of Egbase with his theft of community cash, he moved out, and Aire retained the Bloom firm.  On October 29, 2016, the Bloom Firm served Egbase with her dissolution petition.

196.    As already alleged, Egbase went on the offensive and decided he would revive the moribund dissolution lawsuit he had filed in 2007

because thanks to the gross negligence of LASC, it was not dismissed although closed.

197.    Egbase retained counsel, —, who in direct violation of her code of ethics contacted Aire although she knew Aire was represented by counsel. –threatened and intimidated Aire and told her to dismiss her dissolution lawsuit.

     LASC Aiding Egbase: Backdating, Filing Room Tampering, and Docket Manipulation Related to Plaintiff's Motion for New Trial

198.    Plaintiff alleges that the Los Angeles Superior Court ("LASC"), through its courtroom staff and docket clerks assisted Defendant Anthony Egbase in a pattern of fraud upon the court by deliberately backdating, suppressing, and manipulating docket entries to deprive Plaintiff of post-trial remedies and to conceal Egbase's non-compliance.

199.    On March 13, 2020, Plaintiff filed a Motion for New Trial and properly served Petitioner Egbase by certified mail on March 9, 2020. A second Proof of Service dated March 16, 2020, executed by LaToiya Cooper, was also submitted. The Motion and Proof of Service were physically accepted at the filing window by Judge Byrd's assigned courtroom clerk, who personally removed Plaintiff from the standard line in the filing room and logged the documents.

200.    Despite the filing being accepted and logged, the Case Summary did not reflect any Proof of Service. Subsequently, on May 6, 2020, Judge Byrd ruled on Plaintiff's Motion for New Trial two days before the scheduled hearing for May 8, 2020, stating in the order:

> *"No proof of service was filed, and Petitioner has not responded to the Motion."*

This statement contradicts the factual record and is directly contradicted by Plaintiff's conformed Proof of Service form (FL-335), filed weeks prior.

201.    Plaintiff later discovered that a Declaration by Anthony Egbase, dated March 25, 2020, appeared in the case docket only after Judge Byrd had ruled, falsely giving the impression that Egbase had timely responded to the motion. The response was not present in the docket before the ruling, as confirmed by Plaintiff's screenshots from the online Case Summary captured between March and May 2020.

202.    Upon examining the hard copy of Egbase's declaration, Plaintiff identified a secondary, upside-down stamp bearing the date "6/16/2020" on the left margin—evidence that the filing was not received or processed by the court until June 16, 2020. Despite this, the document was **fraudulently backdated to March 25, 2020,** and inserted into the court's Register of Actions as if it had been timely filed. Plaintiff never

received a copy of the response prior to the court's ruling, further

confirming the response was not filed or served as required by law.

203.    This post-hoc insertion of Egbase's declaration into the record, after

Judge Byrd had ruled, was done in collaboration with court staff to

protect Egbase and retroactively justify the court's ruling. It constitutes a

clear example of fraud upon the court, manipulation of the public record,

and denial of Plaintiff's constitutional right to be heard.

204.    Judge Byrd's reliance on the fabricated record and her shifting

justifications for denying the motion—including her excuse that the court

lacked proof of service despite accepting and logging the documents

through her own courtroom clerk—demonstrates judicial complicity in

the fraud. This misconduct deprived Plaintiff of a fair post-trial

proceeding and actively concealed Egbase's failure to respond.

205.    Egbase has consistently relied on the excuse of "clerical error" to

explain and cover up his failure to follow court rules or file documents on

time. In later filings, including his October 21, 2020, opposition, Egbase

wrote:

> "It appears the trial court did not receive Petitioner's response due to
> the pandemic."
> This is a false and misleading justification used to mask the late filing
> and conceal the **collusion with court clerks to reinsert the
> document post-ruling and backdate it.**

206.    Additionally, Plaintiff alleges that the LASC, through the same personnel including Clerk TATYANA BETS, deleted two prior rejected Writs of Execution submitted by EGBASE under Unlawful Detainer Case No. **20VEUD00634,** which had been improperly cross-referenced in the family law case LD051587 case summary, After securing a fraudulent writ under a modified case number **20VEDU00634**, court staff removed the previously rejected filings from the case summary, thereby hiding the procedural denials and paving the way for EGBASE to wrongfully evict Plaintiff.

207.    These combined actions demonstrate a systemic abuse of judicial authority, with LASC court personnel aiding Egbase in manipulating the case record. The falsification of court records, improper docket alterations, and coordinated omissions constitute fraud upon the court, violations of Plaintiff's due process rights under the Fourteenth Amendment, and a deprivation of rights actionable under 42 U.S.C. § 1983.

**INCOME CONCEALMENT, DISCOVERY MISCONDUCT, AND DATE OF SEPARATION FRAUD**

**Sustained Financial Support Contradicting Claimed Separation Date**

208.    Defendant Egbase asserted the parties were separated as of February 2015. However, Plaintiff's bank statements reveal that Egbase continued to provide regular financial support well beyond that date. On or about May 2016, Egbase deposited $10,000 into Plaintiff's account. From August 2016 through November 2017, Plaintiff received $500 per week, totaling $2,000 monthly. This support pattern strongly rebuts Egbase's claimed separation date and corroborates Plaintiff's assertion of a true separation date of August 1, 2016. Egbase's reduction in support immediately after being informed of the impending divorce indicates strategic financial manipulation.

209.    False Statements Under Oath Regarding Discovery On February 5, 2019, Egbase told Judge Firdaus Dordi in open court that he had already produced discovery covering the period of 2015 through February 2017 to Plaintiff's former counsel. He stated:

"MR. EGBASE: I HAVE AN ISSUE WITH THAT, YOUR HONOR, BECAUSE PRIOR COUNSEL GOT FROM 2015 TO FEBRUARY 2017, BUT WHEN THEY DEMAND SAME THING, I GAVE HIM FROM JANUARY 2017 TO PRESENT, TO THE DATE OF THE DEMAND. SO HE HAVE EVERYTHING, ALL OF MY BANK STATEMENTS, BANK STATEMENTS FROM NIGERIA, ALL RECEIPTS AND EVERYTHING THAT HE HAS DEMAND..."

210.    This statement was false. Email evidence dated February 6, 2017, from Attorney Maya Shulman to Attorney Vernon Ellicott, and the

document titled "2-4-17 PET'S SCHEDULE OF ASSETS AND

DEBTS," confirm that Egbase did not provide any 2016 bank records.

The declaration was intentionally misleading and constitutes perjury.

211.    Evasive Discovery Practices. When questioned about providing his

QuickBooks financial records, Egbase responded, "I don't know what

that means; does the Court know what that means?" His failure to

produce these documents concealed a critical accounting trail. **These**

**evasive answers were part of a calculated plan to avoid full**

**disclosure, particularly of the year 2016**, **during which Egbase**

**earned income exceeding $1 million, including from international**

**legal work.**

212.    Manipulation of Financial Records and Shifting Declarations Egbase

demonstrated a pattern of altering his narrative depending on who

represented him. With Maya Shulman, he claimed the date of separation

was 2007. With Annette Kulik, he changed it to 2015. This was a

recurring tactic to avoid discovery obligations and adjust the marital

timeline to his financial advantage.



$480 Million Nigeria Looted Funds Briefing at the United States Congress: A delegation led by Chairman, US/Nigeria Relations & Inter-Parliamentary Committe, Nigeria House of Reps, Hon. EJ. Agbonayinma to the United States Congressional Nigeria/Caucus at the hearing room with Co-Chair, Congressman Chibot (R) Co-Chair, Congresswoman Sbeila Jackson Lee (D) Congresswoman Bass (D) are both members of Judiciary and Foreign Affairs. From Nigeria are: Special Adviser to President Buhari on Justice Barr. Juliet Ibekaku, representing the Attorney General of the Federation and Minister of Justice, Nigeria, Mr. Abubarka Malami, Dr. Gbara Awanen, Minister/Head of Political Section, Embassy of Nigeria and Mr. Anthony Egbase, Attorney at Law, A.O.E Law & Associates, United States. The meeting took place on June 13th, 2017. Photo by US Congressional Staff.

**Photo of Defendant Anthony Egbase, appearing on June 13, 2017, at the United States Congress as part of a diplomatic delegation regarding the recovery of $480 million in looted Nigerian funds.**

213.    Representing himself as principal counsel of A.O.E. Law &

Associates and as legal liaison to the Nigerian Government, Egbase's

involvement in this high-profile contract—awarded during the

marriage—was never disclosed to the California family court. This

engagement directly contradicts his sworn claims of zero income and

disability, as no record of this or any associated compensation from the

Nigerian Government was reported by Defendant's accountant, Yelena

Kaminsky, nor acknowledged in Judge Byrd's final ruling. Plaintiff's

94

counsel, David Ingram, failed to present this material evidence at trial, despite repeated requests. This contract is one of several obtained by Egbase during the marriage, further evidencing financial concealment and willful fraud upon the court. **Reports indicate Egbase was entitled to a 40% recovery** fee for his role in representing Nigeria in U.S. litigation involving the repatriation of corruption proceeds.

214.    **Contradictory Mortgage Testimony**

Egbase falsely testified that his mortgage payment was **$3,950 per month during the trial**—a figure his accountant, Yelena Kaminsky, repeated. However, during a hearing before Judge John Slawson on November 17, 2017, Egbase admitted that the actual mortgage payment for the family home at 4852 Queen Florence Lane was **$5,385**. Mortgage records confirm his last payment was $5,365 on February 22, 2017. This abrupt cessation occurred at the same time he began withholding 2016 financial records, suggesting he was funneling money elsewhere, possibly into accounts held by his sister.

215.    Evidence of Lavish Spending During Alleged Financial Hardship

While claiming financial hardship, Egbase continued to fund luxury expenses. In June 2015, he and his son flew to Nigeria on first-class tickets costing $10,000. From September to December 2016, he spent

95

over $60,000 on their son's international education in the UK, including

tuition at Warwick University, accommodation, airfare, and over $10,000

in pocket money. He also made more than $20,000 in political

contributions in 2016. None of these expenses were disclosed to the court

or his accountant.

216.    Spending Pattern Inconsistent with Claimed Income From 2015 to

August 2016, Egbase's spending patterns—mortgage payments of

approximately $5,385 monthly, the maintenance of a separate hidden

condominium costing $3,500 per month, first-class and business class

trip to Nigeria costing between $5,000 to $10,000, a $10,000 deposit into

Plaintiff's account in May 2016, and tens of thousands spent on his son's

overseas education—clearly indicate that his income could not have been

between $12,000 and $18,000 per month as he claimed. These figures

point to concealed sources of income and contradict his sworn

declarations. Egbase's lifestyle and continued financial output reflect

substantial undisclosed wealth, bolstering the allegation that he misled

the court under oath.

217.    Summary of Pattern of Financial Fraud **Egbase's sustained support,**

**failure to produce 2016 discovery, perjured statements to the court,**

shifting narratives, mortgage misrepresentation, and concealment of

luxury spending form a deliberate pattern of litigation abuse. These acts

constitute fraud upon the court and violated Plaintiff's constitutional

rights. Plaintiff requests that this Court take judicial notice of these

findings in support of claims under 42 U.S.C. § 1983, and to consider

sanctions, restitution, and criminal referral as warranted.

**Denial of Attorney Fees:**

218.    The Bloom Firm abandoned Aire. The firm failed to file a motion for

attorney fees and costs, and a motion to dismiss the now moribund case

Egbase had revived although not even on life support. The firm stipulated

without Aire's knowledge to dismiss her lawsuit. This left Plaintiff

unrepresented and gave Egbase the opening to begin his fraudulent

litigation against Aire. Egbase used the fact his lawsuit was nine years

old over and over again against Aire, and routinely lied to the judges

what had occurred in the case before it was closed, such as claiming he

had paid attorney fees he was ordered to pay Aire's law firm when he had

not.

219.    For nearly two years, from August 1, 2016—when Aire informed

Egbase that the marriage was over—until June 27, 2018, when the court

finally granted her first award of attorney's fees for $15,000, Aire was

left without legal representation, while Egbase continued to retain legal

counsel and manipulate the proceedings. Egbase had already spent over

$25,000 of community funds on two separate attorneys, arguing two

contradictory theories—first claiming that the date of separation was in

2007, then shifting his position to 2015, and even agreeing with Aire that

the date he finally vacated the family home was August 1, 2016,

depending on what best suited his legal strategy at the moment. No judge

held Egbase accountable for his blatant manipulation of the record, nor

did they question that he initially claimed the separation occurred in 2007

and then no, it occurred eight years later.

220.    Aire had no idea of J. Blanco's conspiracy with Egbase in concocting

the false date of dissolution, when she stipulated on August 24 to J.

Blanco who was still a commissioner to hear her request for attorney

fees.  J. Blanco refused to award Aire fees and played games on the

bench.

221.    Instead, J. Blanco focused on the date of separation although the issue

was not before her. Egbase initially agreed with Aire that he moved out

of the home on August 1, 2016, but claimed the date of separation was

February 22, 2015, was the date as moronic as it seemed (DOS February

2015 but his final move out was 18 months later).

222.    With nothing resolved, inexplicably, J. Blanco incompetently and

inexplicably ordered the case to trial inflicting severe emotional distress

on Aire who had no attorney and had not conducted any discovery.

The next hearing occurred on November 17, 2017, before Judge Slawson. Aire requested a continuance of the trial. She stated:

> I don't think this is fair. I don't have any legal experience. I've not
> had any attorney to support me. he's an attorney, and he's had legal
> representation all the way to our first hearing. He spent over 20,000. I
> had no money. I can't represent myself. It is just going way above
> me... I would like to have a continuance until I can seek counsel. I
> can't do this. I just can't do it.

223.    J. Slawson allowed Egbase to benefit by the gross negligence of

LASC in not dismissing Egbase's dissolution petition he had filed in

2007 and allowing him to reopen it. Despite the fact that Aire had made

her case for needs-based attorney fees as a result of which she was

unprepared for trial, judge dismissed her request, stating that the case had

already been going on for a long time and denied her continuance.

Egbase did confirm to Judge Slawson that he moved out of the family

home on July 31, 2016.

> The Dates of Marriage and Separation Decided by J. Byrd Were
> Chosen for the Sole Purpose of Denial of Spousal Support and
> Community Property.

99

A.  J. Byrd aimed to intimidate Aire. On the first day of trial, J. Byrd herself violated Evid. C. Secs. 351.2, 351.3, 351.4 and directly inquired in open court **about Aire's American citizenship status while never asking about Egbase's.** She violated these sections because there was no request for an in-camera hearing on Aire's citizenship status. Given the present-day Trump xenophobic mania and hysteria, no California judge should be allowed to engage in such shameful anti-immigrant misconduct since California is a sanctuary city.  J. Byrd should be investigated forthwith by the Commission on Judicial Performance which will receive a copy of this complaint.

A. Date of Marriage.

224.    According to Nigerian customary law, a marriage is considered valid if the parties and their parents' consent to the marriage, there are a payment of bride price and a celebration of the marriage, followed by the couple's cohabitation and consummation. Supreme Court of Nigeria case Osamwonyi vs. Osamwonyi (1972) SC 1 and further supported by E.I. Nwogugu in "Family Law in Nigeria" .

225.    Egbase arranged for a **traditional marriage** the first time he was married, which was to a Nigerian woman he met at University of Benin. When the marriage ended, Egbase  requested the return of the bride price

(dowry), a practice permitted under Nigerian custom.  Egbase also sought

the Nigerian marriage when he married **Aire which occurred on April**

**26, 2002,** a month after the couple's second child was born.

226.    In accordance with Nigerian custom, the parties first entered into a

traditional marriage on April 26, 2002, in Nigeria. This ceremony was

solemnized with a formal dowry payment, an essential component of a

valid customary union under Nigerian law. Such traditional marriages are

deeply rooted in cultural norms and are fully recognized as binding by

both families and the community.

227.    Among Nigerians, it is not uncommon for couples to hold multiple

ceremonies—typically a customary wedding, followed by a civil

registration, and, where applicable, a church ceremony. These events

often depend on the parties' social status, religion, and financial ability. In

this case, although Defendant Egbase repeatedly promised a church

ceremony throughout the marriage, it never took place.

228.    Subsequently, the parties mutually agreed to **register their marriage**

**in Los Angeles on April 7, 2005,** and hoping the following of a church

wedding that never happened.

229.    Despite the 2002 traditional marriage being the true beginning of

their marital union, this earlier marriage was never presented or litigated

during trial. Attorney David Ingram failed to introduce this material fact, and by doing so, deprived Plaintiff of the opportunity to establish the full scope of her marital contributions and duration. The trial court relied solely on the 2005 civil registration date, which substantially diminished Plaintiff's legal and equitable rights.

230.    During the dissolution proceeding, Egbase disavowed its legitimacy for obvious reasons, to deprive Aire of her fair share of property and spousal support. Ingram refused to cross examine Egbase about the Nigerian marriage and to put on an expert witness about traditional marriage in Nigeria and the Egbase/Aire Nigerian marriage in particular, although Aire had provided the name of a witness to Ingram who could testify about traditional Nigerian marriages and whether the Egbase/Aire Nigerian marriage was valid.

231.    The date of marriage was the date of registration of the marriage, not the marriage, shaving off three years of community property acquisition and entitlement to spousal support.

B. The Date of Separation.
The Couple's Claimed Dates of Separation (also affecting community property acquisition and entitlement to spousal support):

232.    Aire was consistent from the day she announced to Egbase that the

marriage was over, which was August 1, 2016, that August 1, 2016, is the

date separation.

233.    Applicable Legal Standard for Determining the Date of Separation in

California Under California Family Code § 70(a), the "date of

separation" means the date that a complete and final break in the marital

relationship has occurred, as evidenced by both of the following:

> One spouse has expressed to the other their intent to end the
> marriage;
> The conduct of the spouse is consistent with their intent to end the
> marriage.
> The statute requires courts to weigh all relevant evidence in
> making this determination and expressly overrides the former
> **In re Marriage of Davis (2015) ruling, which required physical
> separation. Under § 70**, *the emphasis is now on conduct and
> intent*.

234.    **Timeline and Conduct Supporting August 1, 2016, as the Legal**

**Separation Date** Plaintiff clearly informed Defendant of her intent to

end the marriage on August 1, 2016. Defendant moved out of the marital

residence that same day. Following the separation, Defendant

transitioned from inconsistent financial contributions to a structured

payment of $500 per week ($2,000/month), mimicking spousal support.

These acts demonstrate Defendant's acknowledgment of separation.

**Additional Evidence of Legal Separation**

235.    Defendant was served with divorce papers on October 29, 2016. Prior to separation, Egbase deposited $10,000 into Plaintiff's bank account in May 2016 and made regular mortgage payments of $5,385 monthly, further disproving his claimed separation in February 2015. These financial activities are inconsistent with separation and affirm that August 1, 2016, was the operative date.

236.    Egbase on the other hand was a chameleon, first, falsely claiming that he and Aire had separated years ago in 2007, with the information he provided his attorney, in 2016, Maya Shulman, based on his filing the moribund dissolution lawsuit at that time, then when he realized the financial woes he would face, such as hundreds of thousands of dollars in support and attorney fees, he initially agreed in court with Aire that the separation date was August 1, 2016. Then, he argued no, it was April 2016 and then settled for February – 2015.

Judge Byrd's Ruling:
Suppression of Plaintiff's Testimony on Date of Separation and
**Judicial Collusion to Endorse a False Narrative**

237.    Plaintiff incorporates all preceding allegations. During trial in In re Marriage of Egbase, Case No. LD051587, the court presided over by Judge Christine Byrd permitted Petitioner Anthony Egbase to dominate the trial record with his version of the alleged date of separation. Egbase

104

was allowed to testify uninterrupted for nine (9) full trial days,

culminating in the Court adopting his unsupported separation narrative

and excluding Plaintiff's rebuttal entirely.

238.    This exclusion was not inadvertent. In a calculated maneuver cloaked

as "judicial efficiency," Judge Byrd claimed that the court calendar

required her to move proceedings forward without allowing Plaintiff to

testify on the key issue of the parties' date of separation — the very issue

on which Egbase had been granted extensive time. Plaintiff did not

consent to this exclusion. Nevertheless, the Court falsely stated in the

record that "both sides agreed" to this decision, when in fact only counsel

(David Ingram for Plaintiff and Adam Apollo for Petitioner) agreed —

without Plaintiff's informed consent or waiver of her right to be heard.

239.    Egbase's testimony on the date of separation was inconsistent and

demonstrably false. In a hearing before Commissioner Alicia Blanco on

October 11, 2017, Egbase testified under oath that he moved out in July

or August 2016, stating: "It was the same day I returned from the trip

from Nigeria... I don't recall the date, but it's a part of July, August

2016." (Transcript from Hearing before Commissioner Blanco, Oct. 11,

2017, Pg. 41) This was also confirmed by Plaintiff on the same record:

"Yes, that date was August 1st... Because that is the date he moved out."

(Id., Pg. 29).

240.    However, during the trial before Judge Byrd in 2019, Egbase radically altered his position, testifying that he vacated the family residence on April 11, 2016, and claiming the final separation date was February 23, 2015, later adopted by the court as June 5, 2015, despite the lack of objective support. This contradiction was never reconciled, and the trial court made no finding as to why Egbase's change in testimony should be considered more credible than the sworn earlier statement under Commissioner Blanco.

241.    The court further mischaracterized Plaintiff's position in the Statement of Decision, falsely suggesting she "asserted inconsistent positions" and that her testimony was "confused," even though she maintained — with corroborating evidence — that Egbase remained in the home until August 2016.

242.    The judge's decision to block Plaintiff's rebuttal testimony—after allowing Egbase nine days to present his version—was not neutral. It was an intentional and unconstitutional suppression of critical evidence that undermined Plaintiff's right to due process, equal protection, and a fair trial under the Fourteenth Amendment.

This conduct is directly contrary to binding California appellate precedent. In Blumenthal v. Superior Court, 137 Cal.App.4th 680, 683–684 (2006), the court held that a trial judge has no authority to impose arbitrary time constraints on a party's right to present evidence for the court's convenience. Similarly, in Marriage of Carlsson, 163 Cal.App.4th 281, 290–292 (2008), the appellate court found reversible error where the family court judge curtailed trial proceedings for calendar reasons, infringing on both parties' rights to a fair hearing.

243.    Judge Byrd's ruling violated both California case law and

constitutional safeguards by:

- Endorsing Petitioner's last-minute version of events

- Misstating the evidentiary record in the Statement of Decision

- Excluding material evidence offered by Plaintiff

- Misrepresenting Plaintiff's alleged agreement to forgo testimony

- Denying Plaintiff, the opportunity to confront and rebut

contradictory evidence

244.    Plaintiff alleges this suppression of evidence was part of a broader

pattern of collusion and judicial misconduct to favor Petitioner Egbase,

shield court officers from exposure, and finalize a fraudulent bifurcation

and dissolution judgment that stripped Plaintiff of her rights to support,

equitable distribution, and redress.

245.    Respondent Aire possessed competent and credible evidence on her

phone, including time-stamped photos and text messages, which

conclusively demonstrated that the marital relationship between the

parties continued until at least August 1, 2016. These communications

established cohabitation, shared activities, and a continuing spousal

relationship.

246.    Despite this, both Egbase and Respondent's counsel at the time,

David Ingram, collaborated to suppress this critical evidence. Ingram

failed to introduce the documents into evidence, and jointly with Egbase,

obstructed Aire from using the digital records from her phone at trial.

**IMPROPER DATE OF SEPARATION AND SUPPRESSION OF CRUCIAL EVIDENCE**

247.    One of the key issues misrepresented and manipulated during the trial

was the date of separation between Plaintiff and Defendant Anthony

Egbase. The trial court, under Judge Christine Byrd, adopted June 5,

2015, as the date of separation, despite substantial and credible evidence

demonstrating that the parties continued to cohabit and conduct

themselves as a married couple well beyond that date.

248.    Thanksgiving messages exchanged between Plaintiff and Defendant

on November 25, 2015, in which Defendant Egbase expressed emotional

distress about being unable to spend the holiday with Plaintiff and their

children, and Plaintiff reciprocated with messages of love, support, and

gratitude. Defendant wrote:

249.   "*My darling and my wonderful boys. I wish you all happy thanksgiving. I want you to know it hurts not to celebrate this thanksgiving holiday with you. However, sometimes we have to make sacrifices so that we have better and more prosperous thanksgivings in years to come.*"

*250.*   Plaintiff responded: "*Give thanks with a grateful heart... Most thankful for you, working v hard, Distance does not make me any less appreciative of the love, care and concern. Happy thanksgiving.*"

251.   Furthermore, on May 15, 2016, Plaintiff and Defendant took a photo together at an upscale location. The photo was captured on Plaintiff's personal iPhone device, which includes metadata verifying the date and authenticity of the image. This photograph was consistent with the parties' marital conduct and contradicts the June 5, 2015, separation date.

252.   Plaintiff references a photograph taken with her iPhone on May 15, 2016, at the Ritz-Carlton in Midtown Atlanta. The metadata of this image confirms it was captured at 12:17 p.m. during a family trip intended to reaffirm the marriage. This trip was referenced in trial testimony. However, Egbase, leveraging his legal acumen, sought to invalidate the photograph by challenging whether it was a "selfie" and who was present when it was taken. His argument was not a denial of the event but an

attempt to discredit its timing and significance. Plaintiff will attach the May 15, 2016, photo as Exhibit _2__ to this Complaint.

253.   The impact of this finding was severe: by backdating the separation to 2015, the court eliminated Plaintiff's right to spousal support, property division, and pension contributions accumulated thereafter. This decision failed to account for Plaintiff's financial dependency, having been a stay-at-home spouse for over 20 years.

254.   As further evidence, Plaintiff shows that Egbase deposited $10,000 into Plaintiff's account in May 2016, and between August 2016 through November 2017, made weekly $500 cash payments, consistent with spousal support and household maintenance. These transactions, which Plaintiff's counsel failed to submit at trial, further disprove the court's adopted separation date, June 5, 2015.

255.   Plaintiff asserts that the failure of Plaintiff's attorney, David Ingram, to present this financial and photographic evidence, along with the suppression of crucial documents including Egbase's complete passport and travel records, deprived Plaintiff of a fair adjudication of marital rights.

256.   The manipulation of the separation date to cut off Plaintiff's entitlements, the judicial disregard of intimate evidence, and the court's

acceptance of unsupported testimony by Defendant constitute a violation of Plaintiff's due process and equal protection rights under 42 U.S.C. ¬ § 1983.

257.   Egbase's fraudulent actions caused Plaintiff severe financial, emotional, and procedural harm. By leveraging unlawful court access and exploiting Plaintiff's cognitive challenges, Egbase deprived Plaintiff of her constitutional rights, including due process and equal protection, entrenching systemic abuse within the judicial system.

258.   Judge Byrd's action constitutes an abuse of discretion and a denial of Plaintiff's fundamental due process rights. It also reflects judicial bias in favor of Egbase, given that the Court disregarded verifiable evidence and adopted an unsupported narrative that benefited Egbase's position regarding asset distribution and support.

259.   The actions of Judge Byrd not only disregarded binding authority but also denied Plaintiff a fair opportunity to be heard, in violation of California due process standards. The trial court's conduct supports Plaintiff's broader claim of systemic judicial bias and abuse.

260.   To make matters worse, following the judge's ruling, David Ingram filed an objection on October 22, 2019, and only provided the document after submission, a document Plaintiff never authorized, altering the

separation date to April 11, 2016, over Aire's objection. This filing intentionally aligned with Egbase's timeline, further supporting his narrative and depriving Aire of a fair hearing. This conspiracy strategically excluded a critical period during which significant marital assets were acquired.

261.    Plaintiff and Defendant Egbase were joined in a valid and binding traditional marriage ceremony under Nigerian native law and custom on April 26, 2002, in Benin City, Nigeria. This customary marriage, including the payment of dowry, was lawful and recognized under the Esan tradition. Although a civil marriage was later registered in Los Angeles on April 7, 2005, the parties' marital relationship, both culturally and factually, began no later than 2002. Plaintiff and Defendant had been in a committed relationship since 1997, making the total duration of their relationship over nineteen years, with at least fourteen years of continuous marital cohabitation.

262.    The marital relationship remained intact until at least August 1, 2016, as evidenced by time-stamped communications, travel records, photographs, and Defendant Egbase's own sworn testimony before Commissioner Alicia Blanco on October 11, 2017, in which he confirmed he moved out in July or August 2016, directly contradicting

his later trial claim of April 11, 2016, and separation date of February 23,

2015.

263.    In a prior hearing before Judge Firdaus Dordi on June 27, 2018, in the

context of evaluating Plaintiff's request for attorney's fees, the Court

reviewed the case record and made the following factual observation on

page 28 of the transcript:

   *"With respect to the length of the marriage, without making any final
adjudication of this issue, it looks like it is largely  undisputed that **the
length of the marriage was approximately 11 years.**"*

   This statement by Judge Dordi, a neutral judicial officer uninvolved in
the later trial, affirms the foundational premise that the parties were engaged
in a long-term marriage — a finding consistent with Plaintiff's position and
crucial to the determination of spousal support and equitable asset
division.

264.    Despite these consistent findings and credible supporting evidence,

Judge Christine Byrd later adopted an unsupported and prejudicial

separation date of **June 5, 2015**, thereby retroactively shortening the

duration of the marriage. This undermined Plaintiff's presumptive right

to long-term spousal support under **California Family Code § 4336** and

disregarded the plain evidence before the court.

265.    Plaintiff sought to introduce key exhibits that would have confirmed

the marriage lasted beyond 14 years, including Facebook

communications, joint travel itineraries, and financial transactions.

However, Plaintiff was prevented from presenting this material due to deliberate obstruction by her own attorney, **David Ingram,** and strategic maneuvering by Defendant Egbase. Plaintiff was ultimately denied her right to testify on this issue during trial — a decision falsely presented as mutual consent by Judge Byrd, when Plaintiff had in fact never agreed.

266.    The cumulative effect of these actions — exclusion of testimony, distortion of the separation date, and rejection of prior judicial findings — resulted in a judicially fabricated narrative that directly harmed Plaintiff's financial rights, status as a long-term spouse, and due process protections under the Fourteenth Amendment

Real Property

267.    Neither Egbase nor Ingram introduced into evidence certified copies of the deeds of the real property at issue at trial.  Egbase was able to withhold critical documents, not just the deeds but bank records, including the financing and refinancing of the property,  and equity loan records. Egbase engaged in inadmissible hearsay, he committed perjury, and Ingram did not object, nor did he conduct an effective cross examination, nor did he discover the relevant records so he could move the documents relevant to the property into evidence. J. Byrd failed to

nonsuit Egbase for failure to prove the characterization of the real

property and its value. Egbase,

121 S. Hope Street, Los Angeles

268.    Egbase orchestrated a fraudulent scheme to conceal his true

ownership of the property. Egbase purchased the property on October 31,

1996, for $137,500 in the name of his younger brother, Gerald Egbase,

despite Anthony being the actual financier and owner. Gerald was a

Straw Buyer.

269.    At the time of purchase, Egbase employed Gerald paying him

approximately $10/hour, making it financially impossible for Gerald to

afford such a property. Gerald falsified his marital status as "single" on

the deed documents, although he was legally married. This

misrepresentation combined with Gerald's lack of financial capacity;

indicates he was used as a "**straw buyer**"—a front to hide Egbase's

ownership of the property. Egbase made all the mortgage payments, paid

property taxes, collected rental income, and exercised complete control

over the property, exercising all the indicia of true ownership. On July

30, 2004, after Gerald's divorce, Gerald transferred the property to

Egbase via a grant deed, falsely categorizing the transaction as a "gift."

270.   Assuming that Egbase was the original purchaser in 1996, the date of

marriage was 2002 or even 2005, August 1, 2016, was the date of

separation, the couple was separated  six months in 2007-2008, Aire's

Moore-Marsden ("M-M") interest in the property began to accrue in

either 2002 or 2005, minus the six months of separation in 2007-2008,

because Egbase continued to use his earnings, the "sweat of his brow",

and other personal efforts which are community property during marriage

to maintain, and pay the mortgages and taxes on, the property. The M-M

interest accrued for fourteen years if 2002 is DOS and eleven years if

2004 is DOS minus six months of separation in 2007-2008.

271.   Assuming that Gerald gifted the property to Egbase in 2004, the date

of marriage was 2002 or even 2005, August 1, 2016, was the date of

separation, the couple was separated  six months in 2007-2008, Aire's

Moore-Marsden ("M-M") interest in the property began to accrue in

2005, because Egbase continued to use his earnings, the "sweat of his

brow", and other personal efforts  which are community property

marriage to maintain, and pay the mortgages and taxes, on the property.

The M-M interest accrued for eleven years minus the six months of

separation in 2007-2008.

272.    Ingram refused to offer in evidence the testimony of Leonnesia Herd, the ex-wife of Gerald, who would have confirmed that during her marriage to Gerald, he never disclosed any ownership interest in the Hope Street property. [With good reason. He put himself on the deed that he was an unmarried man.] She affirmed that Egbase was the true owner, managing all financial obligations related to the property. Her testimony was crucial evidence that would have altered the court's findings, but Ingram refused to present it,

273.    In addition to failing to present critical financial evidence, Ingram refused to offer the testimony of Leonnesia Herd, the ex-wife of Gerald Egbase, during trial. Herd would have testified that throughout her marriage to Gerald, he never disclosed any ownership interest in the Hope Street property. This was significant because Gerald had fraudulently placed himself on the deed as an unmarried man. Herd would have confirmed that Anthony Egbase was the true owner of the property, as he managed all financial obligations associated with it. Her testimony would have directly contradicted the narrative presented by the defense and altered the court's findings. Yet Ingram deliberately excluded this key testimony from trial.

274.    Additionally, prior to meeting my attorney, David Ingram, Gerald

Egbase had become involved in a new relationship with Sheila Harry.

When that relationship ended, Sheila Harry retained David Ingram as her

attorney against Gerald Egbase. When Aire retained Ingram first she had

asked disclosed to him early on that Gerald was Anthony Egbase's

brother. Aire even questioned whether this posed a conflict of interest, to

which Ingram responded that it did not. Despite Aire's repeated requests

that Gerald be con joined to the case, Ingram consistently avoided the

matter and never took steps to conjoin him. This avoidance, in the

context of Ingram's prior representation of Sheila Harry—Gerald's ex—

raises concerns of divided loyalty and a failure to act in Aire's best

interests.

275.    On August 30, 2004: Egbase refinanced the property for $175,000

and committed fraud in obtaining the loan by claiming he was an

unmarried man.

276.    On  November 22, 2005:Egbase refinanced the property for $493,500

and  once again  committed fraud in obtaining the loan by claiming he

was an unmarried man.

**Post-Trial Financial Activities on the Hope St Address:**

A.  Despite claiming financial hardship during the trial, Egbase paid off the following liens on the Hope St property after the case concluded:

• December 23, 2019: Release of an HOA lien by the Promenade Owners  Association.

 • May 14, 2021: payoff of a $100,000 loan


**800 W. 1st Street, #1308, Los Angeles:**

277.   This property was purchased during the marriage, and Egbase admitted in a 2008 declaration that it was community property. Ingram ignored this evidence and failed to present it during the trial in 2019.

278.    Rather than put the deed in his and Aire's name as husband and wife as community property, he put his sister Victoria's name on the deed although he was the purchaser, using community funds to purchase the property. Victoria has never lived in California, certainly never occupied the property, had no control over the property, did not sign loan papers, and after the purchase Egbase had total control over the property, using community funds for the payments on the property, collected all the rents, took out loans on the property keeping them for himself. .

119

279.    Egbase  got away with this crime because the lender was Countrywide, a major contributor to the real estate crash in 2007-2008. Countrywide was known for its "liar" loans, meaning it gave loans with eyes wide open to liars who ginned up their financial applications. Egbase's loan was  doubly a liar loan. Victoria was not the purchaser, he was. Victoria also could not possibly qualify for the loan of $520.000 because she worked as a civil servant in Nigeria earning a very small wage. And he was a married man hiding this fact from both Countrywide and his wife.

280.    That Egbase succeeded in putting Victoria's name as the purchaser is so preposterous that it makes clear how unregulated the real estate market is in the U. S.  What kind of credit check did Countrywide do on Victoria? Did Countrywide's employees working on the loan even speak with Victoria or meet with her – even a fake Victoria who was a woman Egbase bribed to impersonate his sister? Besides defrauding Aire, Egbase defrauded Countrywide, he defrauded Victoria (unless she okayed this arrangement), he defrauded the court, to make sure that his wife got nothing in the dissolution and was put on the street with just the clothes on her back.

281.    After reconciling with Plaintiff in 2008, Defendant Egbase engaged in a fraudulent scheme to reassign property through a fabricated quit claim deed. Although Egbase dated the deed January 15, 2007, it was not recorded until December 16, 2009—nearly three years later. The deed purports to transfer joint ownership of a property between Anthony Egbase and his sister, Victoria Egbase, under the pretense of being joint tenants. Not only was Victoria not in the country on the date alleged in the deed, but the handwriting on the document matches that of Anthony Egbase, further suggesting fabrication. This post-reconciliation manipulation indicates that the deed was backdated to appear as though it predated Egbase's December 3, 2007, dissolution filing, thereby constituting premeditated fraud designed to shield assets from the community estate.

282.    The falsified deed was not recorded until December 16, 2009— almost three years after the claimed execution date of January 15, 2007. This significant delay raises serious red flags and undermines the credibility of the document. The fact that the property transfer was executed post-reconciliation and post-marriage confirms that the deed was strategically backdated to predate the dissolution filing, evading community property laws. The deed's timing, coupled with the use of

Anthony Egbase's handwriting and the absence of Victoria Egbase from the country on the notarized date, point to forgery and intentional concealment from the marital estate. These facts support a finding of fraudulent conveyance and merit immediate judicial review for potential sanctions and reversal of the recorded deed.

283.    Of interest is that the name of the notary, Cynthia Roshon Brown, and her license number, 1654008 do not appear on the list of licensed notaries on the California Secretary of State website as of February 6, 2025.

Egbase (fake Victoria):
• Collected rental income,
• Made the down payment and mortgage payments,
• Maintained exclusive control over the property
• Made and retained all the loans he took out on the property.
• Recorded deeds and other documents related to the property.

284.    Anthony Egbase engaged in multiple refinancing activities to siphon equity from the property while concealing its community interest:

• December 29, 2006: on Initial mortgage of $520,000 on which he
made monthly payments from community funds.
• Multiple refinances between 2006 and 2018, often under false pretenses, increasing the mortgage debt (coerced debt to Aire) while diverting the loans for his personal benefit.

285.    Egbase, with the assistance of his accountant, Yelena Kaminsky, submitted fraudulent financial documents during the divorce trial:

• False Loan Modifications: Presented under Victoria Egbase's name,
even though she had no financial capacity or presence in the U.S. to
legitimize these transactions.
• Falsified Financial Reports: Kaminsky falsely claimed that the property was separate property, although she was not qualified to
render such an opinion and it was up to trier of fact, not her, as to the
character of the property. Besides the evidence was incontrovertible
that community funds were used for downpayment, mortgage payments, maintenance, and repair.

4852 Queen Florence Lane, Woodland Hills

286.    Egbase and Aire bought the property in November 1997. Aire,

contributed £15,000 in October 1997 toward the down payment, which,

based on historical exchange rates, equates to approximately $24,750

USD. The purchase price of the property in 1997 was $650,000.

According to Realtor.com, the property's estimated value is

approximately $2,463,000. Another source suggests a higher estimate of

around $3,096,200.

287.    Assuming the date of marriage is in 2002, and date of separation is in

2016, Aire has a fourteen-year Moore-Marsden interest in the property

plus her personal investment, minus the six month period of separation in

2007-2008.

288.    Egbase imposed coercive debt on Aire throughout the marriage and concealed it from her. Both in 2007-2008 (first separation) and then in 2016-2019, (second separation, trial and judgment) by allowing the properties to come close to foreclosure. He also suppressed the value by taking out loans (keeping them for himself) and by deliberately refusing to pay the full mortgages, and to pay down

the principal.  Immediately after the trial concluded in November 2019, Defendant resumed making payments, to bring the mortgages current and he also obtained a new $250,000 loan from a private individual, Richard Barlowe, to insure the property had no equity in case Aire won on appeal.

289.    A review of the title proves that the property was Egbase's personal piggy bank:

        Recording Date Lender Amount Purchase Money
        1. 07/30/2024 IRA FRIEDMAN ETUX $400,000 NO
        2. 09/13/2023 MANUELA MERCADO $150,000 NO
        3. 12/12/2022 ROCKET MORTGAGE LLC $647,000 NO
        4. 11/27/2019 RICHARD BARLOWE $250,000 NO
        5. 06/27/2007 EDUARDO A CANAS $55,000 NO
        6. 07/25/2005 WORLD SAVINGS BANK FSB $54,500 NO
        7. 05/05/2005 WORLD SAVINGS BANK FSB $546,000 NO
        8. 06/18/2004 UNITED CALIFORNIA SYSTEMS INTL INC $500,000 NO
        9. 02/05/1998 LONG BEACH MTG COMPANY $455,000 YES
        Loans
        455,000   1998 - PURCHASE LOAN - PUT DOWN 195,000 OF WHICH

ABOUT 30,000 WAS  AIRE'S
For about six years, Egbase did not borrow against the property.
500,000    2004 - 2 YRS AFTER NIGERIAN MARRIAGE
546,000    2005 - YEAR OF AMERICAN  MARRIAGE
 54,500    2005 - DITTO
 55,000     2007  -YR FILE FOR DISSO
250,000    2019 - DISSO TRIAL
647,000    2022 - AIRE DISCOVERS THE FRAUD IN JUDGMENT
150,000    2023 -
400,000    2024 –

290.    Egbase stopped making mortgage payments again in 2021 when Plaintiff filed an appeal. Once Plaintiff's appeal was denied, Defendant brought the mortgages current in 2022. In December 2022, when Aire discovered that her judgment was fraudulent, Egbase again began to take loans  on the property. To sum up, Egbase let the mortgages go delinquent whenever Aire litigated and brought them current when he believed Aire had given up.

291.    The following is a list of financial transactions Egbase engaged in using the home as collateral of which Aire had no knowledge. Egbase listed himself as **an unmarried man** on all loan applications after 2002, committing lender fraud. He did not borrow against or encumber the property until two years after he married Aire in 2002 and 2005.

(1) 8/8/2024 - Payoff of $150,000 loan; (2) 01/05/2024 - loan of
$250,000  (3) 09/02/2023 - loan of $400,000; (4)

12/8/2022 -

Refinance of $647,000; (5) 03/15/2022- loan $150,000;
(6) 5/25/2021 - Payoff of $250,000 loan; (7) 4/29/2021 -
Payoff of

$546,000 loan; (8) 11/20/2019 - $250,000 loan (9)
12/11/2019 -

Payoff of $54,500 loan; 10/2/2019 - Lis Pendens
Released by

WORLD SVGS BK FSB; 2/13/2019 - Lis Pendens
Released by

WORLD SVGS BK FSB;

(10) 9/28/2018 - Payoff of $55,000 loan; 9/4/2018 - Lis
Pendens

Released by WELLS FARGO BK NA; 9/4/2018 - Lis
Pendens by

WELLS FARGO BK NA; 2/14/2018 - Lis Pendens by
WORLD

SVGS BK FSB; 2/14/2018 - Lis Pendens Released by
WORLD

SVGS BK FSB; 12/27/2017 - Lis Pendens Released by
WELLS

FARGO BK NA; 12/27/2017 - Lis Pendens by WELLS
FARGO BK

NA; (11) 12/15/2013 refinanced - loan $315,000; (12)
12/19/2012 -

Permit Issued for Addition work valued at $20,000 by
Corona

Construction; (13) 10/24/2012 - Permit Issued for New
Construction valued at $35,000; (14) 08/01/2010 -
Refinanced

property  - loan $315,000; (15) 7/14/2008 - Mechanics
Lien of

$5,000; (16) 06/27/2007 - $55,000 loan; (17) (07/13/2005
- loan of

$546,000; 07/30/2007 - Assignment of mortgage
executed to Kirsten

Lee Limited Partnership; (18) 07/13/2005 - line of credit,
$54,500;

(19) 5/31/2005 - Payoff of $500,000 loan; (20) 4/25/2005

126

Refinance of $546,000; (21) 6/10/2004-  Refinance of
$500,000.

292.    The liens for remodeling prove the remodeling occurred. Ingram and

Egbase hid the fact the home did undergo improvements.

293.    Egbase falsely represented the property's valuation, relying on a

curbside appraisal conducted by Hector Pezer, **who was Egbase's**

**former client which conflict of interest was not disclosed during trial.**

**Ingram let Egbase and Pezer get away with this**.  Both Ingram and

Egbase concealed the official appraisal conducted by Kevin Pellon,

which reflected substantial property

improvements and provided a reasonable valuation of the home.

FRAUDULENT SHIFT FROM MOORE/MARSDEN TO
EPSTEIN/WATTS TO DEFRAUDPLAINTIFF OF HER COMMUNITY
PROPERTY INTEREST

294.    In August 2017, while represented by Attorney **Annette Kulik,**

Defendant Anthony Egbase submitted a declaration through his counsel

to the family court in Case No. LD051587. The declaration stated that

Egbase had engaged a forensic accountant to **calculate Plaintiff's**

**Moore/Marsden community** property interest in the family residence

located at 4852 Queen Florence Lane, Woodland Hills, CA 91364, and

that he had secured a lender to compensate Plaintiff for her share. This

admission established that Plaintiff was entitled to a community property

interest.

The **declaration** further asserted: *"Petitioner has secured an individual lender who is willing to lend Petitioner the funds **to pay Respondent her one-half (½) community interest in the family residence**. This will allow Respondent to obtain substitute housing and thereby allow Petitioner to move back into his property."*

295.    Plaintiff, appearing pro se at the time, relied on the truthfulness of

this declaration and anticipated a fair determination of her rightful

interest in the property.

296.    However, by the time of trial in 2019, Defendant Egbase had

completely reversed his position. With the assistance of forensic

accountant Yelena Kaminsky and the support of Plaintiff's trial attorney

David Ingram, Egbase claimed the property was his separate property

and asserted Epstein/Watts reimbursements for mortgage, utilities, and

maintenance expenses. This shift directly contradicted the 2017

declaration and was done in bad faith to convert Plaintiff's community

property interest into a debt.

297.    The trial court, presided over by Judge Christine Byrd, adopted

Egbase's revised narrative and ruled that **Plaintiff owed Egbase a total**

**of $229,500 in reimbursements**, which was offset by past due spousal

support ($85,470), resulting in a final reimbursement judgment of
$144,030 against Plaintiff.

298.    At no point during trial **were the original deeds to the property
entered into evidence to support Egbase's separate property claim**.
The court relied solely on representations and calculations provided by
Egbase and his expert, despite having conflicting statements in the record
and no verification through title or chain of ownership documentation.

299.    This manipulation of the record—**first acknowledging a community
interest and offering a buyout, then switching to a reimbursement
claim**—constitutes fraud upon the court. It was enabled by collusion
between Egbase, his accountant, Plaintiff's attorney, and Judge Byrd, and
resulted in substantial deprivation of Plaintiff's property rights without
due process.

300.    Plaintiff alleges that this bait-and-switch tactic mirrors Egbase's
broader pattern of litigation abuse, where he manipulates legal positions
for strategic advantage, regardless of truth or consistency. The court's
failure to scrutinize the contradictions and refusal to admit or require
foundational documents like property deeds was a denial of Plaintiff's
Fourteenth Amendment rights to due process and equal protection under
42 U.S.C. § 1983.

**Nigerian Home.**

301.    Both Egbase and Ingram suppressed the evidence concerning the

Nigerian property located in Uromi which Egbase and Aire owned. It was

a compound consisting of several buildings.

302.    Aire's father,  Francis Aire,  had signed an affidavit detailing the

engineering work done on the property. Ingram refused to call Aire's

father as a witness and have him testify remotely although J. Byrd ruled

that he could do so. Nor did Ingram even attempt to move F. Aire's

affidavit into evidence, although it contained crucial details of the

electrical work he did on the property, for ten years, from 2005 to

November 2015. The cost of the electrical work alone was $536,174.23

USD. This amount was supported by engineering estimates for work

completed on the property, including the installation of a transformer

valued at $100,000 USD in 2005.

303.    With Ingram as an attorney for Aire, Egbase knew he would be able to

commit perjury, fraud, and ultimately deprive Aire of all her property and

support.  It got so bad with Ingram that he even began to gaslight his

client, telling Aire that J. Byrd denied her father the right to testify

remotely when Aire herself heard J. Byrd rule that he could.

304.    Ingram's fraud and misconduct opened the door for Egbase to devalue the Nigerian property. In 2007/2008, Egbase deliberately undervalued the property stating it was worth only $200,000 USD. At that time, Egbase referred to the property as a "construction site" with minimal development.

305.    With no one to stop Egbase, Ingram having declared his allegiance to him, Egbase insisted the property was still only worth $200,000 USD **eight years later in 2016** in his pretrial disclosure to his attorney at the time, Maya Shulman. He did so, despite substantial progress on the property by 2016, including the addition of three houses, palm trees, and items shipped from the U.S. for sanitation work.

306.    It became  much worse at trial; Ingram having joined Team Egbase. Ingram refused to present photographic and video evidence documenting the dramatic transformation of the property in the last eight years, from 2008 at which time Egbase claimed the property was worth $200,000 to 2016, including a photograph taken on January 28, 2010, which captured the early stage of development, and photos  showing the property's completed development by 2017. Suppression of the photos of the construction of the buildings over time, and of the testimony of Aire's

father along with his documentation of the cost of electrical installation
spelled doom for Aire.

307.    Ingram suppressed substantial photographic and video evidence
documenting the dramatic  transformation of the property over time,
including a critical photograph taken on January 28, 2010, depicting the
early stage of development, (when the property was worth at least
$200,000 according to Egbase. Ingram, also refused to introduce
evidence showing the property's completed development by 2017. This
suppression included not only the pictures and videos of the completed
mansions on the property but also the affidavit from Engr. Francis Aire,
which detailed the engineering work and community funds invested into
the property.

308.    At trial, according to Egbase – stepping into the void created by
Ingram selling out his client – the property had deteriorated – despite
significant construction which Ingram refused to prove – and now was
only worth $30,000 USD.  Aire was awarded **on paper only** $15,000
USD, an amount that was never received due to the fraudulent nature of
the case.

### Law Practice

309.　Like the properties, the law practice was devalued to the point Aire received zero although Egbase has practiced law for years including when they married in 2002 and again in 2005 and continuing to the present time. His practice is international, in Nigeria, in Washington, D.C. , and in L.A.　*A.O.E. Law and Associates in Los Angeles and Anthony Egbase & Associates in Nigeria were both created during the marriage, in July 2011 and on March 1, 2016, respectively.*

310.　Once more, Ingram came through like a champ for Egbase and refused to obtain an appraisal of Egbase's entire law practice which revenue as of December 29, 2024, is valued at $5,915,000 with over 16 employees. Kona Equity found at https://www.konaequity.com/company/anthony-o.- Egbase-and-associates -4391209705, Anthony O. Egbase and Associates, Los Angeles, CA, a A miraculous comeback! in a short five years since the trial when Egbase's "expert" claimed Egbase's law practice was worth a mere ---.

### Nigerian Law Practice - no Mention of it in Egbase Law Practice Appraisal.

311.　Egbase opened his law office in Nigeria following a significant contract awarded by the Nigerian Government. Egbase admitted in a pre-

trial declaration he had received a 1.5-million-dollar payment from the

Nigerian government. Egbase's legal practice, AOE Law and Associates,

APC, thrives on his connections with high-ranking political figures. He

has hosted political fundraisers for prominent individuals, including

Kamala Harris, and maintains close ties with numerous influential

politicians. His international dealings, particularly in Nigeria, have

further solidified his financial status. Egbase's representation of high-

profile clients, such as the Federal Republic of Nigeria and Nigeria's

Minister for Justice and Attorney-General in major litigation, illustrates

his extensive influence.

312.    Egbase was able to maintain a Nigerian practice and handle Nigerian

government cases in Washington, D.C. because he could be absent from

the family home in Woodland Hills for long periods of time since Aire

kept the home fires burning and devoted herself to raising their two sons

without his participation in parenting the children.

313.    Egbase continues to the present time to handle federal cases filed in

U. S. District Court for the District of Columbia involving the recovery

of stolen funds from Nigeria. Egbase is entitled to 40% of the recovered

amounts, such as in the case involving $550 million, from which he stood

to gain 40%, along with many other similar contracts.

314.    The law practice appraisal made no mention of the Nigerian

government contract nor of Egbase's ongoing D.C. litigation. In fact,

Egbase claimed in family court in Los Angeles that his domestic practice

in Los Angeles was depressed because of glaucoma and detached retina

which glaucoma and detached retina did not stop him from filing a

detailed motion in the federal court in D.C.  Of interest the "glaucoma

and detached retina"

Egbase's California Bankruptcy Practice –
No Mention of it in Appraisal

315.    Egbase was paid substantial fees representing clients in bankruptcy

court for many years. There was no mention of his bankruptcy practice in

the appraisal.

Post-Judgment Property Acquisitions
Using Hidden Funds

316.    Following the conclusion of the dissolution proceedings, and notably

after Plaintiff's appeal was dismissed on April 27, 2022,  Defendant

Anthony Egbase engaged in a pattern of concealed, high-valued real

estate, post-judgment property acquisitions, using hidden funds that were

not disclosed during divorce proceedings, in violation of fiduciary

disclosure obligations under California Family Code § 3210, which raise

serious concerns about fraud, asset concealment, and financial misconduct in violation of Plaintiff's marital property rights and California community property laws.

317.    Shortly before acquiring additional properties, Defendant Egbase made a substantial mortgage payment totaling approximately **$820,000 toward the property located at 4852 Queen Florence Lane**, a property that had long been in default and facing foreclosure. This significant outlay of funds occurred immediately prior to a suspicious sequence of high-value real estate transactions, which Plaintiff believes were funded using community assets hidden from the court during the dissolution trial.

318.    Within months of the $820,000 payment, Defendant Egbase **acquired a luxury property at 10909 Balantrae Lane, Potomac, MD 20854. Public records confirm the home was purchased for $1,499,000** on September 29, 2021, but notably, the purchase was made not in his individual name but through a trust vehicle titled **SPE Memorial Family Trust LLC**. Plaintiff alleges that the use of this trust was a deliberate scheme to shield the property from division or disclosure as marital property.

319.    Then, approximately six months later, Defendant Egbase acquired a second luxury residence located at **3199 Bel Air Dr, Las Vegas, NV 89109, on December 6, 2022, for a recorded sale price of $1,439,000.** This transaction, again post-judgment and post-appeal, further supports Plaintiff's allegations that Defendant was actively concealing community assets and income during litigation and had access to substantial funds that were never disclosed during discovery.

320.    Plaintiff notes with concern that during the dissolution trial, Defendant Egbase represented to the court that all three of his properties were in foreclosure, with no equity, and that his financial condition was dire. However, the rapid sequence of property acquisitions, funded with liquid cash or undisclosed assets and conducted under obscure trust entities, strongly indicates fraud on the court and Plaintiff.

321.    These post-judgment real estate acquisitions represent egregious financial abuse and asset dissipation, and they materially undermine the credibility of Defendant's prior representations under oath. Plaintiff respectfully requests that the Court take judicial notice of the property records for the following:

> 10909 Balantrae Lane, Potomac, MD 20854 (SPE Memorial Family Trust LLC
> 3199 Bel Air Dr, Las Vegas, NV 89109 (Purchased by Anthony

Egbase individually)
4852 Queen Florence Lane (substantial mortgage payoff of $820,000,
beginning November 2019, immediately after trial, before Judgement
was entered on February 2020.

322.    These purchases, made just after the judgment and coinciding with the

denial of Plaintiff's appeal, strongly suggest strategic concealment of

wealth to avoid equitable distribution. the timing, and the purpose of the

SPE Memorial Family Trust LLC, restitution of community property

wrongfully withheld.

**Theft of Community Funds for "Love Nest". 880 west 1st str. Unit
306, LA 90012**

323.    Secret Condominium Maintained with Community Funds Egbase

secretly maintained a residential unit at 880 West 1st Street, Unit 306,

Los Angeles, CA 90012—referred to in internal communications as a

"love nest"—for over three years, dating back as far as 2014. Plaintiff has

uncovered email evidence dating from 2014 through 2016 confirming

Defendant's exclusive use, control, and payment of expenses for the unit,

including furniture, appliances, and parking spaces. Egbase paid rent

regularly and used his law office employees to coordinate these

arrangements, including direct communication with the property

management office. Evidence includes emails from Egbase confirming

his ongoing use, instructions about appliances left in the unit, and third-

party email chains referencing parking and rent payments for Unit 306.

Despite the community having a separate unit at 800 West 1st Street—

held in the name of Victoria Egbase—Defendant funded this second unit

without disclosure. Plaintiff's attorney, David Ingram, failed to disclose

this to the court or demand reimbursement, depriving Plaintiff of any

recovery for the $3,500/month average paid from community assets.

Plaintiff now demands full reimbursement and equalization for at least

three years of hidden tenancy at Unit. Ingram refused to present the

evidence of Egbase making secret payments to this property even though

were provided to him, Ingram told Plaintiff, you don't want the court to

know he was cheating on you.


**Denial of Spousal Support.**

324.    After finding the four properties worthless and awarding them all to

Egbase with no equalization payment to Aire and also after finding Aire

was not entitled to any equalization payment for the law practices, J.

Byrd denied Aire spousal support.

325.    First, with respect to spousal support based on the marriage being ten

years or longer, as already established  J. Byrd established a date of

separation neither party suggested, to insure Aire could not claim she was

married more than ten years. However, Aire was certainly entitled to a

few years of spousal support to get on her feet and  based on extreme

need. She is a black woman in her fifties and had not worked outside the

home for years.

326.    Egbase's perjury and manipulation of the facts, aided and abetted by

Ingram are shocking. As already alleged, Egbase convinced J. – to

suspend spousal support in exchange for payment of the mortgage on the

Queen Florence home. That is, the payment of the mortgage was in lieu

of spousal support. Egbase violated that agreement. He refused to pay on

the principal in order to decrease the value of the home and had

encumbered the home with liens for loans he kept for himself.

327.    Then, having submitted falsified "appraisals" of his law practice

income and falsified dates when he opened the law practices in Los

Angeles and in Nigeria which **Ingram did not challenge,** Egbase

maliciously depressed the law practice income. As just one example,

Ingram failed to cross examine Egbase about the 1.5-million-dollar

attorney fee he had recently received from the Nigerian government.

Ingram also refused to seek fees to hire a forensic accountant. Instead, he

informed Aire he would do the accounting himself, so he could  throw

the case.

328.   J. Byrd ignored the law of the case established by Judge Dordi on June 27, 2018.  J. Dordi  found that the family enjoyed a comfortable lifestyle, noting they lived in a very comfortable home, and they traveled and went on vacations. They provided private school for the two children; He noted that neither party disputed these facts. Egbase claimed that presently Aire was able to support herself since she claimed she had been an event planner. J. Dordi rejected his argument. He ruled that Egbase's income was far greater than that of Aire, **and it was unlikely that Aire would be self-supporting in the near future.** He also found that Egbase could afford to pay attorney fees and ordered he pay Aire's retained attorney $15000.

329.   At trial, Egbase pulled off an outrageous fraud which Ingram aided and abetted.  As already alleged, Egbase had filed an ex parte claiming falsely he could not afford paying the mortgage on the Queen Florence home and tried to evict Aire. The judge decided to suspend spousal support and the mortgage payments were substituted for her spousal support so she could remain in the home with her minor son.

330.   By the time trial had rolled around, Egbase not only was not paying the full mortgage as he promised he would to get out of paying spousal support for the sole purpose of depressing the equity while also

141

encumbering the property with loans to reduce the equity even more, he

had the nerve to demand Aire pay half or the entire rent when payment of

the mortgage was supposed to be a substitute for her spousal support!

331.   To make the trial even more of a mockery of fairness and due process,

Egbase refused to repair the home when a wall fell in and caused

enormous damage. The home was unlivable, but Aire and her son had no

place else to live because Aire had had her spousal support suspended in

exchange for Egbase paying the full mortgage which agreement he also

violated.  It was unrentable. Yet, J. Byrd found that the fair rental value

was $7,000 a month when not even an unhoused person would live in the

home because it was dangerous, besides being unlivable. J. Byrd

requested Plaintiff to reimburse Egbase $229,000 for living in the family

house.

332.   As already alleged, —, Ingram's client he was representing at the

same time as he was serving as Aire's attorney, claimed his law practice

income was depressed because of glaucoma and detached retina which

was the identical reason Egbase claimed his law practice income was

depressed.  Egbase had possibly committed fraud against his disability

insurance company.

142

333.    Using the eye medical problem as a ruse, Egbase came into trial claiming he was not making much money (from his Nigerian government contract, or from his Nigerian, Wash., D.C. , or Los Angeles law practices, Palmer Business, and other businesses he had opened, generally in faux Victoria's name). Besides, the family's four properties were worthless (thanks to his loans and purposely not paying the mortgages)' and of course, Ingram kept Aire from testifying to the millions of dollars of community property he had sent to Nigeria during their marriage.

334.    Although J. Dordi already found the couple enjoyed a comfortable home and lifestyle, J. Byrd revisited the issue, which is part of the reason why women consistently lose property and support and why attorney fees are so high in family court. Aire was forced once more to introduce evidence of an extravagant life style, such as spending $10,000.00 on plane tickets, paying for expensive dinners, donating large amounts of money to various groups, and **hosting a fundraiser at his expense for Karen Bass when she ran for mayor**, J. Byrd explained it all away by claiming that Egbase and Aire lived beyond their means, and they were really just a middle class family. Spouses who are W-2 employees

143

earning just a middle-class income also have legal obligations to support their stay-at-home spouses.

335.    As a result of all this charlatanism, Aire ended up owing Egbase for the privilege of being married to him for either fourteen years or eleven years and elevating him into the limelight to make more money. Egbase walked away with all the properties, his law practices intact, and Aire owing him an equalization payment.

336.    J. Byrd issued the Judgment on February 26, 2020, finalizing the community property division. Almost immediately, Egbase brought the properties current paying off substantial liens. Within a year, in 2021, Egbase also purchased a home located at 10909 Balantre Lane, Potomac, MD 20854 worth over $1.7 million and another home located at 3199 Bel Air Drive, Las Vegas, NV 89109 also purchased in 2021 worth –.$1.5 Million

337.    Post-Judgment Acquisition of Real Property Using Fraudulently Concealed Community Funds: Constructive Trust Allegation

338.    Following the fraudulent entry of a bifurcation divorce decree on August 3, 2017—signed by Commissioner Alicia Blanco without jurisdiction—Defendant Egbase rapidly began to dissipate and convert community property under the false pretense that the marriage had

legally ended. One of the most egregious acts of post-judgment fraud occurred shortly after Plaintiff's appeal was dismissed on April 27, 2022. Egbase used undisclosed and concealed community funds to purchase a luxury property located at 10909 Balantrae Lane, Potomac, MD 20854, placing title in the name of "SPE Memorial Family Trust LLC."

339.    The purchase of this property was not incidental. It was a deliberate act of concealment, occurring while Plaintiff was still unaware that the judgment underlying the dissolution of her marriage had been fraudulently entered and therefore void. The fraudulent decree served as the foundation upon which Egbase secured this real estate asset, insulating himself from future claims by Plaintiff and manipulating the legal process to make it appear as if he was no longer subject to community property laws. He structured the transaction through a trust entity to shield the property from scrutiny and to preemptively defeat Plaintiff's rights.

340.    Approximately six months later, Egbase acquired yet another post-judgment property located at 3199 Bel Air Drive, Las Vegas, Nevada. Again, he used a different concealment tactic—this time misrepresenting the property as his primary residence to qualify for financing—despite it being a luxury investment held solely in his name. These actions were

executed after the purported final judgment in February 2020, which was itself premised on the bifurcation judgment from 2017, thereby tainting all post-judgment financial actions and acquisitions with fraud.

341.    Plaintiff asserts that these properties were acquired using funds derived from the marital estate, including but not limited to, proceeds from undisclosed international contracts, diverted community funds, and assets held in the names of third parties such as Egbase's sister. Given that the underlying divorce judgment was procured through fraud upon the court and therefore void ab initio, Plaintiff maintains that the community property regime was never legally dissolved, and her interest in post-acquired assets must be preserved.

342.    Plaintiff seeks the imposition of a **constructive trust** over the properties located at 10909 Balantrae Lane, Potomac, MD, and 3199 Bel Air Drive, Las Vegas, NV. These properties are traceable to marital earnings, hidden transactions, and unlawful conduct. A constructive trust is warranted to prevent unjust enrichment, to rectify the fraud upon the court, and to secure Plaintiff's rightful interest in assets unlawfully diverted following a fraudulent judgment. Plaintiff reserves the right to identify and amend the complaint to include any additional real properties obtained in a similar fraudulent manner.

146

## The Illegal Eviction of Aire and Her Sons.

343.    Immediately upon the judgment being entered, Egbase filed an

unlawful detainer action against Aire.  Egbase served critical documents

to incorrect addresses intentionally—using 4851 and 2852 Queen

Florence Lane instead of 4852 Queen Florence Lane—which ensured

Aire did not receive notice

and Egbase obtained a *false default judgment of eviction* on June 4, 2020.

344.    Egbase sought a writ of execution twice with the correct case number

to provide the sheriff to evict Aire and her son. Both applications were

rejected by the clerk on August 31, 2020, and September 11, 2020, as

reflected by the case summary in existence when Aire took a screen shot.

The case summary at this time shows no writs were issued or rejected.

345.    While waiting on his second application, Egbase decided he could not

wait any longer. After all, he had a Mistress, from Nigeria, half his age

and a young child to move into the home, probably pulling on her what

he had pulled on Aire.

346.    Egbase  had to locate a clerk willing to sign a forged writ on which he

purposely changed "UD" to "DU" in the case number, fraudulently

altering the case number from 20VEUD00634 to 20VEDU00634,

resulting in the issuance of a **fake writ of execution dated September 2,**

147

**2020.** Aire also has a copy of the forged writ showing the falsified case number.  The case summary does not show the issuance of any writ, including the writ with the falsified case number which Bets signed and issued to Egbase and which was used by the **Sheriff deputies to put Aire and her children on the street on September 16, 2020, amid a pandemic and during an eviction moratorium in Los Angeles, violating state and federal protections provided under the COVID-19 Tenant Relief Act.**

347.   This is gendered racism at its worst because the eviction was aimed at a black mother and her two sons who were homeless and with no money. Black persons in Los Angeles County were among those who suffered the highest rate of deaths from Covid-19. While Aire's sons were over the age of 18 they had no place to live when they were evicted, and both suffered mental disabilities.

348.    Another black mother who also was unemployed with no place to live and her daughter who was about to turn eleven years old were evicted just eleven months later also by a LASC judge, in August 2021, the month and year that African Americans suffered their highest death rate in Los Angeles County from the pandemic.  Both evictions were

unspeakably cruel, they were illegal, and they violated the City and

County moratoria on evictions as well as the ADA.


### Motion to Disqualify J. Byrd and Two Motions for New Trial

349.   With no immediate family in California and a lack of financial means

to engage legal representation. the respondent was thrust into the

daunting role of self-representation. She planned to appeal when she

realized her attorney had kept out important evidence. She faced another

battle. Ingram would not substitute out perhaps to run out the clock on a

motion to vacate. Aire was forced to seek the aid of the Bar to force

Ingram to substitute out. He finally did.


### Judicial Handoff Chaos Enabling Fraud

350.   Defendant LASC's chaotic and inconsistent reassignment of

Plaintiff's family law case between multiple judges without continuity

enabled Defendant Egbase to present inconsistent narratives, suppress

prior rulings, and manipulate judicial findings. The absence of an

assigned judicial officer for all purposes violated due process and directly

contributed to the fabrication of the bifurcation judgment and denial of

Plaintiff's property rights.

**JUDGE CHRISTINE BYRD**

351.    Denial of Due Process and Right to Counsel (Fourteenth Amendment)

On November 13, 2019, Plaintiff reported attorney misconduct by David
Ingram to Judge Christine Byrd, including suppression of evidence,
refusal to allow Plaintiff's father to testify, and failure to submit deeds
and affidavits. Plaintiff requested to substitute counsel or proceed pro se.
Judge Byrd denied this request without investigation, violating Plaintiff's
constitutional right to a fair trial under the Fourteenth Amendment.

### Failure to Protect Plaintiff's Vulnerable Adult Child

352.    On September 25, 2019, Plaintiff informed Judge Byrd that her adult
son, diagnosed with a mental illness, had been forced onto a plane to
London by Defendant Anthony Egbase while hallucinating. Judge Byrd
failed to act or inquire, thereby enabling Defendant to avoid adult child
support obligations under California Family Code §3910. This omission
resulted in Plaintiff's son been hospitalize in London, under section 2 of
the mental health Act, and has caused irreparable harm to her son.

### Tampering with Evidence During Appeal

While Plaintiff's appeal was pending, Judge Byrd issued an order for
both parties to remove exhibit boxes from court premises. These boxes
contained evidence such as the forged divorce decree with a fake judicial

signature. Judge Byrd was aware of the potential forgery yet permitted

the removal, obstructing justice and violating due process protections.

353.    Misuse of Prior Transcript to Favor Defendant

Judge Byrd selectively cited an **out-of-context quote** from the April 16,

2008, transcript: *"MA'AM, YOU'RE LIVING IN THE HOUSE. YOU'RE*

*GOING TO HAVE TO PAY FOR THE HOUSE,"* while disregarding

Judge Kohn's instructions for forensic investigation of Defendant's

finances. This misrepresentation constituted judicial bias and an

intentional distortion of the record. Notably, this exact quote had been

repeatedly used by Defendant Anthony Egbase in his filings and court

appearances, suggesting a concerning pattern. The replication of this

language in Judge Byrd's ruling raises serious concerns that the judgment

may have been authored or substantially influenced by Defendant Egbase

himself and later signed by the Judge. This further undermines the

impartiality of the proceedings and supports Plaintiff's claim of collusion

and judicial misconduct.

354.    Contradictory Rulings on Attorney Fees

On June 27, 2018, Judge Dordi awarded attorney fees to Plaintiff under

California Family Code §4320. However, during trial, Judge Byrd

151

refused to apply the same statute and denied Plaintiff fees, disregarding

financial need and violating legal consistency and access to justice.

355.    Refusal to Recuse Despite Bias

Following the trial, Plaintiff moved for recusal of Judge Byrd due to bias,

violations of due process, and mishandling of trial procedures. Judge

Byrd denied this motion and subsequently denied Plaintiff's Motion for a

New trial. The denial occurred despite Plaintiff's homelessness and

hardship.


### Misuse of Date of Separation Contrary to Family Code §70

356.    Judge Byrd ignored photographic and testimonial evidence

supporting August 1, 2016, as the legal date of separation. **Instead, she

adopted June 5, 2015**—a date favoring the Defendant—despite contrary

findings in the record. This ruling denied Plaintiff rightful property

valuation and support.

357.    Improper Handling of Post-Trial Motions (May 6, 2020)

Plaintiff filed a motion for a new trial based on newly discovered

evidence, including previously suppressed deeds and inconsistencies in

the timeline of events. The hearing on the motion was officially

scheduled for May 8, 2020. However, Judge Byrd issued a ruling on May

6, 2020—two days before the scheduled hearing—denying the motion

without any response from Defendant Egbase. By ruling prematurely and

without consideration of the opposition or the new evidence, Judge Byrd

violated Plaintiff's constitutional right to due process and deprived her of

a meaningful opportunity to be heard.

### Termination of Spousal Support Without Jurisdiction

358.    Judge Byrd's final judgment stated that spousal support would

terminate on August 31, 2020, with no future court having jurisdiction to

modify. The order reads: "The final spousal support payments are due on

August 1 and 15, 2020, and jurisdiction over spousal support shall

terminate absolutely on August 31, 2020, unless terminated earlier, *and*

*no court will have any jurisdiction to order support thereafter; (d) The*

*final termination date of August 31, 2020, shall not be extended under*

*any circumstances, even if a change in circumstances occurs*." This

ruling disregarded the Plaintiff's disability, financial hardship, and

fundamental rights under family law, effectively foreclosing her legal

recourse. Judge Byrd's deliberate inclusion of such **extreme language**

**illustrates her intent to bar the Plaintiff from ever seeking support,**

**regardless of future hardship or disability, thereby violating due process and long-term financial protections.**

359.    Bias and Discrediting of Plaintiff Throughout Proceedings

Throughout the history of this case, the parties have appeared before at least five different judges. No prior judge ever described Plaintiff as "not credible." On the contrary, several judges expressed concerns about Defendant Anthony Egbase's credibility and characterized him as not credible. However, **during the trial presided over by Judge Christine Byrd, Plaintiff was repeatedly labeled as "not credible"** in nearly every ruling, regardless of the facts presented. Judge Byrd's consistent use of this term against Plaintiff—despite her having no history of dishonesty or fabrication in court—was excessive and abusive. The language employed by Judge Byrd discredited the Plaintiff to such a degree that it discouraged any attorney from taking her case post-trial. This conduct revealed clear judicial bias and discrimination, particularly when contrasted with the leniency and credibility afforded to Defendant Egbase, an attorney and multimillionaire with a known pattern of misrepresentations. Such partiality deprived Plaintiff of her right to a fair trial and violated principles of judicial neutrality.

These actions constitute violations under 42 U.S.C. §1983 for deprivation of civil rights, **acting under color of law**. **Judge Byrd acted beyond her judicial role, exhibiting patterns of collusion, misconduct, and favoritism which are not protected by judicial immunity**.

### LINDA COMSTOCK, COURT REPORTER

**Defendant Linda Comstock's Alteration and Fabrication of Court Transcripts**

360.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

361.    Egbase's California Bankruptcy Practice - No Mention of It in Appraisal.

362.    **On November 13, 2019**, Plaintiff formally requested to discharge her attorney David Ingram due to serious allegations of misconduct, including suppression of material evidence, collusion with opposing counsel, and denial of Plaintiff's constitutional rights. This critical request is clearly documented in the contemporaneously prepared Minute Order issued that same day.

363.    However, the transcript produced over a year later by Defendant Comstock materially omits Plaintiff's request to represent herself and contains fabricated statements never made during the proceeding. The

transcript further attributed statements to Plaintiff's counsel that were false, while excluding exculpatory testimony made by Plaintiff, including her statement: *"The moment he called $350,000.00 dollars, 350,000.00 Naira, I knew for sure he was not working for me."*

364.    These intentional omissions and insertions in the transcript fundamentally altered the record of judicial proceedings and denied Plaintiff the opportunity for meaningful appellate review. The discrepancies between the Minute Order and transcript evidence a deliberate scheme to obstruct justice.

365.    The transcript fails to document Plaintiff's request to proceed in pro per, a constitutional right under both the Sixth and Fourteenth Amendments. The omission directly infringes on Plaintiff's due process rights and further illustrates the calculated alteration of judicial records.

**A. Falsification of September 25, 2019, Transcript**

366.    Defendant Comstock also materially altered the transcript of the September 25, 2019, hearing. At the beginning of that session, Plaintiff brought to the Court's attention that her son, who has severe mental illness, was hallucinating at the airport while being forced on an international flight by Defendant Anthony Egbase. This urgent testimony

was directly presented to the Court to address Egbase's endangerment of their son.

367.    Defendant Comstock intentionally omitted this testimony from the official transcript. The omission not only erased Plaintiff's urgent plea but undermined legal claims related to adult child support, child endangerment, and Plaintiff's fundamental rights as a caregiver.

### Refusal to Produce Stenographic Notes and ASCII Files

368.    After discovering the discrepancies between the transcript and the Minute Order, Plaintiff filed a Motion to Compel the production of the original stenographic notes and ASCII-formatted versions of both the November 13 and September 25, 2019, hearings. The motion was denied on August 18, 2023.

369.    Defendant Comstock refused to produce audio recordings, time-stamped ASCII files, or original stenographic notes. She asserted that her uncertified transcript constituted the official record. These actions violated Plaintiff's rights under the California Rules of Court and denied her the opportunity to verify and correct the official court record.

370.    The ASCII file Plaintiff later received from **Defendant Comstock lacked the required time stamps**. In comparison, an ASCII file from a different court reporter in the same case did include time stamps, further

exposing the discrepancies in Comstock's transcript and the broader

effort to conceal misconduct.

### B. Pattern of Deception and Concealment

371.    In response to Plaintiff's July 2023 request for a corrected ASCII

transcript, Defendant Comstock emailed a disclaimer stating that

transcripts were not appeal-eligible and refused to provide any master

index. The statements contradicted Comstock's prior representation of

transcript format requirements and highlight her intent to obstruct post-

trial review.

372.    Plaintiff was forced to pay for the altered transcripts, including a $42

payment for a five-page excerpt intended for her adult child support

filing. Despite clear communication from Plaintiff regarding the format

needed, the transcript provided omitted Plaintiff's account of Egbase's

misconduct toward their son.

373.    Plaintiff filed a complaint with the Court Reporter Board of

California (CRB) under complaint number #2122043. Several months

later, Plaintiff received a boilerplate closure letter without name or

signature, further suggesting institutional collusion and lack of

accountability.

### C.  Violations of State and Federal Law

374.    Defendant Comstock's conduct constitutes multiple state and federal

crimes:

- California Penal Code §115(a): Knowingly offering or filing false documents in a public record.
- California Penal Code §132: Offering false evidence in a legal proceeding.
- California Penal Code §134: Preparing false evidence for a legal proceeding.
- 18 U.S.C. §1519: Falsification, alteration, or destruction of records in federal investigations or proceedings.

375.    Defendant Comstock's actions directly caused the dismissal of

Plaintiff's appeal without ever reaching a hearing. Defendant Anthony

Egbase exploited the fraudulent transcript and filed a motion to dismiss

Plaintiff's appeal on procedural grounds, which was granted without any

inquiry into the transcript dispute.

376.    These events deprived Plaintiff of access to appellate review and her

constitutional rights. The misconduct committed by Defendant Comstock

was not isolated but part of a coordinated effort to shield judicial and

attorney misconduct.

377.    Defendant Comstock's deliberate fabrication of court transcripts and

refusal to disclose official records demonstrates systemic corruption that

has irreparably harmed Plaintiff's rights to a fair trial and redress.

Malpractice Lawsuit against Ingram

378.    Aire filed a malpractice lawsuit against Ingram. As she studied the

documents Ingram had turned over to her and became more and more

familiar with her rights under the Family Code, she soon realized Ingram

had engaged in fraud, concealment, breach of fiduciary duty, forging her

signature on court documents Aire had never seen, much less approved.

She realized he had been working with Egbase to bring about an absurdly

unjust result in family court in Egbase's favor. Not knowing her rights,

which was to amend to include the intentionally, possibly criminal claims

against Ingram, she sought a stay of the lawsuit, stating she wanted to file

in federal court against him.

379.    The following allegations against her former attorney, David Ingram,

for legal malpractice, breach of fiduciary duty, fraud, and conspiracy to

obstruct justice. These allegations arise from the events that occurred

during the underlying family law proceedings in Los Angeles Superior

Court, Case No. LD051587. Plaintiff retained Ingram during a highly

contested divorce case in which judicial misconduct and concealment of

evidence played a central role. Ingram's legal representation, rather than

protecting Plaintiff's rights, became part of a larger pattern of collusion

and fraud that ultimately led to Plaintiff filing a separate legal

malpractice case, 21VECV00055, in an attempt to seek redress.

380.    However, the civil case 21VECV00055 was not dismissed based on

the merits. Instead, it was terminated through procedural irregularities

and legal technicalities designed to silence Plaintiff and prevent the

exposure of deeper judicial fraud, accounting misconduct, and evidence

suppression. At the heart of this concealment was Plaintiff's attempt to

reveal in open court—via Zoom and filed pleadings—that the judgment

in her dissolution case was the product of collusion between her attorney,

David Ingram, and opposing counsel. The handling of the malpractice

case demonstrated a coordinated effort to shield judicial actors and legal

professionals from accountability.

381.    The claims in this federal complaint differ fundamentally from those

raised in the earlier malpractice action. They are based on newly

discovered evidence of conspiracy and civil rights violations that could

not have been presented earlier due to Ingram's concealment, procedural

suppression, and obstruction of Plaintiff's ability to testify. These

allegations raise constitutional and civil rights violations beyond the

scope of traditional malpractice and justify federal review and redress

under 42 U.S.C. §1983.

382.    Fraudulent Use of Plaintiff's Signature on Blank Declaration Forms

In the early stages of representation, Ingram invited Plaintiff to his office

to sign declaration forms. Plaintiff was presented with signature pages on

plain paper with blank dates and no content attached. Trusting that she

would review full versions later, Plaintiff signed in good faith. Ingram

later attached these signed pages to filings Plaintiff never reviewed or

approved, allowing him to submit documents under Plaintiff's name

without her consent.

383.    These actions were discovered during Plaintiff's preparation of

interrogatory responses in case 21VECV00055, when she retrieved boxes

from Ingram's office and found the misused signature pages. Prior to this

discovery, Plaintiff had also warned Ingram in writing to stop submitting

documents without her review. In many instances, Plaintiff only received

post-filing copies forwarded by Ingram's secretary, Kellie Woodman,

giving her no opportunity to review or revise them.

III. Suppression of Critical Evidence During Trial

384.    Ingram intentionally withheld crucial evidence during trial, including:

- Real property deeds

- Passport copies of Defendant Egbase

- Property appraisal reports

162

- Financial records of Egbase's undisclosed income and assets

385.    These materials, which directly contradicted trial testimony, were found by Plaintiff while responding to interrogatories in the malpractice case.

IV. Pattern of Delay and Sabotage

386.    Ingram's negligence manifested through repeated delays, missed deadlines, and failure to act on Plaintiff's instructions. He:

- Refused to contact prior counsel at The Bloom Firm
- Ignored discovery requests related to Egbase's income
- Allowed a falsified judgment to be entered into evidence
- Failed to challenge Egbase's false statements using transcripts
- Denied Plaintiff the opportunity to call key witnesses

387.    His conduct facilitated Egbase's false narrative and obstructed **Plaintiff's access to a fair trial.**

Motion to Stay Proceedings and Coordinated Retaliation

388.    Upon discovering the misconduct, Plaintiff filed a complaint with the California State Bar and moved to stay the malpractice proceedings. The hearing was scheduled for February 22, 2024. On February 20, 2024, Plaintiff received a denial via email—pre-dating the scheduled hearing. The attached denial order was falsely dated February 22.

389.    Simultaneously, Ingram's counsel filed an opposition requesting Plaintiff be barred from oral testimony. These tactics mirrored the

silencing and procedural suppression seen in Plaintiff's family law case

and reflected coordinated retaliation.

**Conspiracy to Obstruct Justice and Cover Up Judicial Misconduct**

390.    As Plaintiff uncovered that her dissolution case involved a fraudulent

judgment and judicial misconduct, Ingram and others acted to suppress

this evidence. Plaintiff believes Ingram conspired with Egbase to protect

the fraudulent ruling and obstruct any judicial review.

Legal Distinction from Prior Malpractice Action

391.    Plaintiff's current federal claims differ from the earlier civil

malpractice action (21VECV00055). The claims here are based on newly

uncovered fraud and civil rights violations that were unknown and

inaccessible due to concealment and procedural suppression.

**UNAUTHORIZED FILINGS BY ATTORNEY DAVID INGRAM**

392.    During the course of the litigation, Plaintiff Ejeme Joyce Aire alleges

that her attorney, David Ingram, repeatedly filed documents with the

court that were neither reviewed nor authorized by her, violating both

ethical standards and her right to due process.

393.    In or around August 2018, Plaintiff visited the office of attorney

David Ingram for the sole occasion to sign a declaration. Plaintiff, who

processes information slowly due to dyslexia and who was placed under

pressure during this visit, was asked to read and sign a 10-page

declaration. Despite the document's length and complexity, Plaintiff

managed to review it while in the office and explicitly requested that a

reference to her son receiving 47 hours of Regional Center services be

removed, stating clearly that this was outdated information from 10 years

prior. Plaintiff also expressed surprise that Ingram had included such

information, which had only previously been used by attorney Gail

Wasserman in a declaration filed a decade earlier.

394.    Attorney Ingram assured Plaintiff that the 47-hour service reference

would be removed before filing and that he would insert the signature

page she had signed separately. However, this correction was never

made. Instead, Ingram filed the declaration with the inaccurate

information intact, misrepresenting Plaintiff's current circumstances and

contributing to a false narrative during trial.

395.    Subsequent to this visit, Plaintiff never returned to Ingram's office,

nor was she provided with any DocuSign access or invited to review

additional documents. However, Plaintiff later discovered that her

signature had been photocopied and applied to multiple documents

submitted to the court. For example, on or around October 30, 2018,

Ingram filed an FL-140 (Declaration of Disclosure) using a pre-signed

signature page, added his own handwritten date, and submitted the

document under penalty of perjury—despite Plaintiff never reviewing or

authorizing the content.

396.    When Plaintiff eventually retrieved her case boxes, she found blank

verification sheets bearing her typed name and original signature, with no

dates filled in. She alleges these were improperly used by Ingram to file

documents without her knowledge or consent.

397.    A particularly damaging consequence occurred during Plaintiff's trial

in 2019. On her first appearance as a witness, opposing counsel Anthony

Egbase confronted her with the erroneous 47-hour therapy declaration.

When asked under oath if the statement was in her handwriting, Plaintiff

confirmed it was. Egbase then asked whether their son was currently

receiving 47 hours of therapy. Plaintiff, caught off guard and unaware

that the correction had never been made, did not know how to respond.

Attorney Ingram sat silently, lowering his head without objecting or

defending her. This omission was exploited by Egbase and contributed to

Judge Christine Byrd's repeated findings that Plaintiff was "not credible."

166

Prior to trial, none of the four judges who oversaw the case—Judges
Wendy Kohn, Alicia Blanco, Slawson, and Dordi—had ever labeled
Plaintiff as lacking credibility.

398.    This incident reflects a pattern of conduct by Ingram in alignment
with Egbase to undermine Plaintiff's credibility and damage her case.
Plaintiff later emailed Ingram warning him to stop filing unauthorized
documents. Nevertheless, he continued, including submitting a post-trial
response to a tentative ruling that changed the date of separation to April
11, 2016—consistent with Egbase's false timeline—without Plaintiff's
knowledge. Ingram then sent Plaintiff a copy of the document *after* it had
already been filed.

399.    Additionally, another instance of misconduct occurred when Ingram
insisted Plaintiff verify child support payments dating back to 2015.
Plaintiff had explicitly told Ingram in an August 2018 email **that she did
not feel comfortable trying to dignify Egbase's lies by identifying
what was support or not for 2015 through October 2016,** as they were
still living together during that period. Ingram, however, ignored this
instruction and pressured her to comply, stating in an email,

"*It won't dignify. Just do it. You cannot afford to lose the support he
owes.*"

167

400.   What Plaintiff did not know at the time was that by verifying

payments from 2015, she was inadvertently conceding to a separation

date in 2015, contradicting her consistent position that the separation

occurred in August 2016. This tactic ultimately worked against her at

trial and further supported Egbase's false timeline.

401.   Plaintiff contends that this pattern of unauthorized filings, failure to

consult, use of outdated and misleading facts, and alignment with the

opposing party amounted to legal malpractice, breach of fiduciary duty,

and a violation of her civil rights under 42 U.S.C. § 1983, especially in

the context of an ongoing deprivation of due process and equal protection

in family court proceedings.


**These facts justify relief under 42 U.S.C. §1983. Legal
Clarification**

402.   Plaintiff asserts that her civil rights claims are not barred by res

judicata, as the previous case was terminated without full disclosure. The

current complaint addresses constitutional violations and conspiracy, not

merely malpractice.

403.   As Aire studied the records of the case, documents related to the

properties, obtained other financial information and acquainted herself

with the law. Aire realized that the judgment of divorce on bifurcation was fraudulent, and she filed a motion to vacate it which was denied on August 8, 2023. Once the judge who denied the motion realized that J. Blanco was involved in the forgery he closed ranks.

404.   Aire filed a RFO for adult child support on behalf of her first-born son who is diagnosed as suffering from mental illness. He was in a hospital in London being treated and was forced to take leave from college. Aire produced medical records of her son to support her claim he had the mental illness. J. Dordi denied the motion, claiming Aire needed an "expert", that the medical records of her son's doctors were not sufficient to prove his illness.

405.   What LASC allowed to be perpetrated on Aire and her sons is part of a pattern and practice of denying mothers and children justice, due process, and equal protection in family court.  There is no judicial independence. If judges are fair, move the cases along, and rule in favor of mothers and children when the facts and the law call for those rulings, there are talking-to and warnings from other judges.

406.   It is not a coincidence that in the midst and waning of the Covid-19 pandemic, two black women and their children were evicted from their home in violation of the City and County moratoria by a superior court

169

judge (aided and abetted by a clerk) in September 2020 (Aire and her sons). Then eleven months later, in August 2021 a commissioner put a black mother and her young nine-year-old daughter on the street.

407.   On information and belief, in a LASC courtroom when a mother brought up Pique's Law, found at Fam. C. Sec.3193 which prohibits "reunification programs" resulting in changing custody because child does not want to visit the non-custodial parent, the judge, father, and father's attorney laughed at the mother.

### PATTERN OF FRAUDULENT BIFURCATION AND ITS PSYCHOLOGICAL IMPACT MIRRORED IN HISTORICAL LEGAL ABUSE CASES, DAN BRODERICK

408.   Plaintiff Ejeme Joyce Aire respectfully submits that the fraudulent bifurcation of her marital status by Defendant Anthony Egbase, in collaboration with judicial officers of the Los Angeles Superior Court, not only violated statutory law but closely mirrors a notorious historical case of legal and psychological abuse: *People v. Broderick (1989),* concerning Dan and Betty Broderick. The comparison is instructive and relevant to show the chilling effect of unchecked legal manipulation by powerful attorneys against their vulnerable spouses.

409.   In the Broderick matter, Dan Broderick, a well-known malpractice attorney in San Diego, utilized his legal expertise and influence to

170

overwhelm Betty Broderick through repeated filings, motions, and court delays that left her emotionally destabilized. **Dan secured a bifurcation of marital status—terminating the marriage while leaving financial and custody matters unresolved**—a tactic that rendered Betty powerless and exacerbated her psychological decline. This legal tactic deprived her of any leverage or protection under the guise of procedural propriety.

410.    Similarly, Defendant Egbase filed a fraudulent Request for Order (RFO) for bifurcation of marital status in a dormant 2007 dissolution case (LD051587), without Plaintiff's knowledge or presence at any hearing. The resulting "judgment" of bifurcation was forged with a falsified hearing date, misrepresented judicial officers, and conflicting entries regarding who presided over the supposed hearing (Commissioner Blanco versus Judge Watkins), thereby terminating the marriage status prematurely and fraudulently.

411.    Like Betty Broderick, Plaintiff found herself stripped of marital protections, denied access to community property rights, spousal support, and the opportunity to fully litigate financial issues before the status of marriage was terminated. The court, without due process, accepted

forged documents which became the foundation for ongoing deprivation of Plaintiff's legal rights.

412.    **Both cases demonstrate the grave harm that results when powerful attorneys weaponize the judicial process to silence**, **control, and ultimately destroy the rights of their spouses**. The Broderick **case ended in tragic violence**; while **Plaintiff Aire has not resorted to violence, she has suffered years of homelessness, financial devastation, mental health decline, and complete alienation from her rightful property and marital entitlements.**

413.    Plaintiff seeks to bring this pattern of abuse to light under her civil rights claim pursuant to 42 U.S.C. § 1983, **asserting that the judicial machinery enabled a form of psychological and legal warfare that disproportionately harmed her as a stay-at-home wife and mother of over 20 years**. This bifurcation, effectuated by fraud and without hearing, mirrors the misuse of bifurcation in Broderick to strategically cut off the spouse from financial negotiation leverage.

414.    Plaintiff respectfully urges this Court to recognize that such patterns, when tolerated, amount to state-sanctioned emotional abuse and deprivation of civil liberties, **<u>especially when perpetrated by attorneys in collusion with court officials.</u>** The judicial system must not be

weaponized to re-victimize vulnerable spouses under the guise of procedural efficiency.

415.    Plaintiff seeks relief and redress not only for the tangible financial harms caused but for the profound emotional and psychological injuries resulting from this abuse of process, and for the failure of court officers to safeguard her constitutional and family law rights.

## Disability Fraud, Medical Retaliation, and Civil Rights Violations

416.    In or about April 2018, Defendant Anthony Egbase claimed disability based on an eye condition (retinal detachment) and submitted sworn declarations requesting the reduction or elimination of his child and spousal support obligations, asserting he was unable to work. Egbase's claim was used throughout the litigation period to avoid financial responsibility.

417.    However, medical records and procedure notes reveal that the surgeries Egbase underwent were routine outpatient procedures — specifically, a vitrectomy and silicone oil removal performed under local sedation. These procedures are commonly administered and do not render a patient disabled long-term. There was no evidence that Egbase

experienced any lasting impairment that would justify a complete suspension of income or professional activity.

418.    Despite this, Egbase reportedly received a lump sum disability benefit in 2018 exceeding $10,000 per month. He never disclosed these funds in his Income and Expense Declarations. Instead, he filed court documents indicating zero income, while maintaining full control and ownership over A.O.E. Law & Associates, Inc. He continued traveling between the United States and Nigeria during this period, overseeing business operations and legal practice without restriction.

419.    Additionally, Egbase falsely claimed he had no employees, misclassifying at least 18 known workers between his Los Angeles and Nigerian offices as independent contractors. This misrepresentation was made under oath during prior hearings before Judge Slawson, allowing Egbase to conceal the full financial strength of his firm.

**Plaintiff's Medical Crisis and Retaliatory Termination of Insurance**

420.    In sharp contrast, during the same litigation period, Plaintiff Joyce Aire suffered serious medical issues, including chronic uterine bleeding and fibroids, which required urgent surgical intervention. Dr. Diana Wong documented the severity of the Plaintiff's condition in November 2019.

174

421.    Aire underwent two major hospital procedures under anesthesia - first on March 23, 2019, and again on September 11, 2019. These procedures and the seriousness of her health status were never submitted into evidence. Plaintiff's attorney, David Ingram, failed to present any supporting medical documentation to the court. Instead, when Plaintiff attempted to explain her scheduling difficulties during trial, she was questioned as to why her procedures were scheduled during that time period - despite no formal objection being raised about trial accommodation.

422.    Immediately after the trial concluded, Egbase terminated Plaintiff's medical and auto insurance coverage, despite knowing she had never been employed in the United States and relied on the coverage for ongoing care. This left her uninsured, medically vulnerable, and financially stranded.

423.    Aire eventually underwent a necessary surgical procedure on March 25, 2025, in London under the UK National Health System (NHS), more than five years after her condition was first documented.

**Suppression of Travel Records and Evidence by Plaintiff's Counsel**

424.    During the litigation (2016-2020), Plaintiff had full custody of the couple's minor child. Egbase, meanwhile, spent approximately 90% of

his time outside the country, mainly in Nigeria, conducting business and attending social events. Plaintiff repeatedly requested copies of Egbase's U.S. and Nigerian passport records to demonstrate his prolonged absence and support her claim for full custody reimbursement.

425.   In November and December 2019, Plaintiff formally requested this documentation from her attorney, David Ingram. During trial, when Plaintiff referenced Egbase's travel, the court responded that no such evidence had been submitted. After multiple follow-up emails, Ingram eventually provided Plaintiff only 15 pages of Egbase's passport post-trial.

426.   When Plaintiff later retrieved her case files from Ingram's office in February 2020, she discovered that Ingram had been in possession of over 30 pages of passport records, which included key travel entry and exit stamps. This documentation would have conclusively established Egbase's near-total absence from parenting responsibilities between 2016 and 2019. Despite this, Ingram never filed a motion or calculation to request child custody reimbursement for Plaintiff.

**Strategic Non-Disclosure of Financial Documents by Plaintiff's Counsel to Shield Defendant's Income Fraud**

427. During the course of trial, Plaintiff's attorney, David Ingram, knowingly and strategically failed to enforce discovery obligations concerning Defendant Anthony Egbase's financial records, allowing critical income disclosures to remain suppressed. Although the trial court had expressly ordered both parties to exchange current tax returns and profit and loss statements, Ingram offered no explanation for his failure to compel compliance from Defendant.

428. In an alarming turn, Mr. Ingram argued that Plaintiff's own Income and Expense Declaration, filed on June 26, 2019, required updating under the California Rules of Court. However, he failed to acknowledge that this obligation was reciprocal, and that Defendant Egbase had not updated his financial disclosures since October 22, 2018 — well over a year prior to trial. Despite the trial court's directive, Ingram declined to act on Defendant's noncompliance, leaving Plaintiff at a distinct disadvantage.

429. Rather than take steps to compel Egbase's compliance or file the appropriate motions, Ingram's inaction enabled Defendant to continue concealing lucrative legal contracts, investment income, and undisclosed earnings from international engagements — including substantial income

from the Nigerian government tied to recovered Abacha loot litigation.

Plaintiff, who had no independent income and was financially dependent

throughout the marriage, had only recently begun to sell personal

belongings during litigation to survive. Nevertheless, Ingram allowed

Defendant to falsely argue that Plaintiff was operating a business —

"Events by J" — and used that mischaracterization to create a false

equivalence between their respective financial disclosures.

430.   This coordinated suppression of financial truth by Plaintiff's own

counsel directly undermined Plaintiff's ability to pursue equitable

division of property and spousal support. It further demonstrates the

deliberate orchestration between Egbase and Ingram to frustrate

Plaintiff's due process rights and assist in the concealment of community

assets from judicial scrutiny.

**Pattern of Collusion and Civil Rights Violations**

431.   Defendant Egbase manipulated medical claims to his advantage,

claiming disability while continuing to operate internationally and

profiting from unreported income. Meanwhile, Plaintiff's own serious

medical condition was entirely dismissed.

432.   Attorney David Ingram's failure to submit evidence, disclose

passport documentation, and represent Plaintiff's custody claims in court

further deprived Plaintiff of due process. These acts — individually and collectively — reveal a broader pattern of judicial misconduct, legal malpractice, and discrimination.

433.    Plaintiff's rights to fair trial, medical protection, financial restitution, and child custody reimbursement were denied. These actions constitute violations of Plaintiff's civil rights under 42 U.S.C. § 1983.

### Discriminatory Denial of ADA Advocate Assistance
### Denial of ADA Advocate

434.    Despite Plaintiff's documented disability, the Superior Court arbitrarily denied Plaintiff the right to have her ADA advocate assist her during critical proceedings, including the malpractice lawsuit against former counsel David Ingram. This discriminatory denial further violated the Americans with Disabilities Act and deprived Plaintiff of meaningful access to court in violation of federal and state law.

## DUE PROCESS, EQUAL PROTECTION, AND ACCESS TO COURT

435.    Plaintiff re-alleges and incorporates by reference all prior paragraphs as though fully set forth herein. This section addresses the systematic deprivation of Plaintiff's constitutional rights, including due process,

179

equal protection, and meaningful access to the courts, through the

deliberate actions and omissions of the judicial officers, attorneys, and

court personnel, primarily Judge Christine Byrd.

436.    On November 13, 2019, during the trial in case LD051587, Plaintiff

sought to discharge her attorney, David Ingram, due to his repeated

suppression of material evidence and refusal to present medical

documentation supporting her request for adult child support under

California Family Code § 3910. Judge Byrd denied Plaintiff's oral

request to substitute counsel and ignored Plaintiff's complaints, forcing

her to continue trial under duress and without adequate representation.

437.    During the September 25, 2019, trial hearing, Plaintiff was compelled

to directly inform the court that her son, Obehi Egbase—diagnosed with

schizophrenia—had been hallucinating at the airport when Defendant

Anthony Egbase forced him on a transatlantic flight to London. Plaintiff

stated: "Your honor, our son was hallucinating at the airport, and his

father forced him on a plane to London." Judge Byrd disregarded this

urgent testimony and took no steps to investigate or protect the child.

438.    Plaintiff's son was subsequently hospitalized under Section 2 of the

UK Mental Health Act at Chadwick Lodge, evidencing the severity of his

condition and confirming the truth of Plaintiff's testimony. Medical

180

records from May 6, 2019, and discharge summaries from March 2023

show a longstanding history of psychiatric instability and continued need

for supervised care and stable housing.

### AIRE'S POST JUDGMENT ATTEMPTS TO REMEDY THE UNFAIRNESS OF THE JUDGMENTS AND OTHER RULINGS

439.    No matter what procedure Aire used in LASC to correct the gross

injustices she suffered as a result of the judgments and orders - and she

used many -  the judges were determined she would receive no relief.

They circled the wagons determined to protect their fellow judges,

Egbase and Ingram, Bets, and Comstock who all assisted Egbase in

defeating all Aire's rights and claims participating in fraudm forgery, and

perjury to do so.

440.    All the post-judgment motions and appeals Aire filed were denied on

procedural grounds, never on the merits. It was got'cha litigation from

start to finish.

    A. Aire's Two Attempts to Disqualify J. Byrd.

441.    Aire filed two Statements of Disqualification against J. Byrd, the first,

on March 13, 2020, when she filed Motion for New Trial, and the

second, years later, on September 27, 2023.  Both times, J. Byrd herself

struck the Statement which in itself is a miscarriage of justice. The

California Legislature foolishly allows judges to determine their own

fairness and lack of bias which is an oxymoron.

442.   This due process glitch in the disqualification procedure has turned it

into a mockery because almost all judges strike their own disqualification

challenges, forcing the litigant, generally pro per, to file an appeal within

ten days from the striking of the petition which is also unreasonable.

Even lawyers often don't know the Petition for Writ of Mandate

challenging the striking of the statement must be filed within ten days of

the ruling (five extra days if mailed).

443.   The U.S. Supreme Court has ruled that  that "...no [woman] can be a

judge in  [her] own case, and no [woman] is permitted to try cases where

[she] has an interest in the outcome" In re Murchison, 349 U.S. 133, 136

(1955). -except California judges.  Aire suffered yet another denial of due

process and equal protection.

        B.  Aire's Motion for New Trial.

444.   By way of introduction, the Legislature concocted a cockamamie

two-part procedure to move for new trial with time periods which are

jurisdictional and very confusing which is as unreasonable as the

disqualification procedure. First, the party has to give notice of intent she

will be filing for new trial and yet, the notice of intent is considered to be

the motion for new trial. CCP Sec.659. Then, ten days later, she must serve a legal brief and her evidence. CCP Sec.659a. Then, the opposing party has ten days to file her opposition, and the moving party has five days to file a reply,

445.    On March 13, 2020, Aire filed both a Notice of Intent to move for New Trial with hearing date of April 9 and its Proof of Service ("POS") on March 9, 2020. Shervin Rookan, a friend of Aire, signed a second Proof of Service ("POS") indicating served Egbase with additional documents related to the motion. This POS was not filed with the clerk. Aire was planning to bring it to the hearing on the motion.

446.    Aire filed the Motion and POS at the filing window. J. Byrd's courtroom clerk interfered with the filing, personally removed Aire from the line in the filing room, and that clerk personally logged in the documents.

447.    J. Byrd's clerk suppressed the filing of the first POS, although Aire has a conformed copy. She also made sure the Case Summary does not show the POS was filed.

448.    J. Byrd rescheduled the hearing on the motion for May 8. Aire planned to bring the second POS signed by Rookan to the hearing. Egbase did not file an opposition. On May 6, 2020, with no hearing and

no opposition, Judge Byrd took Aire by surprise and summarily denied

the motion, stating in the order:

> No proof of service was filed (true and false) and Petitioner has not
> responded to the Motion.(true)

449.    J. Byrd is directly contradicted by Aire's conformed POS (FL-335),

filed weeks earlier which J. Byrd's clerk had tossed so J. Byrd could rule

no POS was filed. But J. Byrd did note that Egbase had not filed an

opposition as of May 6 when she signed the order denying the motion.

450.    Because of the ongoing fraud and forgery committed by court

personnel, Aire began taking screen shots of the Case Summary which

she did of the summary between March 13 and May 6, 2020.

451.    One of the clerks accepted a declaration of Egbase he backdated

March 25, 2020, and the clerk also fraudulently backdated it to March 25,

2020, filed it, and falsified the Case Summary which states it was filed on

March 25.

452.    Besides J. Byrd confirming that Egbase had not filed an opposition as

of May 6, the date of her ruling, and the fact that **Aire had never**

**received a declaration of Egbase opposing the motion, Aire's**

**screenshots of the summary she took between March 13 and May 6**

**also confirm Egbase filed no document whatsoever, let alone a**

**declaration in opposition to her motion for new trial.**

184

453.   Upon examining the hard copy of Egbase's declaration, Aire identified a secondary, upside-down superior court stamp bearing the date "6/16/2020" on the left margin-evidence that the filing was not received or processed by the court until that date.

454.   But for the fraud of the clerk in not filing Aire's POS, Aire could have argued that the motion had been conceded by Egbase, and she was entitled to an order in her favor.

455.   Fraud has a way of backfiring - which it did when the unthinking clerks backdated the declaration of the unthinking Egbase after J. Byrd ruled Egbase had never filed a response. Forging the date Egbase filed it pitted Egbase and the clerk against J. Byrd, making her appear incompetent.

### D. The Illegal Eviction of Aire and Her Sons obtained by Default and Fraud During the Height of the Pandemic.

*456.*   After the third and final judgment was entered, Egbase filed an unlawful detainer action against Aire. Egbase served court documents using incorrect addresses intentionally-4851 and 2852 Queen Florence Lane instead of 4852 Queen Florence Lane-which ensured Aire would suffer a shocking denial of due process because she never received notice of court hearings. *Egbase obtained a false default judgment of eviction*

185

*on June 4, 2020, in the middle of the raging pandemic and after the*

*County and the City had each enacted a moratorium prohibiting*

*evictions.*

457.   Egbase sought a writ of execution twice with the correct case number

to provide the sheriff to evict Aire and her son. The clerk rejected the

applications on August 31, 2020, and September 11, 2020, respectively,

possibly at the direction of a judge since both the City and County

eviction moratoria were in effect. The case summary in existence when

Aire took a screen shot of it effects the rejections. The case summary at

this time shows **no writs were issued or rejected**.

458.    While waiting on his second application, Egbase became impatient,

probably because not only he, but his partner (half his age) and her child

(his third) were eager to move into the home.

459.   Egbase had to locate a clerk which he did, Tatiana Bets. Bets was

willing to sign a forged writ on which Egbase changed "UD" to "DU" in

the case number, fraudulently altering the case number from

20VEUD00634 to 20VEDU00634, resulting in the issuance of **a forged**

**writ of execution dated September 2, 2020.**

460.   Aire has a copy of the forged writ. As indicated supra, the case

summary does not show the issuance of any writ, including the writ with

the falsified case number which Bets signed and issued to Egbase and

which was used by the **Sheriff deputies to put Aire and her children**

**on the street on September 16, 2020, amid a pandemic in which**

**African Americans were the most vulnerable to the disease and were**

**dying in great numbers in the County and City. What is really so**

**disturbing is Egbase has just lost his elder brother and in-law, due to**

**the covid pandemic.**

D.    **Aire Hires Attorney Who Attempts Another Motion for New Trial Primarily Based on Ingram Gross Negligence and Suppression of Evidence.**

461.    Aire was able to scrape some money to hire an attorney, who filed for

notion for New Trial and other relief on September 22, 2022. J. Byrd's

reliance on the fabricated record and her shifting justifications for

denying the motion, including her excuse that the court lacked proof of

service, despite Aire's conformed copies of the two POS proving she had

filed them, demonstrated her ongoing bias and prejudice against Aire.

        **Intentional Reliance on Known Falsehoods**

462.    Plaintiff hired attorney Joel Acuario from Claery & Hammond LLP

and filed a renewed motion for new trial. During the hearing, Plaintiff

presented, for the first time, compelling evidence such as the actual deed

of trust showing a $546,000 refinance recorded after the marriage date,

directly contradicting Egbase's sworn testimony and Judge Byrd's ruling.

Despite visibly reacting to the evidence, Judge Byrd refused to alter her judgment, using technicalities to again deny relief. Plaintiff emphasized her homelessness due to the court's ruling, but her pleas were ignored.

463.   In the hearing on the motion on October 21, 2022, at which time Aire was unhoused because of the illegal and forged eviction, and without an income or job, J. Byrd admitted that Ingram engaged in malpractice. She acknowledged that she could not impute negligence of Ingram to Aire, per Fam.C. Sec.2124 but since Aire was alleging, he engaged in fraud, the statute did not apply.  She denied the motion because it was untimely.

**Appeal and Suppression of Evidence**

464.   In February 2021, Plaintiff filed her Notice of Appeal in case B311523. She sought only one transcript - the November 13, 2019, proceedings - which contained her motion to discharge attorney Ingram and oral objections to evidence suppression.

465.   It took Plaintiff nearly nine months to locate Court Reporter Linda Comstock, despite using official court email addresses. When the transcript was finally produced, it had been altered to remove Plaintiff's statements about Ingram's misconduct and her effort to represent herself.

466.   Following this, Plaintiff filed a motion with the California Court of Appeal to compel production of the original stenographic notes, citing

188

discrepancies between what transpired in court and what appeared in the official transcript. **Less than 24 hours after Plaintiff's motion to compel was filed,** Anthony Egbase filed a Request for Judicial Notice and a Motion to Dismiss the Appeal. Egbase's motion attached several rulings from Judge Byrd, which were intended to deflect from the misconduct issue and convince the appellate court that the issues raised were already adjudicated.

467.    On April 27, 2022, the appeal was dismissed on procedural grounds—without any review on the merits or consideration of the falsified transcript. This abrupt dismissal not only deprived Plaintiff of her due process rights but also permitted the underlying **judicial misconduct to remain unaddressed.**

468.    Plaintiff further notes that while the appeal was pending and during her record designation phase in mid-2021, she received a peculiar communication from Judge Christine Byrd's courtroom. The message requested both parties (Plaintiff and Egbase) to come to the court and retrieve their trial exhibits. The timing—during the pandemic, and while the appeal was active—raised serious concerns. Plaintiff believes this was an attempt to destroy or tamper with critical evidence, particularly

because Egbase's trial exhibits included the falsified bifurcation judgment issued under Commissioner Alicia Blanco's name.

469.    This sequence of actions—including the altered transcript, retaliatory filings by Egbase, and the premature exhibit removal—demonstrates a concerted effort to obstruct Plaintiff's access to justice. It also substantiates her claim of systemic misconduct under color of law, thereby warranting federal jurisdiction under the Civil Rights Act, 42 U.S.C. § 1983.

E.    **Aire's Malpractice Suit Against Ingram**

470.    On January 15, 2021, Aire filed a malpractice suit against Ingram. Months were spent on whether Ingram and his law practice were served and on Aire's failure to file for default judgment which she did - for the law practice - and it was granted on September 9, eight months after the complaint was filed. On September 10, Ingram filed a general denial. On October 29, three OSC's were filed against Aire, for failure to file POS, to file for default, and for failure to prosecute.

471.    Ingram began papering Aire with all kinds of discovery requests when he held all the cards including all the documents of the case. She responded to them, and he, of course, and was not happy and immediately papered her with motions to compel. The motions to compel

and case management conference were repeatedly continued. Ingram

filed more motions to compel, four of them in December 2022.

472.    Going through the box of documents Ingram had provided her,

Aire decided the case against him was not about malpractice, but fraud,

concealment, and conspiracy with Egbase.  In January 2023, Aire filed

for a stay and was also looking for funds to try to bring her son with

mental illness back to America. Not knowing she should dismiss without

prejudice or move to amend to include the more serious claims. Ingram

opposed the stay.

473.    Upon discovering extensive proof of fraud and attorney collusion,

Plaintiff filed detailed supplemental complaints against both Egbase and

Ingram in 2023 with the State Bar of California and submitted a separate

complaint with the California Attorney General's Office, requesting a full

investigation and stay of proceedings in her legal malpractice suit.

474.    Despite this, on February 6, 2024, Ingram filed a declaration under

penalty of perjury, falsely asserting that no State Bar investigations were

pending. Based on this falsehood, Judge Valerie Salkin denied Plaintiff's

request for a stay of proceedings in a tentative ruling dated February 20,

2024, issued just two days before a scheduled hearing for February 22,

2024.

191

475.   On February 21 Aire filed a disqualifications statement which appears timely and should have been honored. On the February 22 hearing, Judge - barred Aire's ADA advocate from assisting Aire via zoom, they denied her assess. **She also would not allow Aire to speak or argue against Ingram's motion.  Of course, the motion was granted and the motion to stay was denied.**

476.   The merits of Ingram's criminality were never heard by the jury.  The last hearing was on February 22, 2024.

### G.    Aire's RFO Filed August 8, 2023

477.   On August 7, 2023, Aire filed a certified 300-page Affidavit of Truth detailing extensive fraud, forged court documents, judicial misconduct, and systemic denial of due process. The affidavit included exhibits and sworn declarations substantiating Plaintiff's allegations against the defendants which they committed in the disso proceeding.

478.    Simultaneously, Aire submitted formal Judicial Notices in the disso case and in Aire's malpractice case against Ingram alerting the judges to the fraudulent nature of the bifurcation decree, the misrepresentation of jurisdiction, falsified clerk signatures, and the backdating of writs and filings.

192

479.   As already alleged, Aire filed an RFO which was heard on August 8,
2023, in part, to compel Comstock to produce her notes and other
documents. In that RFO, Aire also sought spousal support and to vacate
the judgment based on the fraudulent and forged judgment of divorce.

480.   Aire made an oral announcement of the Affidavit during the August 8,
2023, hearing before J. Dordi. He refused to take judicial notice of the
affidavit allegations. Instead, Judge Dordi denied Plaintiff's motion to
vacate judgment, relying solely on Family Code ¬ß 2122's statute of
limitations of one and two years, without considering the **fraud-on-the-
court** exception.

481.   When Aire exposed the fraud orchestrated by Egbase and J. Blanco,
J.Dordi-who had previously conducted himself with fairness on earlier
matters-abruptly abandoned his impartiality to protect his judicial
colleague. J. Dordi became overtly hostile toward Aire, denying her any
relief and immediately signaling his unwillingness to address the grave
allegations of fraud upon the court.

482.    J. Dordi threatened Aire, stating that if she continued to pursue her
claims, Egbase could move for sanctions against her and seek attorney's
fees. Dordi further suggested, "You  know, we can also investigate when
you found out," implying irrationally that Aire knew about the fraud

earlier than she did. It took her years to unravel the byzantine fraud J. Blanco and Egbase had perpetrated on the Court and on her. Aire also did not discover the Bets/Egbase fraud of the fictional writ used to evict her until years later because according to the Case Summary of the eviction action, the writ does not exist.

483.   J. Dordi also denied spousal support relying on J. Byrd's non retention of jurisdiction and tying up the hands of future judges to rectify the unfairness of her order.

H. **Aire's Ex Parte Application for Emergency Child Support for Older Son.**

484.   This judicial conduct had a chilling effect on Plaintiff's ability to seek relief. Nevertheless, in December 2023, Plaintiff attempted to file an emergency ex parte application requesting attorney's fees, financial support, and protection of her interest in marital property, particularly on behalf of her son diagnosed with schizophrenia. Defendant Egbase was served and given 24 hours' notice to appear. He failed to appear, and there were no consequences imposed by the court. The Judge denied my ex parte citing, see FL-342

485.   At that moment, Plaintiff understood that regardless of the evidence she submitted, she would not receive a fair review or obtain justice

through LASC that had repeatedly dismissed her claims and shielded Defendant from accountability.

486.    Judge Byrd's Final Judgment, dated December 20, 2019, explicitly stated:

> **"No court will have any jurisdiction to order support thereafter… even if a change in circumstances occurs."**

487.    This clause was crafted with premeditation, foreclosing Plaintiff's legal remedies and insulating Defendant Egbase from all future financial responsibility, even if Plaintiff or the adult child's condition worsened or fraud was later uncovered. The language was so extreme that it nullified California law providing for relief in cases of newly discovered evidence or disability—e.g., Family Code § 3910 and Family Code § 2124.

488.    Post-judgment, Plaintiff discovered that Defendant Egbase, who claimed financial hardship during trial, in fact was a multimillionaire who immediately paid off nearly $1.1 million across three Los Angeles properties, including:

**A. - $820,000 on Queen Florence Lane**

**B. - $100,000 on 121 S. Hope Street**

**C. - $150,000 on 800 W. First Street**

489.    He later acquired two luxury estates worth over $3 million—strongly suggesting perjury and fraudulent concealment of assets during trial.

490.    Meanwhile, Plaintiff's son, Obehi Egbase, was forced to seek public

housing assistance from the DPSS due to his incapacitation and lack of

support. Plaintiff, who suffers from severe depression resulting from

prolonged litigation abuse, has remained the sole caregiver without

support from the father or the court, bearing the psychological and

financial burden alone.

491.    In In re Marriage of Drake (1997) 53 Cal.App.4th 1139, the

California Court of Appeal affirmed that both parents have a continuing

obligation to support an incapacitated adult child. Unlike in Drake, where

support was granted post-judgment, Plaintiff here was categorically

denied support due to a judicially imposed bar, even after presenting

similar or greater need and medical documentation.

492.    Moreover, Plaintiff's appellate rights were obstructed by transcript

tampering. The November 13, 2019, transcript, prepared by Linda

Comstock, deliberately omitted Plaintiff's statements about discharging

her counsel and misrepresented her tone and testimony. When Plaintiff

later requested the September 25, 2019, transcript to support her Family

Code § 3910 application, the record had been scrubbed of her references

to her son's hallucinations and forced flight. These omissions, when

196

compared to contemporaneous minute orders, prove deliberate

falsification and fraud upon the court.

493.    Plaintiff's civil rights under the Fourteenth Amendment—

specifically, procedural due process, equal protection, and access to

courts—were systematically violated by:

    A. - Denial of the right to present material evidence

    B. - Judicial crafting of language to bar jurisdiction

    C. - Tampering with the trial record

    D. - Refusal to hear post-judgment support applications

494.    **Plaintiff invokes Rule 60(d)(3) of the Federal Rules of Civil

Procedure** to seek relief from judgment on the basis of fraud upon the

court. She also requests that this court compel production of the original

stenographic notes and ASCII-formatted transcripts WITH

TIMESTAMPS from Linda Comstock for September 25, 2019, and

November 13, 2019, to substantiate her claims.

495.    These actions—taken collectively and in conspiracy with opposing

counsel and court officials—are not mere judicial error. They constitute a

pattern of abuse, fraud, and systemic obstruction aimed at stripping

Plaintiff of constitutional protections and safeguarding the fraudulent

interests of Defendant Egbase.

197

THE CALIFORNIA STATE BAR FOR OBSTRUCTION OF
JUSTICE, FAILURE TO INVESTIGATE, AND CIVIL RIGHTS
VIOLATIONS

496.    Plaintiff brings this action against the State Bar of California for its

deliberate failure to investigate and act upon well-substantiated

complaints of attorney misconduct involving Defendant Anthony Egbase

and former counsel David Ingram. The Bar's omissions reflect a pattern

of systemic bias, selective enforcement, and protection of corrupt legal

actors that has contributed directly to Plaintiff's deprivation of due

process and civil rights under 42 U.S.C. § 1983.

497.    In shielding favored attorneys from investigation and discipline, the

State Bar has sent a dangerous message that power and influence

override ethics, accountability, and the integrity of the judicial process.

When attorneys engage in fraud, collusion, forgery, and obstruction with

impunity, and the regulatory body tasked with public protection turns a

blind eye, the justice system fails its most vulnerable. This complaint

seeks to ensure no woman, no litigant, and no underrepresented party is

silenced or diminished in their pursuit of truth and justice.

Pattern of Neglect and Suppression
Failure to Investigate Complaint Against David Ingram (2020-2024)

498.    In 2020, Plaintiff submitted a formal complaint to the California State

Bar against David Ingram for legal malpractice, fraud, and conspiracy

198

with opposing counsel Anthony Egbase. Plaintiff provided detailed evidence, including:

**- Unauthorized use of her signature on court documents;**

- Suppression of critical trial evidence;

**- Conflict of interest with Egbase and his legal associates.**

499.    Investigator Kevin Lindarto was assigned to the case and maintained brief correspondence. However, the investigation was terminated abruptly without any substantive review, interview, or explanation. In 2022 and 2023, Plaintiff submitted follow-up complaints supported by transcripts where Judge Christine Byrd acknowledged Ingram's failure to act and protect Plaintiff's rights. Nevertheless, on October 30, 2024, the Bar dismissed the case, falsely claiming there was "insufficient evidence," while disregarding conclusive material that implicated Ingram.

500.    **Failure to Investigate Complaint Against Anthony Egbase** 2021, Plaintiff submitted a complaint against Anthony Egbase for:

- Identity thief;

- Misrepresentation of the date of separation to manipulate property division;

- Collusion with court staff and judicial officers.

Despite submitting forged court orders and mismatched judgment pages (with discrepancies between conformed and original signed documents), Investigator Mr. Aresca failed to contact Plaintiff or seek clarification. The complaint was summarily dismissed.

501.    When Plaintiff resubmitted with additional evidence in 2023, including altered financial disclosures and property deeds, the Complaint Review Unit dismissed the case again on November 25, 2024. They claimed there was "no significant new evidence," while ignoring:

> - Financial records showing Egbase concealed assets and misrepresented income;
> - Altered divorce judgments with forged judicial signatures;
> - Evidence Egbase used forged documents in open court.

502.    **State Bar Ignored Clear Conflicts of Interest**

Plaintiff provided evidence that David Ingram had previously represented Egbase's younger brother and shared legal staff. These relationships rendered his representation of Plaintiff unethical and compromised. **The State Bar ignored this direct conflict** and focused instead on Egbase's use of an employee, Adam Apollo, deflecting from the deeper ethical violation. This selective focus indicates **deliberate misdirection and failure to uphold professional standards.**

503.    Obstruction of Justice and Bias in Disciplinary Practices

The Bar's failure is not isolated to Plaintiff's case. As national reporting
and government inquiries have revealed, the State Bar of California has a
long and troubling history of protecting elite and politically connected
attorneys. **The most notorious example is disbarred attorney Tom
Girardi, who defrauded clients for decades while maintaining a
powerful presence in legal and political circles.**

504.    According to the State Audit of 2022, Girardi faced over 200
complaints, yet the State Bar failed to take meaningful action. Internal
communications revealed Girardi used his influence to halt
investigations, sway disciplinary outcomes, and install allies within the
Bar. His conduct included embezzlement, client abuse, and fraud on a
mass scale—yet he remained protected until federal authorities
intervened.

505.    This pattern is echoed in Plaintiff's case, where despite documented
fraud, forgery, and judicial collusion, no action has been taken against
Egbase or Ingram. **The Bar's conduct perpetuates a culture of
protectionism, particularly for male attorneys with political
connections or insider status.**

    - California Business and Professions Code §60600 et seq.

201

506.    By refusing to act on well-supported complaints, misrepresenting

facts in dismissal letters, and failing to prevent further harm, the Bar

facilitated fraud upon the court and denied Plaintiff meaningful access to

justice.

507.    This case must mark a turning point. When a regulatory body

becomes complicit in the misconduct it was created to prevent, it no

longer serves the public. Plaintiff seeks:

   - Immediate federal oversight and investigation of the California State

   Bar;

   - Damages for harm caused by the Bar's negligence and misconduct;

   - Referral to Congressional authorities for inquiry into systemic

   corruption;

   - Injunctive relief to require transparency and reform in complaint

handling procedures;

508.    Justice must no longer be a privilege for the powerful, but a right

equally accessible to all, including women, minorities, and litigants

challenging misconduct within the legal system.

STATE BAR'S DELIBERATE SUPPRESSION OF CONFLICT-
OF-INTEREST EVIDENCE AND INVESTIGATORY
OBSTRUCTION

509.    In addition to ignoring well-substantiated claims of fraud and

misconduct, the California State Bar further obstructed justice by

intentionally mischaracterizing Plaintiff's evidentiary submissions to

deflect from a direct and disqualifying **conflict of interest** between

former counsel **David Ingram** and opposing counsel **Anthony Egbase.**

510.    Plaintiff presented irrefutable proof that Ingram had previously

represented Egbase's younger brother, Edwin Aimufua, in a civil action,

and worked alongside legal associates from Egbase's law firm, creating a

tri-party relationship that disqualified him from advocating on Plaintiff's

behalf during the dissolution trial. This evidence was disclosed to the Bar

on multiple occasions between 2021 and 2024. However, the Bar

deliberately ignored this clear ethical violation and **instead narrowed**

**the focus** of their investigation to a tangential and far less significant

association involving **Egbase's employee, Adam Apollo—**a red herring

used to shield Ingram and Egbase from discipline.

511.    The Bar's Complaint Review Unit (CRU), despite receiving

documentation including court pleadings, emails, case law, and

declarations, issued a boilerplate rejection on **November 25, 2024,**

claiming "no new evidence," when in fact Plaintiff had provided **primary source material** establishing direct legal relationships and conflicting interests between the involved attorneys.

512.    Moreover, this conflict was not limited to past representation—it actively compromised Plaintiff's trial outcome. Evidence suggests that Ingram's ongoing relationship with Egbase and Aimufua **created an avenue for bribery or coercion,** given their long-standing legal entanglements and Egbase's political and financial leverage. Ingram's suppression of evidence, refusal to subpoena financial records, and failure to challenge perjured testimony on the mortgage, all align with this theory.

513.    Plaintiff also reported that when she escalated her complaint to the **State Bar's San Francisco Office at 180 Howard Street,** no meaningful action was taken, and her documentation—including a transcript where Judge Byrd acknowledges Ingram's suppression of evidence—was ignored. The State Bar has failed to contact Plaintiff at any point regarding her 2021 complaint against Egbase (Case No. 21-O-08747), confirming its systemic unwillingness to investigate politically protected attorneys.

514.    Plaintiff further discovered that **Egbase made political donations
and hosted fundraisers for major figures**, contemporaries and
prominent elected officials, contributing to an environment where
oversight agencies like the Bar felt pressured or compromised.

515.    In failing to act upon this mounting evidence of collusion, bribery
risk, and obstruction, the State Bar not only violated its statutory
obligations under **California Business and Professions Code §§ 6068,
6106, 6060**, and **California Rules of Professional Conduct**, but also
became complicit in the judicial fraud and retaliatory litigation Plaintiff
faced post-judgment.

### State Bar's Deliberate Indifference

516.    Plaintiff filed formal complaints with the State Bar of California
detailing Defendant Egbase's and Attorney David Ingram's serious
misconduct, including fraud upon the court, suppression of evidence, and
ethical violations. Despite clear evidence, the State Bar refused to
investigate or discipline either attorney, reflecting deliberate indifference
to Plaintiff's rights and perpetuating systemic gender- and status-based
discrimination against victims of family law fraud.

"A dangerous message is being sent when institutions protect those
who abuse power. This must be the moment where silence ends, and truth
begins. No woman, no litigant, should be denied dignity, fairness, or their

rightful place in the pursuit of justice."

V.
CAUSE OF ACTION
FIRST CAUSE OF ACTION

Domestic Violence,  Ca Civ. C. Section 1708.6 - applies to Egbase and A.O.E.  Law and Associates, APC

517.   Aire realleges and incorporates by reference the allegations set out in

paras 1 -304 as if fully set out in this claim.

518.   Egbase engaged in a longtime pattern and practice of fraud,

concealment, theft, and other crimes against Aire constituting

domestic violence

and coercive control and lasting into the present time including, but

not limited to:

A. Fraud

B. Forgery

C. Imposing coercive debt on Aire without her knowledge and

consent;

D. Imposing coercive debt on Aire without her knowledge and

consent;

E. Working in concert with J. Blanco to create, file, and enter a

forged, fraudulent bifurcated divorce proceeding and judgment;

206

F.  Working through his agents in concert with Ingram so that Aire

would end up with no property and no support and a bogus

judgment based on falsehoods, perjury, and forgeries;

G. Using the family court and his extensive legal experience to

deprive her of her property and support by filing frivolous

motions, perjurious declarations, and by using his employees,

his brother,  unethical "experts", and Ingram to provide

falsified reports, appraisals, and dates of marriage and

separation;

H. Evicting her and her children from her home based on a forged

writ of execution which issuance is not reflected in the Case

Summary of the family lawsuit by armed, uniform police

officers threatening violence if she did not leave;

519.   The ongoing  D.V. causes Aire extreme pain and she is suffering

mental anguish, emotional and physical distress and loss of property and

support for which she is entitled to compensatory and out-of-pocket

damages and injunctive relief against Egbase.

520.   The acts of Egbase were willful, wanton, malicious and oppressive,

thus, justifying an award of exemplary and punitive damages against him

in an amount to be determined at trial.

207

521.    Aire seeks an award of attorney fees against Egbase.

SECOND CAUSE OF ACTION

Intentional and/or Negligent Infliction of Emotional Distress applies to Egbase, A.O.E.  Law and Associates, APC and to Ingram and David Ingram Law, APC ("Ingram Law")

522.    Aire realleges and incorporates by reference the allegations set forth in paragraphs above as if fully set out here.

523.    Egbase intended to cause Aire emotional distress; or, Egbase acted with reckless disregard of the probability that Aire would suffer emotional distress, knowing that Aire was directly impacted when he committed fraud and other bad acts and denied her all her property and support

524.    Aire suffered severe emotional distress; and  Egbase's conduct was a substantial factor in causing Aire's severe emotional distress.

525.    The severe emotional distress caused Aire extreme pain for which she is entitled to compensatory damages against Egbase.

526.    The acts of Egbase were willful, wanton, malicious and oppressive, thus justifying an award of exemplary and punitive damages against him in an amount to be determined at trial.

527.    When Ingram represented Aire as her attorney while acting in concert with Egbase resulting in a denial of all her property and support, he

intended to cause Aire emotional distress; or, he  acted with reckless

disregard of the probability that Aire would suffer emotional distress,

knowing that Aire was

directly impacted when he committed fraud and other bad acts, including,

but not limited to, gaslighting her, forging her signature without her

consent, failing to provide her relevant documents, failing to retain a

forensic expert to value the law practice, failing to conduct discovery

especially of Egbase's Nigerian and Washington, D. C. practice, failing

to obtain the deeds to all the properties in

California and moving them into evidence, failing to cross examine

Egbase on all the loans he had taken out on the properties, failing to put

on evidence concerning the Nigerian compound, forcing her to testify

about the money Egbase sent her for household expenses while still

married to her implying to the court the money was for spousal/child

support after separation, refusing to substitute out of the case to run out

the time for Aire to file Motion for New Trial.

528.    Ingram failed to disclose to Aire that he was representing, Edwin

Aimufua an attorney who was working for Egbase at the same time

Ingram was representing Aire. This provided a cover for Ingram to accept

bribes from Egbase disguised as payments from — to Ingram for

representing him. For example, in the records of Egbase's law practice,

there is a payment of $3,000.00 to Edwin Aimufua.

529.    Aire suffered severe emotional distress; and Ingram's conduct was a

substantial factor in causing Aire's severe emotional distress.

530.    The severe emotional distress caused Aire extreme pain for which she

is entitled to compensatory damages against Ingram.

531.    The acts of Ingram were willful, wanton, malicious and oppressive,

thus justifying an award of exemplary and punitive damages against him

in an amount to be determined at trial.

### THIRD CAUSE OF ACTION

Breach of Fiduciary Duty - common law and Fam. C. Secs. 721, 1100,
1101, Applies to Egbase; and to Ingram and Ingram and Ingram Law -
Violation of CA Ethical Rules 1,1(a), 1.4, 1.7,  Common Law - Duty of
Loyalty

532.    Aire realleges and incorporates by reference the allegations set forth

in paragraphs 1- 304 above as if fully set out here. Pattern of Identity

Theft

533.    Defendant Egbase committed multiple acts of identity theft against

Plaintiff, including opening businesses such as Palmer Medical Supply

and Palmer Properties & Development using Plaintiff's name without her

consent, opening unauthorized email accounts, and applying for loans

using Plaintiff's social security number and financial credentials. These

acts were concealed from Plaintiff and were part of a broader pattern of

fraudulent asset diversion and concealment of community property.

EGBASE

534.    Fam. C. Sec.721 (b) states:

Except as provided in Sections 143, 144, 146, 16040, 16047, and
21385 of the Probate Code, in transactions between themselves,
spouses are subject to the general rules governing fiduciary
relationships that control the actions of persons occupying
confidential relations with each other. This confidential relationship
imposes a duty of the highest good faith and fair dealing on each
spouse, and neither shall take any unfair advantage of the other. This
confidential relationship is a fiduciary relationship subject to the same
rights and duties of nonmarital business partners, as provided in
Sections 16403, 16404, and 16503 of the Corporations Code.

535.    Fam. C. Sec.1100 states in part:

(e) Each spouse shall act with respect to the other spouse in the
management and control of the community assets and liabilities in
accordance with the general rules governing fiduciary relationships
which control the actions of persons having relationships of personal
confidence as specified in Section 721, until such time as the assets
and liabilities have been divided by the parties or by a court. This
duty includes the obligation to make full disclosure to the other
spouse of all material facts and information regarding the existence,
characterization, and valuation of all assets in which the community
has or may have an interest and debts for which the community is or
may be liable, and to provide equal access to all information, records,
and books that pertain to the value and character of those assets and
debts, upon request.

536.    Egbase violated these sections from the day Egbase married Aire in

2002 and in 2005 as set out in the prior paragraphs. He engaged in

outrageous acts of fraud and forgery, not the least of which was the

fictional bifurcated divorce proceeding. He concealed from Aire his law practice earnings, that he was sending community property cash over the years to Nigeria, that he was forging deeds to community property, that he was using his sister's identity to purchase a community property, that he imposed coercive debt on her by encumbering the three properties repeatedly over the years without her knowledge, he used her identity as a ghost employee in his law firm and as the owner of the Palmer business, and  he had no intention of making full disclosure of all the assets and liabilities incurred during the marriage. His sole purpose was to insure all community property would remain with him after divorce.

537.    To accomplish that goal, he committed lender fraud, IRS fraud, and court fraud, going so far as to engage in crimes of forgery with Bets and J. Blanco. J. Blanco and he created an elaborate fictional proceeding, hearing, and judgment of a bifurcated divorce just so he could then file taxes as a single man (false) and hide from Aire the fact that he had received a million-dollar attorney fee from the Nigerian government.

538.    Aire suffered severe emotional distress; and  Egbase's conduct was a substantial factor in causing Aire's severe emotional distress.

212

539.    The severe emotional distress caused Aire extreme pain for which she is entitled to compensatory damages against Egbase.

540.    As a further remedy, pursuant to Fam. C. Sec.1101, Aire requests that she be awarded 1/2 of the community estate, including an in- kind award of her interest in the law practice, spousal support, and that she be awarded the entire First St property because he failed to disclose to Aire that he had made the faux Victoria the owner of the property when it was he who purchased, maintained, collected its rents, paid the mortgage and property taxes on it. ,

541.    The acts of Egbase were willful, wanton, malicious and oppressive, thus justifying an award of exemplary and punitive damages against him in an amount to be determined at trial.

542.    Aire is also entitled to attorney fees against Egbase.

INGRAM AND INGRAM LAW

543.    Ingram worked with Egbase hand in glove, throwing the case of his client. He violated Rule 1.3, intentionally failing to represent Aire with all due diligence; Rule 1.4, failure to communicate truthfully about the case; Rule 1.7, engaging in a clear conflict of interest by representing Amu– an attorney working in Egbase's firm which he did not disclose to Aire. Amu could provide bribes to

Ingram to throw Aire's case by masking the bribe as a payment for

attorney fees to Ingram for representing him. Most of all, Ingram violated

his sacred duty of loyalty to Aire.

> [The] lawyers' duty of loyalty is the most fundamental of all fiduciary
> duties the legal profession owes to its clients.[fn 7 omitted] From the
> beginning of the profession, lawyers have owed an unwavering duty
> of loyalty to their clients, a duty that is recognized in the common law
> of every jurisdiction of the United States [fn 8 omitted] and codified
> in every American code of legal ethics ever promulgated. [fn 9 omitted] "The Gang of Thirty-Three: Taking the Wrecking Ball to
> Client Loyalty", Lawrence Fox, 27 Mar 2012, Yale Law Journal
> Found at yalelawjournal.org/forum/the-gang-of-thirty-three-taking-the-wrecking-ball-to-client-loyalty

544.    Aire suffered severe emotional distress; and Ingram's conduct was a

substantial factor in causing Aire's severe emotional distress. His

misconduct in throwing the case, played a substantial role in Aire losing

all her property and spousal support.

545.    The severe emotional distress caused Aire extreme pain for which she

is entitled to compensatory damages against Ingram,

214

546.    The acts of Ingram were willful, wanton, malicious and oppressive, thus justifying an award of exemplary and punitive damages against him in an amount to be determined at trial.

FOURTH CAUSE OF ACTION

Fraud by Concealment and Misrepresentation - applies to Egbase, A.O.E. Law, J. Blanco, Ingram, Ingram Law, Bets, Comstock, and unsued J. Byrd

547.    Aire realleges and incorporates by reference the allegations set forth in paragraphs 1-192 above as if fully set out here.

548.    Defendants Egbase made misrepresentations to Aire, lenders, judges, and IRS, including stealing Aire's and his sister Victoria's respective identities and using them to advance his financial interests and to harm Aire's, especially at trial as alleged in paragraphs.-- He also engaged in fraud by concealment as alleged in paragraphs

549.    J. Blanco and Egbase made misrepresentations to the Court and to Aire and  concealed their conspiracy with each other to commit criminal fraud and forgery creating a false proceeding, hearing, and judgment of a bifurcated judgment and then concealed the crimes from the Court and Aire as alleged in paragraphs –.

550.    Ingram made misrepresentations to Aire and in court during the trial
and committed fraud by concealment against Aire as alleged in
paragraphs –

551.    Bets entered into a conspiracy with Egbase to forge a writ of
execution by changing the case number on the document in order to
illegally evict Aire and concealed the fraud from Aire, the Court, and the
Sheriff as alleged in paragraphs –

552.    Comstock produced fraudulent transcripts to the Court and Aire in
order to defeat Aire's claims of misconduct against J. Byrd and Ingram.

553.    J. Byrd aided and abetted the fraud and misrepresentation of Egbase
and Ingram's glaring abandonment of his client at trial. For example, she
knew she had to nonsuit Egbase on the three properties in California
because he only offered inadmissible hearsay about the properties, and
failed to produce the deeds and move them into evidence. As in re Knox
points out, because pro per wife failed to produce quit claim deed of
home, she lost on whether the home was community property. She knew
Ingram was engaging in extreme negligence such as for example not
having a forensic expert value the law practice. She accepted a road side
appraisal by a former client of Egbase as competent evidence of the value
of the Queen Florence home. She went to great lengths to squeeze Aire as

to date of marriage (2005 in place of 2002) and date of separation (picking a date neither party claimed, ignoring the fact that Egbase had testified in an earlier hearing that he moved out of home on August 1, 2016, which is the date Aire testified was the date of final separation) in order to deprive Aire of the magic ten year marriage mark generally guaranteeing spousal support when spouse proves she is unable to support herself without support from the ex-spouse. She denied Aire support when she knew or should have known that Judge Dordi had already found that Aire would not be able to find employment in the near future which should have been the law of the case. J. Byrd  knew that Aire is black, in her fifties, had not worked outside the home for 20 years, and had advanced her husband's career with her own efforts. J. Byrd demanded to know in open court about Aire's citizenship status (but not Egbase's) which is explicitly prohibited by law in California. She signed documents provided by Egbase and unopposed by Ingram which repeatedly stated that Aire was not credible when two or three judges had already ruled that Egbase was not credible. When she learned that Aire had filed an appeal, she made an order that the parties had to pick up exhibits admitted into evidence from her courtroom knowing the

exhibits had to be forwarded to the appeals court to support Aire's appeal.

554.    When Aire demanded that Ingram get off the case, J. Byrd would not allow it, when Aire moved for new trial, she denied it without a hearing, when Aire tried again with an attorney she acknowledged that Ingram had engaged in malpractice and then decided it was just a dispute between lawyer and client and denied the motion and ruled that it was filed too late after violating her due process rights the first time Aire filed the motion.

555.    All the defendants knew their misrepresentations were false and knew they were false when they made the misrepresentations. They intended that Aire rely on them. Aire relied on them

556.    All the defendants concealed certain information. Egbase was required by law to provide all relevant information about the dates of marriage and separation, about the properties acquired or maintained during the marriage, about his earnings, about his law practice, and instead he provided only falsified information. Egbase and J. Blanco concealed from Aire that they had manufactured on paper a hearing on a bifurcated divorce which never occurred before a judge who never conducted any hearing on a bifurcated divorce and filed a judgment of a

bifurcated divorce which was never signed by any judge. Aire had an attorney/client relationship with Ingram, and he was obligated to provide all facts known to him related to the issues in the trial. Bets had a mandatory duty to insure that the writ of execution did not contain a false case number and had to insure that the case summary reflected that the writ she signed had been issued. Comstock had a mandatory duty to produce truthful, accurate, and authentic transcripts of what was said by the participants in the proceedings Aire asked her to transcribe.

557.    Defendants intentionally failed to disclose certain facts to Aire that were known only to them and that Aire could not have discovered on her own or only until she conducted exhaustive research ;Aire did not know of the concealed facts until much later after she had suffered loss of all her property and support and was illegally evicted from her home. All the defendants intended to deceive Aire by concealing the facts.  Had the omitted information been disclosed, Aire would have behaved differently. Aire was harmed; and all the defendants 'concealment was a substantial factor in causing Aire's harm.

558.    As a result of the defendants' fraud by concealment and misrepresentation, Aire suffered the loss of all her property and support.

559.    Aire suffered severe emotional distress; and Defendants' conduct was a substantial factor in causing Aire's severe emotional distress.

560.    The severe emotional distress caused Aire extreme pain for which she is entitled to compensatory damages against all the defendants.

561.    The acts of all Defendants were willful, wanton, malicious and oppressive, thus justifying an award of exemplary and punitive damages against him in an amount to be determined at trial.

562.    J Byrd should be liable for the harm she inflicted on Aire except that at this time, J. Byrd has immunity from damages for the harm she caused Aire.

FIFTH CAUSE OF ACTION

42 U.S.C. Sec.1983 - Fourteenth Amendment - Conspiracy to Deprive Plaintiff of Property without Due Process; Deprivation of Property based on Race/Age/Gender/Marital Status/Financial Status; Denial of Equal Access to Court - applies to Egbase, A,O.E.  Law and Associates, APC;  Ingram, David Ingram Law J. Blanco, Bets, Comstock, and unsued J. Byrd

563.    Aire realleges and incorporates by reference the allegations set forth in paragraphs above as if fully set out here.

564.    Egbase, J. Blanco, Bets, Comstock, Ingram, and unsued J. Byrd worked as a cohesive whole to insure that Aire would be deprived of all her property and support and put on the street, evicted from her home

without a place to live and no money. Denial of Property and Support without Due Process:

565.    Aire had a cognizable property interest as defined by the California Family Code in property accumulated or maintained during the marriage as well as a right of continuing support based on a marriage of ten years or more.

566.    As set out in this complaint, Aire suffered a deprivation of her share of community property and was denied spousal support without an appropriate level of process or procedural safeguards.

567.    This was accomplished by the actions of the defendants, in particular, Egbase acting as a cohesive unit against Aire.

Deprivation of Property based on Race/Age/ Gender/Marital Status/ Financial Status (Denial of Equal Protection)

568.    Aire also lost her property and support based on gendered racism, age, marital and financial status.  She is a black woman in her fifties. DEI is being killed as this complaint is filed.  So, it's back to hiring white people, mostly men. Also, as a married woman who worked only in the home and not outside it and was seeking property and support in court she was immediately an outlier in the eyes of the judges. Judges view fulltime wives and mothers as looking for a handout when going through

a divorce, rather than seeking what is legally theirs – property and support.

569.   Judges also view work attributed mostly to women-- keeping the home fires burning and caring for the children in all aspects of their lives – as trivial because unpaid. The dissomaster (designed by white males and approved by judges) which is used to determine child, and spousal support does not include what mothers would be earning based on the work they performed as fulltime homemakers and childcare providers as a benchmark for what she should be paid as spousal support.

570.   The patriarchal implication is that mothers should sacrifice themselves and do the work of homemaker, wife, concubine, and mother (Nazi slogan: "Kinder, Kutchen, Kirche [church]" and sexual availability when Das Fuhrer demanded it) with a smile and no money. Aire's efforts and work – like the work of all housewives and mothers – are essential and necessary for the family and the country to thrive – a fact conveniently ignored by judges in the alt universe of the AFCC-dominated family court.

571.   What happened to Aire is not an aberration also because of the continuing misogyny and authoritarianism of family court and attorneys in which mothers are policed like criminals and complaints of child abuse

against the father are flipped and defined as alienation by the mother. As already alleged, women who make the mistake of becoming full time wives and mothers, like Aire, are viewed as non-essential and will be denied all or most of all the property and support they are entitled to, under the law. But goddess forbid the mothers are successful in the man's world of commerce, government, medicine, or education outside the home, because they are viewed with deep resentment, jealousy, and suspicion and regularly denied child and spousal support even if they have primary custody because they are big earners.

572.    Another reason Aire was treated so badly in family court is because gendered racism against black women is rampant in Los Angeles City and County including in family/juvenile court.

573.    Ironically, as Egbase and Aire spent thousands of dollars to fundraise for a black woman, Karen Bass, to become the first black female mayor of our City, because of the world remaining sexist as ever, that fundraising for Bass provided  Egbase, the insider status in family court to wreak havoc on the rights of Aire.

574.    Aire also advanced Egbase's career without remuneration or payments. Having been the one who enabled him to obtain access to democratic politicians like **Karen Bass** – a black woman herself – (Exh.

1)  Egbase used that access combined with the fact he was male, he had money, and he was an attorney to crush Aire in LASC aided and abetted by J. Blanco, Ingram, Bets, Comstock, and J. Byrd. Denial of Access to Court.

575.     The ongoing denials of access to the court are legion. LASC did not on its own issue an OSC to dismiss Egbase's petition for dissolution filed in 2007 which gave Egbase a litigation advantage, caused confusion with judges claiming the case had been pending unresolved for years when the couple had reconciled and remained reconciled for the next eight years, allowed J. Blanco and Egbase to pull off The Great Deception of not just a forged judgment but created a paper trial manufacturing a hearing which never took place by a judge who never heard the motion which was never filed and issuing a false judgment which does not exist. LASC failed to insure Aire had needs-based attorney fees in a timely manner, for months, and permitted J. Blanco to repeatedly deny a hearing for attorney fees. LASC failed to insure spousal support for as long as Aire was unable to support herself.

576.     As a result of the defendants' violations, Aire was denied all her property and support.

224

577.    Aire suffered severe emotional distress; and Defendants' conduct was a substantial factor in causing Aire's severe emotional distress.

578.    The severe emotional distress caused Aire extreme pain for which she is entitled to compensatory damages against all the defendants.

579.    The acts of all Defendants were willful, wanton, malicious and oppressive, thus justifying an award of exemplary and punitive damages against him in an amount to be determined at trial.

580.    Aire also requests an award of property and an accounting from Egbase.

581.    Aire is also entitled to attorney fees against Defendants.


SIXTH CAUSE OF ACTION
TITLE VI, 1964 Civil Rights Act as
amended applies to LASC

582.    Aire realleges and incorporates by reference the allegations set forth in paragraphs 1-192 above as if fully set out here.

583.    LASC is a recipient of federal funding.  Title VI prohibits discrimination against beneficiaries of federal funding based on race.

584.    LASC discriminated against Aire on the basis of race in conjunction with her gender in violation of Title VI. 42 U.S.C. Sec. 2000d-7(a) states:

(a) General provision

225

(1)    A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of ...title VI of the Civil Rights Act of 1964 [42 U.S.C. 2000d et seq.],

(2)    In a suit against a State for a violation of a statute referred to in paragraph (1), remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in the suit against any public or private entity other than a State.

585.    As a result of the defendants' violations, Aire was denied all her property and support.

586.    Aire suffered severe emotional distress; and LASC's conduct was a substantial factor in causing Aire's severe emotional distress.

587.    The severe emotional distress caused Aire extreme pain for which she is entitled to compensatory damages against LASC.

588.    Aire is also entitled to attorney fees against LASC.


SEVENTH CAUSE OF ACTION

Declaratory Relief (28 U.S.C. §§ 2201 – 2202; Cal. Code Civ. Proc. § 1060)

589.    Aire incorporates by reference all preceding paragraphs as through fully set forth herein.

590.    An actual controversy exists between Plaintiff and Defendants concerning their respective rights and duties.

226

591.    Plaintiff seeks a judicial declaration that the forged bifurcation judgment, falsified transcripts, and docket tampering performed by Defendants, including but not limited to Judge Alicia Blanco, Anthony Egbase, Linda Comstock, and Tatyana Bets, were unlawful and void.

592.    Plaintiff also seeks declaratory relief affirming that the family law court's actions—including its use of a dormant case (LD051587) to bypass due process—violated Plaintiff's constitutional rights under the Fourteenth Amendment and 42 U.S.C. § 1983.

593.    A declaration by this Court will resolve uncertainty concerning Plaintiff's status, due process rights, spousal support rights, and future ability to obtain equitable relief and property recovery.

594.    Plaintiff therefore requests that the Court issue a judgment declaring:

    1.    The bifurcation decree signed by Commissioner Alicia Blanco on August 3, 2017, is void ab initio for lack of jurisdiction, absence of a signed stipulation, and forgery of judicial signature and hearing date;

    2.    The trial court's judgment issued by Judge Christine Byrd on February 26, 2020, is built upon constitutionally infirm orders and omissions of material evidence, including falsified transcripts and exclusion of Plaintiff's testimony;

3.  The fraudulent writ of execution entered as Case No. 20VEUD00634, later disguised as 20VEDU00634, is also void ab initio as it was procured without a valid judgment and inserted deceptively into a separate docket;

4.  The actions of the Superior Court and its agents violated Plaintiff's federal rights;

5.  Any judgments issued based on those fraudulent documents are void ab initio.

### EIGHTH CAUSE OF ACTION

Violence Against Women Reauthorization Act , ("VAWA") 34 U.S. Code
Sec.12395(b): Gender/Race  discrimination - Applies to LASC

595.    Aire realleges and incorporates by reference the allegations set forth in paragraphs 1-192 above as if fully set out here.

596.    LASC is a recipient of VAWA funds.

34 USC Sec. 12395 (b)(13)(A) states: Nondiscrimination

No person in the United States shall, on the basis of actual or perceived race, color, religion, national origin, sex, gender identity (as defined in paragraph 249(c)(4) of title 18), sexual orientation, or disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity funded in whole or in part with funds made available under the Violence Against Women Act of 1994 (title IV of Public Law 103–322; 108 Stat. 1902), the Violence Against Women Act of 2000 (division B of Public Law 106–386; 114 Stat. 1491), the Violence

228

Against Women and Department of Justice Reauthorization Act of 2005 (title IX of Public Law 109–162; 119 Stat. 3080),2 the Violence Against Women Reauthorization Act of 2013, and any other program or activity funded in whole or in part with funds appropriated for grants, cooperative agreements, and other assistance administered by the Office on Violence Against Women.

597.    Aire is a victim of domestic and economic violence as defined by 34 USC Sec. 12395(a)(12) and (13):

(12)        Domestic violence

The term "domestic violence" includes ...a pattern of any other coercive behavior committed, enabled, or solicited to gain or maintain power and control over a victim, including verbal, psychological, economic, or technological abuse that may or may not constitute criminal behavior, by a person who-

(A) is a current or former spouse or intimate partner of the victim, or person similarly situated to a spouse of the victim;

(B) ... has cohabitated, with the victim as a spouse...;

(C) shares a child in common with the victim; or

(13)        Economic abuse

The term "economic abuse", in the context of domestic violence,.., means behavior that is coercive, deceptive, or unreasonably controls or restrains a person's ability to acquire, use, or maintain economic resources to which they are entitled, including using coercion, fraud, or manipulation to-

(A) restrict a person's access to money, assets, credit, or financial information;

(B) unfairly use a person's personal economic resources, including money, assets, and credit, for one's own advantage; [use of Aire's identity without her knowledge

229

for economic gain]

© exert undue influence over a person's financial and economic behavior or decisions, including forcing default on joint or other financial obligations, exploiting powers of attorney, guardianship, or conservatorship, or failing or neglecting to act in the best interests of a person to whom one has a fiduciary duty.

598.    LASC empowered Egbase to engage in domestic and economic abuse against Aire by allowing J. Blanco, Ingram, Bets, Comstock, and unsued J. Byrd to act in concert with Egbase to deprive Aire of her property and support.

599.    As a result of the defendants' violations, Aire was denied all her property and support.

600.    Aire suffered severe emotional distress; and LASC's conduct was a substantial factor in causing Aire's severe emotional distress.

601.    The severe emotional distress caused Aire extreme pain for which she is entitled to compensatory damages against LASC.

602.    Aire is also entitled to attorney fees against LASC.

NINTH CAUSE OF ACTION

FRAUDULENT DOCUMENT TAMPERING AND CONCEALMENT
(Against: Anthony Egbase, Tatyana Bets, Linda Comstock, and Commissioner Alicia Blanco)

603.    Plaintiff realleges and incorporates by reference all prior paragraphs as though fully set forth herein.

604.   Defendants engaged in a pattern of deliberate document tampering, forgery, and concealment of judicial records in order to obstruct justice and deprive Plaintiff of her lawful rights. These actions include, but are not limited to, the backdating of judicial filings, the unauthorized issuance of bifurcation orders, and the alteration and suppression of court transcripts.

605.   Court clerk Tatyana Bets, acting in concert with Defendant Egbase, manipulated file room records by altering rejection notices, modifying case numbers (e.g., changing 20VEUD00634 to 20VEDU00634), and re-submitting previously rejected writs of execution. The tampered documents were inserted into the family court record, enabling the execution of an illegal eviction during an active moratorium.

606.   Court reporter Linda Comstock failed to include key testimony in the certified transcript from the September 25, 2019, hearing, specifically omitting Plaintiff's report to Judge Byrd about her son's mental health crisis. Despite Plaintiff's formal request for the original recording or an ASCII version, Comstock produced an incomplete and sanitized transcript, thus impeding Plaintiff's ability to seek appellate review.

607.   Commissioner Alicia Blanco, without a valid stipulation filed prior to her issuance of orders, signed a bifurcation judgment on August 3, 2017.

The stipulation to appoint her as a temporary judge was not filed until August 24, 2017—after the judgment was entered—rendering the action procedurally void.

608.   These coordinated acts of misconduct intentionally misled the court, concealed the true procedural history, and created a false record to benefit Egbase. Defendants' actions were willful, malicious, and committed with the intent to deprive Plaintiff of her community property rights, spousal support, and due process protections.

609.   Plaintiff seeks compensatory and punitive damages, declaratory relief, and all available remedies under civil fraud statutes and constitutional violations pursuant to 42 U.S.C. § 1983.

TENTH CAUSE OF ACTION

EQUITABLE RECLASSIFICATION AND PROTECTIVE RELIEF FOR PRIMARY MARITAL RESIDENCE

610.   (Pertaining to 4852 Queen Florence Lane, Woodland Hills, CA 91364)

611.   Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

612.   Plaintiff respectfully petitions this Court for equitable relief and reclassification of the property located at 4852 Queen Florence Lane, Woodland Hills, CA 91364 ("Subject Property") as community property

or marital property, and for protective orders to preserve her equitable interest pending resolution of this action.

613.   Throughout the marriage, Plaintiff and Defendant Anthony Egbase resided at this property with their children, including Plaintiff's now adult son with schizophrenia and another son with special needs. This was the only family home the children knew. Plaintiff served as full-time caregiver, homemaker, and support to Defendant's legal practice. Defendant vacated the property only after the legal separation in August 2016.

614.   The Subject Property was fraudulently refinanced and transferred on several occasions, even as litigation remained pending. After failing to make mortgage payments for over four years and using these missed payments to devalue the home at trial, Defendant Egbase made a lump-sum payoff of over $820,000 shortly after the conclusion of the 2019 trial—well before judgment had been signed—suggesting access to undisclosed funds.

615.   Plaintiff has evidence that immediately after she uncovered the fraud surrounding the bifurcation judgment, Defendant Egbase resumed leveraging the property to obtain private loans, one of which was recorded on July 30, 2024, in the amount of $400,000, by falsely

declaring the property as his secondary home. This declaration is knowingly false: Egbase continues to reside at the property, where Plaintiff has directed process servers and where neighbors confirm his continued presence. His minor daughter also attends school less than three miles away, further confirming it is his primary residence.

616.  Defendant is a licensed bankruptcy attorney and has a documented history of acquiring distressed properties from vulnerable clients, including an elderly woman, Willie Mae McKay, who filed a fraud action against Egbase. He used similar tactics to represent himself as financially distressed while actively acquiring properties with concealed funds. The property at 4852 Queen Florence Lane is now subject to the same pattern of asset manipulation.

617.  Plaintiff further asserts that Defendant's classification of the Subject Property as a "secondary residence" in loan documentation—while continuing to occupy it as his primary home—was intentionally misleading and poses a threat to Plaintiff's ability to reclaim or equitably divide the asset. If the property is foreclosed or refinanced again under false pretenses, Plaintiff's legal interest and potential recovery could be irreparably harmed.

### ELEVENTH CAUSE OF ACTION

Fraudulent Conveyance, Nominee Ownership, and Concealment of
Community Property Interest

(Against Anthony Egbase and Victoria Egbase)

618.   Plaintiff re-alleges and incorporates by reference all preceding
paragraphs of this Complaint as though fully set forth herein.

619.   This cause of action relates to the real property located at 800 W. 1st
Street, Unit #1308, Los Angeles, California 90012 (APN: 5151-027-087),
which was acquired during the marriage and is presumed to be
community property under California Family Code § 760.

620.   On or about December 14, 2006, while the parties were married, the
subject property was purchased and vested in the name of Defendant
Anthony Egbase's sister, Victoria Egbase.  At no time during the
marriage did Defendant inform Plaintiff that the property belonged to
Victoria Egbase. Instead, Defendant Anthony Egbase exercised all
incidents of ownership, including rent collection, mortgage payments,
and financial management.

621.   In 2008, during pending dissolution proceedings, Defendant Anthony
Egbase filed a declaration with the court stating that 800 W. 1st Street
was community property but had no equity due to being underwater.
After the parties reconciled, Anthony Egbase allegedly executed a

fraudulent Quitclaim Deed dated January 15, 2007, purporting to transfer the property to Victoria Egbase. However, the document was not recorded until December 16, 2009.

622.    Plaintiff alleges that this Quitclaim Deed was backdated and fraudulent, executed without Victoria Egbase's presence or consent. At the time, Victoria Egbase was residing in Nigeria, and the signature on the document is consistent with Anthony Egbase's handwriting. Plaintiff contends the deed was created solely to fabricate a defense of separate ownership during litigation.

623.    Additionally, in August 2010, a loan modification agreement was executed for the property under Victoria Egbase's name. The notary acknowledgment, signed by J. Midollo—a close associate of Anthony Egbase—stated Victoria was present in Los Angeles. In truth, Victoria was abroad, and the signature on the agreement appears to be that of Anthony Egbase forging his sister's name. This amounts to perjury and fraud upon the lender and court.

624.    The Quitclaim Deed includes a handwritten note stating, "this is a bonafide gift and the grantor received nothing in return," which further supports Plaintiff's contention that the transaction was a sham conveyance lacking valid consideration.

236

625.    Anthony Egbase has repeatedly used Victoria Egbase's identity in financial and legal matters, including creating a DBA ("Doing Business As") for Superior Attorney Services and conducting banking transactions through accounts at 121 S. Hope Street and 350 S. Figueroa Street registered under her name.

626.    Corporate filings show that Palmer Medical Supply was registered in 2006 listing Victoria Egbase as a Director, despite her employment in Nigeria, further proving her identity was being used by Anthony Egbase to hide assets.

627.    Victoria Egbase's employment status, foreign domicile, and lack of qualifying U.S. income render her legally incapable of acquiring real estate or lines of credit in the United States. Despite this, Egbase used her name to funnel community funds and shelter assets from division.

628.    Plaintiff requested her attorney, David Ingram, to join Victoria Egbase to the dissolution proceedings and subpoena deeds and ownership records. Ingram refused and failed to conduct discovery or submit any title documentation at trial, thereby suppressing critical evidence and violating Plaintiff's rights.

629.    On October 21, 2019, the trial court erroneously ruled that 800 W. 1st Street was a separate property gift, based on false representations and

237

missing deeds. Plaintiff moved to represent herself on November 13, 2019, due to her attorney's misconduct, but her request was denied, depriving her of due process.

630.   The entire pattern of nominee ownership, fraudulent conveyances, forged deeds, and use of Victoria Egbase as a straw owner was orchestrated to deprive Plaintiff of her community interest in violation of California Family Code §§ 760, 721, and Civil Code § 3439 et seq. (Uniform Fraudulent Transfer Act).

631.    Anthony Egbase's conduct constitutes fraud upon the court, breach of fiduciary duty, concealment, and intentional interference with the equitable distribution of community property.

TWELFTH CAUSE OF ACTION
FRAUDULENT CONCEALMENT OF COMMUNITY PROPERTY
INTEREST: 121 S. HOPE STREET

632.   (Against Defendant Anthony Egbase)

633.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

634.   This cause of action relates to the real property located at 121 S. Hope Street, Unit 503, Los Angeles, California 90012 (APN: 5151-002-139), which Plaintiff alleges was acquired, held, and maintained with

community funds during the marriage between Plaintiff and Defendant Anthony Egbase.

635.    On or about October 22, 1996, the property was originally acquired in the name of Gerald Egbase, Defendant's brother, for $137,500. However, Plaintiff alleges that Gerald Egbase served merely as a nominee or titleholder, and that Anthony Egbase was the true beneficial owner of the property from the outset.

636.    On July 30, 2004, Gerald Egbase executed a Grant Deed purporting to transfer the property to Defendant Anthony Egbase as an 'unmarried man', even though Defendant was at that time legally married to Plaintiff. This deed was recorded on September 1, 2004 (Instrument No. 04-2249565).

637.    The representation that Anthony Egbase was an 'unmarried man' at the time of the transfer was knowingly false and constituted an intentional effort to avoid the classification of the property as community property under California Family Code § 760.

638.    During the marriage, community funds were used to pay all mortgage payments, taxes, insurance, and costs related to the property. Furthermore, a refinance was executed during the marriage, wherein Anthony Egbase again falsely declared himself to be unmarried, and

239

failed to obtain Plaintiff's consent or disclose the community character of the property.

639.    While the 121 S. Hope Street property was disclosed during divorce proceedings, the court improperly characterized it as a gift, due to the fact that the true deeds and full payment history were never submitted. This omission was facilitated by Defendant Egbase's accountant, who failed to produce discovery showing the use of community funds. Moreover, Gerald Egbase was never joined to the family law case nor required to disclose how he afforded the down payment while earning approximately $10/hour working for his brother. The result was a flawed and unjust analysis that excluded Plaintiff's rightful interest.

640.    Also, during the trial, Plaintiff's attorney, David Ingram, refused Plaintiff's repeated requests to join Gerald Egbase to the case and failed to produce the relevant deeds or request discovery or deposition concerning the property. Plaintiff further alleges that Attorney Ingram actively suppressed crucial evidence from the court, thereby undermining Plaintiff's claim. Notably, David Ingram had previously represented Sheila Harry in a legal dispute against Gerald Egbase, establishing a prior conflict of interest that further compromised Plaintiff's right to fair representation and due process.

240

641.   Plaintiff further alleges that the misrepresentation and concealment of

the 121 S. Hope Street property constituted a fraud upon the court,

violating her rights under due process, and Family Code §§ 721 and

1100(e), which impose a fiduciary duty of full disclosure between

spouses.

642.   These actions have caused Plaintiff severe financial and emotional

distress and have unjustly enriched Defendant at the expense of Plaintiff

and her dependent children.

### THIRTEEN CAUSE OF ACTION

Post-Judgment Fraudulent Transfers, Asset Dissipation, and Anticipatory
Concealment of Community Property
(Against Anthony Egbase)

643.   Plaintiff re-alleges and incorporates by reference all prior paragraphs

of this Complaint.

644.   In or around December 2022, Plaintiff discovered that the Judgment

entered on August 3, 2017, which included the fraudulent bifurcation and

dissolution decree, and the subsequent Judgment entered on February 26,

2020, were procured through fraud upon the court.

645.   Plaintiff filed a motion to vacate these Judgments on June 2, 2023,

pursuant to Family Code §2122, on grounds of fraud. That motion was

denied on August 8, 2023, by Judge Firdaus Dordi. During that hearing,

Plaintiff notified the court of her intent to obtain the transcript for

appellate review and further stated on the record that she understood her

rights to pursue further legal recourse based on fraud upon the court,

even if the motion was denied.

646.   Shortly after this, Defendant Anthony Egbase, aware that Plaintiff had

discovered the fraud and intended to seek redress in federal court,

**engaged in a series of suspicious property transactions and financial**

**maneuvers designed to conceal and devalue community property**

**assets**.

647.   On or around July 2023, Anthony Egbase secured a private mortgage

loan through Ira and Edye Friedman, recorded on July 30, 2024, using

the property at 4852 Queen Florence Lane, a known community asset, as

collateral.

648.   Around the same time, Anthony Egbase also completed a quitclaim

deed and secured another private mortgage on the property at 3199 Bel

Air Drive, Las Vegas, Nevada, with the **same lenders—Ira and Edye**

**Friedman, for $1.439 million—as shown in the Nevada Recorder's**

**filing.**

649.   The simultaneous use of the same private lender, coupled with the

recorded Deed of Trust and Quitclaim Deed executed under SPE

Memorial Family Trust, LLC, of which Anthony Egbase is the managing

member, strongly suggests that these properties were leveraged post-

judgment to strip equity, obscure ownership, and prevent Plaintiff from

recovering any value in the event of a favorable ruling.

650.    These actions reflect a clear pattern of anticipatory fraudulent

conveyance, indicating that Defendant Egbase—**who is a bankruptcy**

**attorney with knowledge of asset protection schemes**—took deliberate

steps to avoid potential court-imposed restitution or equitable property

division by encumbering community properties post-judgment.

651.    The use of **SPE Memorial Family Trust,** registered in Nevada, and

the timing of the conveyances and loan instruments, further support

Plaintiff's claims of an ongoing **RICO-patterned enterprise** to commit

fraud, suppress discovery, conceal community assets, and defraud both

the court and Plaintiff.

652.    Plaintiff requests this Court recognize the conveyances and loan

instruments as fraudulent transfers made with the intent to hinder, delay,

or defraud the Plaintiff and the judicial process in violation of the

**Uniform Voidable Transactions Act (UVTA), Family Code §§721,**

**1101, 2100 et seq., and 18 U.S.C. § 1961 et seq. (RICO).**

## FOURTEENTH CAUSE OF ACTION

### FRAUDULENT POST-JUDGMENT ACQUISITION OF 10909 BALANTRE LANE USING HIDDEN COMMUNITY FUNDS (Against Defendant Anthony Egbase)

653.   Plaintiff re-alleges and incorporates by reference all preceding

paragraphs of this Complaint as though fully set forth herein.

654.   This cause of action relates to the real property located at 10909

Balantre Lane, Potomac, Maryland 20854. Plaintiff alleges that this

property was fraudulently acquired by Defendant Anthony Egbase using

concealed community assets immediately following the entry of

judgment in the divorce proceeding.

655.   On or about July 16, 2021, the property was purchased for

$1,499,000, shortly after the denial of Plaintiff's appeal and dismissal of

her new trial motion. The timing raises strong inference of a coordinated

scheme to launder or conceal marital assets under the guise of separate

property.

656.   The transaction was completed through a nominee entity, SPE

Memorial Family Trust LLC, mirroring prior transfers made by

Defendant Egbase for the purpose of shielding assets. The Maryland

SDAT record lists the property as deeded from West Management LLC

to SPE Memorial Family Trust LLC.

657.   At the time of this acquisition, Egbase had just completed multiple large loan payoffs totaling over $820,000, including for the Queen Florence Lane property. These payments were made using income and funds never disclosed during trial, violating California Family Code §§ 721 and 1100(e).

658.   Plaintiff believes this home, like the Las Vegas property at 3199 Bel Air Drive, was purchased with diverted community income and proceeds from concealed business earnings. The title transfer and financing were arranged to deliberately exclude Plaintiff and deprive her of marital property rights.

659.   This action was part of a broader pattern of concealment, as Defendant Egbase had previously placed three other properties into foreclosure during litigation (121 S. Hope Street, 4852 Queen Florence Lane, and 800 W. 1st Street), suggesting manipulation of financial hardship claims during trial.

660.   These actions constitute a violation of fiduciary duty, fraudulent conveyance, and ongoing concealment under California Civil Code § 3439 et seq. and Family Code § 721.

661.   Plaintiff hereby asserts a lis pendens claim against the Maryland property to preserve her equitable interest and prevent any further fraudulent transfers pending resolution of this civil action.

FIFTEENTH CAUSE OF ACTION
Fraudulent Concealment of Community Property Interest - Nigerian Government Contracts and Asset Recovery Proceeds (Against Defendant Anthony O. Egbase)

662.   Plaintiff Ejeme Joyce Aire ("Plaintiff") realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

663.    At all times relevant, Plaintiff and Defendant Anthony O. Egbase ("Defendant") were lawfully married and owed each other the highest fiduciary duties of good faith, loyalty, full disclosure, and fair dealing pursuant to California Family Code ¬§¬§ 721, 1100, and related laws.

664.   During the marriage, between approximately 2014 and 2016, Plaintiff and Defendant jointly supported efforts to secure lucrative legal contracts with the Federal Government of Nigeria. Plaintiff provided direct support through public relations, organizing and participating in events, attending meetings, and maintaining the family household while Defendant traveled extensively to Nigeria (approximately 90% of the time between 2014-2016) to cultivate and finalize these engagements.

665.   In March 2016, while still married to Plaintiff, Defendant, through his

law firms A.O.E. Law & Associates and Anthony O. Egbase &

Associates, was officially retained by the Federal Government of Nigeria

to assist in recovering looted assets in the United States and United

Kingdom, including the Abacha Loot Recovery, the James Ibori Asset

Recovery, and the Alamieyeseigha Asset Recovery, among others.

666.   Defendant was engaged on contingency fee arrangements, wherein

attorneys typically receive 30-40% of any recovered sums. In the Abacha

Loot case alone, the recoverable amount exceeded $550 million. Public

records confirm the Nigerian government retained foreign counsel on

contingency terms in these matters.

667.   In addition to asset recovery, Defendant represented over 27 Nigerian

officials in the Indigenous People of Biafra (IPOB) lawsuit in the United

States District Court for the District of Columbia, successfully obtaining

dismissal of claims valued at hundreds of millions of dollars.

668.   Based on extensive documentation, circumstantial evidence, public

reports, and Defendant's own admissions, Plaintiff alleges that Defendant

received payments and contingency fees exceeding One **Hundred**

**Million Dollars ($100,000,000)** during the marriage or as a direct result

of work secured during the intact marriage.

247

669.    Despite these substantial financial gains, Defendant failed and refused to disclose the existence of these contracts, contingent interests, and proceeds during divorce proceedings. Defendant intentionally concealed these assets, in violation of his fiduciary duties.

670.    Defendant further **fabricated an earlier date of separation (February 22, 2015)** to mischaracterize community property assets as his separate property, despite substantial evidence, including joint public appearances, tax filings, hotel stays, and direct communications, proving that the marital community continued until at least August 1, 2016.

671.    Defendant's concealment of the Nigerian contract proceeds directly **deprived Plaintiff of her rightful 50% community property interest in these assets**. Plaintiff reasonably relied on Defendant's fiduciary duties and was harmed thereby.

672.    Defendant's fraudulent concealment constitutes extrinsic fraud upon Plaintiff and upon the Court, warranting the setting aside of all relevant judgments and the imposition of equitable remedies, including but not limited to restitution, disgorgement, and the establishment of constructive trusts.

673.    As a direct and proximate result of Defendant's fraudulent concealment and breach of fiduciary duty, **Plaintiff has suffered**

248

**damages exceeding Fifty Million Dollars ($50,000,000)**, **representing her rightful 50% interest in the Nigerian contract proceeds**, in addition to other consequential and punitive damages.

674.  Defendant's conduct was fraudulent, malicious, and oppressive, justifying an award of punitive damages pursuant to California Civil Code ¬§ 3294.

## VI.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff EJEME JOYCE AIRE respectfully requests that this Honorable Court enter judgment in her favor and against all Defendants, jointly and severally, and grant the following relief:

1.  Declaratory Relief:
    - A declaration that Plaintiff's constitutional rights under the Due

Process and Equal Protection Clauses of the Fourteenth Amendment, and her

right of access to the courts, were violated by Defendants through acts

including but not limited to judicial fraud, falsified court documents,

suppression of evidence, and obstruction of justice.

2.  Void Prior Judgments:

    - Enter a judgment voiding the divorce judgment filed in 2017 and

voiding the Judgments filed on November 13, 2019, December 6, 2019, and

February 26, 2020, and declaring all of them as having no effect.

3.  Equitable and Injunctive Relief:

- Voiding and setting aside all judgments, orders, and decrees

obtained through fraud upon the court, including the bifurcation judgment,

unlawful property transfers, and denial of adult child support, pursuant to

Federal Rule of Civil Procedure 60(d)(3);

- Enjoining Defendants from enforcing any such fraudulent orders;

- Enjoining further retaliation or obstruction of Plaintiff's access to

court, housing, and medical care.

4. Restitution and Property Recovery:

- Immediate return of the family residence at 4852 Queen Florence

Lane, Woodland Hills, CA;

- Establishment of a constructive trust over all community assets

fraudulently concealed or diverted by Defendant Egbase, including those

acquired post-judgment;

- Full accounting and restitution of Plaintiff's rightful share of

community property;

- Order Defendant Egbase to provide a full financial accounting of

all income, payments, contracts, or real estate acquired through the Nigerian

government, political partnerships, or Nigerian corporations during the

marriage using community funds, and to disgorge all such proceeds under a

constructive trust in favor of Plaintiff;

- Adjudication recognizing all hidden assets, including Nigerian government contract proceeds,  real estate, mortgage payoffs, and related properties, as community property;

- Award to Plaintiff of her 50% community property share of all proceeds, assets, and income related to Egbase's international legal contracts, estimated to be no less than $50 million;

- Disgorgement of all hidden profits and proceeds received through Nigerian government contracts, including post-separation proceeds traceable to marital efforts;

- Imposition of a constructive trust over all funds, properties, and assets derived from these contracts;

- Punitive damages for willful concealment, fraud, and malice relating to the Nigerian contract proceeds.

5.  Special Needs Relief:

- Creation of a Special Needs Trust for Plaintiff's adult son with schizophrenia, under Plaintiff's control, funded monthly by Defendant Egbase, pursuant to California Family Code § 3910 and   supported by In re Marriage of Drake (1997);

- Immediate interim support for the adult son's housing, education, and healthcare.

6.  Spousal Support and Financial Redress:

    - Reinstatement and retroactive evaluation of unpaid spousal support based on Defendant Egbase's concealed income and false financial disclosures;

    - Order for Defendant Egbase to pay all outstanding mortgage, tax, and upkeep obligations on community properties pending full adjudication.

7.  Damages:

    - Compensatory damages for financial harm, homelessness, emotional distress, coerced debt, litigation costs, and damage to reputation and livelihood;

    - Punitive damages under California Family Code § 1101(h) and 42 U.S.C. § 1983 for willful, malicious, and fraudulent conduct, including breach of fiduciary duty, document forgery, perjury, and abuse of authority.

8.  Production of Court Records:

    - Immediate production of stenographic notes and corrected transcripts from court reporter Linda Comstock for hearings on September 25, 2019, and November 13, 2019, to support Plaintiff's fraud claims and motion under Rule 60(d)(3).

9.  Attorney's Fees and Litigation Costs:

- Reasonable attorney's fees pursuant to 42 U.S.C. § 1988 and California Family Code § 2030 et seq.;

- Full reimbursement of costs for transcripts, court filings, expert evaluations, and related   litigation expenses, rents, and all court-related fees.

10. Additional Punitive Damages:

- Award punitive damages against Defendants Egbase, Ingram, Bets, Comstock, and J. Blanco.

11. Injunctive Relief:

- Enjoining Defendant Egbase from enforcing any judgment, decree, or order declared void in this proceeding;

- Enjoining Defendant Egbase from retaliating against Plaintiff for pursuing her civil rights;

- Enjoining Defendant Egbase from obstructing Plaintiff's access to housing, medical care, or the judicial process.

12. Any Other Relief:

- Grant such further and additional relief as the Court may deem just, equitable, and appropriate  in the interests of justice and to prevent further irreparable harm to Plaintiff and her children.

JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of facts and

damages stated herein.


VII.

EXHIBITS

Attached to this Complaint are three key exhibits submitted in support

of the allegations herein,

Plaintiff respectfully submits the following exhibits as part of her Complaint

to substantiate allegations of **fraud upon the court,** fabrication of judicial

documents, and violation of due process rights in the underlying dissolution

proceedings:


Plaintiff submits these exhibits to demonstrate the systemic fraud,

misconduct by opposing counsel and her own former attorney, and collusion

among court officers that deprived her of fundamental due process rights.

These fraudulent documents **underpin the entire unlawful judgment**

**entered against her and form a critical part of her claims for relief**

**under 42 U.S.C. § 1983 and related causes of action**.

# DECLARATION

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

DATED: April 29, 2025

_____

EJEME JOYCE AIRE,

PLAINTIFF PRO SE

Plaintiff Aire requests a jury

DATED: April 28, 2025,

255

**EXHIBITS IN SUPPORT OF COMPLAINT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

Fraudulent "Original" FL-180 Judgment (Filed August 3, 2017)



This document purports to be an official judgment of dissolution of marriage, allegedly signed by Commissioner Alicia Blanco on August 3, 2017. However, court records confirm that Commissioner Blanco was not stipulated into the case until August 24, 2017, making it impossible for her to have legally executed any judgment on August 3, 2017. The document is internally inconsistent and fraudulent.

Plaintiff asserts that this judgment was fabricated to create the illusion of a legally divorce decree when, in fact, no lawful bifurcation hearing or ruling ever occurred.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT
# B

Fraudulent Conformed Copy Submitted as Trial Exhibit (2019)

FL-180

CASE NAME (Last name, first name of each party): Marriage of Egbase/Aire

CASE NUMBER: LD 051587

i. [ ] The children of this marriage or domestic partnership are:
(1) [ ] Name Birthdate

(2) [ ] Parentage is established for children of this relationship born prior to the marriage or domestic partnership

j. [ ] Child custody and visitation (parenting time) are ordered as set forth in the attached
(1) [ ] Settlement agreement, stipulation for judgment, or other written agreement which contains the information required by Family Code section 3048(a).
(2) [ ] *Child Custody and Visitation Order Attachment* (form FL-341).
(3) [ ] *Stipulation and Order for Custody and/or Visitation of Children* (form FL-355).
(4) [ ] Previously established in another case. Case number: Court:

k. [ ] Child support is ordered as set forth in the attached
(1) [ ] Settlement agreement, stipulation for judgment, or other written agreement which contains the declarations required by Family Code section 4065(a).
(2) [ ] *Child Support Information and Order Attachment* (form FL-342).
(3) [ ] *Stipulation to Establish or Modify Child Support and Order* (form FL-350).
(4) [ ] Previously established in another case. Case number: Court:

l. [ ] Spousal, domestic partner, or family support is ordered:
(1) [ ] Reserved for future determination as relates to [ ] petitioner [ ] respondent
(2) [ ] Jurisdiction terminated to order spousal or partner support to [ ] petitioner [ ] respondent
(3) [ ] As set forth in the attached *Spousal, Partner, or Family Support Order Attachment* (form FL-343).
(4) [ ] As set forth in the attached settlement agreement, stipulation for judgment, or other written agreement.
(5) [ ] Other *(specify)*:

m. [ ] Property division is ordered as set forth in the attached
(1) [ ] Settlement agreement, stipulation for judgment, or other written agreement.
(2) [ ] *Property Order Attachment to Judgment* (form FL-345).
(3) [ ] Other *(specify)*:

n. [ ] Attorney fees and costs are ordered as set forth in the attached
(1) [ ] Settlement agreement, stipulation for judgment, or other written agreement.
(2) [ ] *Attorney Fees and Costs Order* (form FL-346).
(3) [ ] Other *(specify)*:

o. [X] Other *(specify)*: Bifurcation Status Only

Each attachment to this judgment is incorporated into this judgment, and the parties are ordered to comply with each attachment's provisions. Jurisdiction is reserved to make other orders necessary to carry out this judgment.

Date: 8-3-17

ALICIA Y. BLANCO
JUDICIAL OFFICER

5. Number of pages attached: 4

[ ] SIGNATURE FOLLOWS LAST ATTACHMENT

**NOTICE**

Dissolution or legal separation may automatically cancel the rights of a spouse or domestic partner under the other spouse's or domestic partner's will, trust, retirement plan, power of attorney, pay-on-death bank account, transfer-on-death vehicle registration, survivorship rights to any property owned in joint tenancy, and any other similar property interest. It does not automatically cancel the rights of a spouse or domestic partner as beneficiary of the other spouse's or domestic partner's life insurance policy. You should review these matters, as well as any credit cards, other credit accounts, insurance policies, retirement plans, and credit reports, to determine whether they should be changed or whether you should take any other actions.

A debt or obligation may be assigned to one party as part of the dissolution of property and debts, but if that party does not pay the debt or obligation, the creditor may be able to collect from the other party.

An earnings assignment may be issued without additional proof if child, family, partner, or spousal support is ordered.

Any party required to pay support must pay interest on overdue amounts at the "legal rate," which is currently 10 percent.

FL-180 [Rev. July 1, 2012] **JUDGMENT** (Family Law) 000008 Page 2 of 2

This "conformed" copy of the FL-180 Judgment was submitted by Defendant Anthony Egbase as an exhibit during the 2019 trial. Plaintiff's then-attorney, David Ingram, failed to object to its submission despite clear irregularities and Plaintiff's lack of consent.

The conformed copy was materially altered and perpetuated the fraudulent narrative that a valid divorce had occurred, severely prejudicing Plaintiff's rights during the trial. Plaintiff asserts that both the original and conformed versions were used to deceive the court and deny Plaintiff a fair proceeding.